IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | |
| ) | |
| EDWARD SNOWDEN ) | |
| *exact address unknown*, ) | **COMPLAINT** |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| MACMILLAN PUBLISHERS INC., ) | |
| 175 5th Avenue ) | |
| New York, NY 10010, ) | |
| ) | |
| MACMILLAN PUBLISHING GROUP, LLC ) | |
| d/b/a HENRY HOLT AND COMPANY, ) | |
| 175 5th Avenue ) | |
| New York, NY 10010, ) | |
| ) | |
| HOLTZBRINCK PUBLISHERS, LLC c/o ) | |
| HOLTZBRINCK PUBLISHING HOLDINGS LP, ) | |
| 175 5th Avenue ) | |
| New York, NY 10010, ) | |
| ) | |
| Relief-Defendants. ) | |

**INTRODUCTION**

1.     The United States of America brings this civil action for breach of contract and fiduciary obligations against Defendant Edward Snowden, a United States citizen who formerly worked as a contractor and staff employee for the Central Intelligence Agency (CIA) and was employed as a contract employee by the National Security Agency (NSA), and who published a book without submitting the manuscript for prepublication review and has given speeches without

submitting the necessary materials for prepublication review, in violation of his secrecy agreements and non-disclosure obligations to the United States.  As relief-defendants only, the United States also names Macmillan Publishers Inc.; Macmillan Publishing Group, LLC d/b/a Henry Holt and Company; and Holtzbrinck Publishers, LLC.  No independent claims are asserted herein against the relief-defendants; rather, they are named as necessary parties for purposes of according the United States complete relief in this lawsuit.  Through this suit, the United States is not seeking to enjoin or restrain publication or distribution of Snowden's book.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345.

3.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).  With respect to § 1391(b)(1), all three relief-defendants are considered residents of Virginia pursuant to § 1391(c)(2), and Snowden does not reside in the United States, *see* § 1391(c)(3).  With respect to § 1391(b)(2), the Eastern District of Virginia is the judicial district in which the CIA and the Department of Defense are headquartered; in which the CIA performs prepublication reviews; in which Snowden signed several of his secrecy agreements and exit forms; and in which Booz Allen Hamilton, one of the companies that employed Snowden while he served as a contractor for NSA, is headquartered.

## PARTIES

4.     Plaintiff is the United States of America (hereafter "United States" or "Government").

5.     Defendant Edward Snowden is a United States citizen who, upon information and belief, currently resides abroad in or near Moscow, Russia.  Snowden is a former contractor and employee of the CIA, an agency of the United States, which has its headquarters in Langley,

Virginia.  Snowden is also a former contractor for the NSA, an agency of the United States, which has its headquarters in Fort Meade, Maryland.  The NSA is an agency within the Department of Defense, and the Department of Defense has its headquarters at the Pentagon, located in Arlington, Virginia.  Currently, Snowden serves as President of the Board of Directors for the Freedom of the Press Foundation, which has its headquarters in San Francisco, California.

6.     Relief-Defendant Macmillan Publishers Inc. is a company registered in New York and transacting business in Virginia, with its principal place of business in the United States located at 175 5th Avenue, New York, NY.

7.     Relief-Defendant Macmillan Publishing Group, LLC d/b/a Henry Holt and Company is a company registered and transacting business in Virginia, with its principal place of business in the United States located at 175 5th Avenue, New York, NY.  Upon information and belief, Macmillan Publishing Group, LLC d/b/a Henry Holt and Company is a wholly owned subsidiary of Macmillan Publishers Inc.

8.     Relief-Defendant Holtzbrinck Publishers, LLC is a company registered and transacting business in Virginia, with its principal place of business in the United States located at 175 5th Avenue, New York, NY.  Upon information and belief, Macmillan Publishers Inc. is a wholly owned subsidiary of Holtzbrinck Publishers, LLC.

9.     The three relief-defendants named herein are named as nominal defendants only, for purposes of according complete relief among the existing parties.  *See* Fed. R. Civ. P. 19(a)(1)(A).  The United States asserts no independent claims herein against any of the relief-defendants.  As used in this Complaint, the term "Macmillan" includes and applies, both individually and collectively, to any and all of the three relief-defendants named herein—*i.e.*,

Macmillan Publishers Inc.; Macmillan Publishing Group, LLC d/b/a Henry Holt and Company; and/or Holtzbrinck Publishers, LLC.

## FACTUAL ALLEGATIONS

### The CIA's and NSA's Responsibilities With Respect to National Security

10.     The Central Intelligence Agency was established by section 104(a) of the National Security Act of 1947 (the "Act"), as amended, 50 U.S.C. § 3035.  Pursuant to section 104(b) of the Act, 50 U.S.C. § 3035(b), the function of the CIA is to assist the Director of the CIA in carrying out her responsibilities.  The Director's responsibilities include, among other things, "collect[ing] intelligence through human sources and by other appropriate means."  50 U.S.C. § 3036(d)(1).

11.     Under the direction of the Director of National Intelligence, pursuant to section 102A(i) of the Act, as amended, 50 U.S.C. § 3024(i), and in accordance with section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507, and sections 1.3(b)(8) and 1.6(d) of Executive Order 12333, as amended, the Director of the CIA is also responsible for protecting CIA intelligence sources and methods from unauthorized disclosure.

12.     Personnel employed by or affiliated with the CIA, before beginning their official duties, as a condition of their contractual relationship or staff employment with the CIA and as a condition of being granted access to classified information, are required to execute a secrecy agreement.  This requirement is in furtherance of the Director of the CIA's responsibility to protect intelligence sources and methods from unauthorized disclosure.

13.     The National Security Agency operates within the Department of Defense and is part of the Intelligence Community.  Pursuant to section 105(b)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3038(b)(1), the Secretary of Defense, under the direction of the Director of National Intelligence, shall ensure "through the National Security Agency . . . the

continued operation of an effective unified organization for the conduct of signals intelligence activities."

14.     Pursuant to sections 1.4(f) and 1.7(c)(7) of Executive Order 12333, as amended, the NSA's responsibilities include protecting the security of its activities and information by appropriate means, and prescribing security regulations covering its operating practices.

15.     Personnel assigned to perform work on contracts which require access to classified information with the NSA, before beginning their official duties, as a condition of their assignment to contracted employment with the NSA and as a condition of being granted access to classified information, are required to execute a secrecy agreement.  This requirement is in furtherance of the NSA's responsibility to protect the security of its activities, information, and practices.

**Snowden's Employment and Secrecy Agreements With CIA**

16.     Snowden was employed by the CIA from August 2006 until 2009, and prior to this he worked for CIA as a contractor from 2005 to 2006.  For ease of reference, these are collectively referred to herein as his CIA employment.

17.     Snowden signed materially identical secrecy agreements with the CIA on November 22, 2005; August 28, 2006; and April 16, 2009.  True and correct redacted copies of these secrecy agreements are attached as Exhibit A to the Complaint (hereafter "CIA Secrecy Agreements").

18.     Each of these CIA Secrecy Agreements was signed by Snowden at a CIA facility located within the Eastern District of Virginia.  During the course of his employment with CIA, Snowden's salary and benefits were processed through CIA facilities located in the Eastern District of Virginia.  Pursuant to Snowden's CIA employment, he was frequently present in the Eastern District of Virginia, including for training, processing, and other work-related activities.

19.     Snowden voluntarily, willingly, and knowingly entered into these CIA Secrecy Agreements.  These CIA Secrecy Agreements were executed as a condition of his employment with the CIA and as a condition of him being granted access to classified information and other information which, if disclosed in an unauthorized manner, would jeopardize intelligence activities of the United States Government.

20.     By signing the CIA Secrecy Agreements, Snowden expressly acknowledged that he understood and accepted that the United States Government was placing special confidence and trust in him by granting him access to classified information.  *See* CIA Secrecy Agreements ¶ 2.

21.     As a condition of employment, and under the terms of the CIA Secrecy Agreements, Snowden was required never to disclose in any form or manner, to any person not authorized by the CIA to receive it, any information obtained in the course of his employment or other service with CIA and that is classified or in the process of a classification determination.  *See* CIA Secrecy Agreements ¶ 3.

22.     As a condition of employment, and under the terms of the CIA Secrecy Agreements, Snowden was required to submit to the CIA for its review any writing or other preparation in any form, including a work of fiction, that Snowden contemplates disclosing publicly or has prepared for public disclosure, that "contains any mention of intelligence data or activities" or "contains any other information or material that might be based on" information obtained during the course of his CIA employment that is classified or in the process of a classification determination.  *See* CIA Secrecy Agreements ¶ 5.  This prepublication obligation applies both during his employment or other service with CIA and at any time thereafter.  *See id.*

23.     Snowden was required to submit his material for prepublication review "prior to discussing [the work] with or showing it to anyone who is not authorized to have access to"

classified information.  CIA Secrecy Agreements ¶ 5.  Snowden was also required not to "take any steps towards public disclosure until [he] received written permission to do so from the Central Intelligence Agency." *Id.*

24.     As Snowden acknowledged in the CIA Secrecy Agreements, the purpose of this prepublication review "is to give the Central Intelligence Agency an opportunity to determine whether the information or material that I contemplate disclosing publicly contains any information or material that I have agreed not to disclose."  CIA Secrecy Agreements ¶ 6.

25.     Snowden acknowledged and agreed in the CIA Secrecy Agreements that the obligations undertaken by him in executing the CIA Secrecy Agreements would remain valid and binding upon him after the termination of his employment with the CIA, unless he obtained a written release from the CIA.  *See* CIA Secrecy Agreements ¶ 13.

26.     Snowden also agreed in the CIA Secrecy Agreements that all classified information acquired by him during the course of his employment was the property of the United States Government, *see* CIA Secrecy Agreements ¶ 7; that there were established procedures for reporting any concerns about unlawful or improper intelligence activities, *id.* ¶ 9; and that if he violated any of the terms of the CIA Secrecy Agreements, the Government could institute a civil proceeding seeking compensatory damages or other appropriate relief, *id.* ¶ 10.

27.     Snowden specifically agreed that, "[i]n addition to any other remedy to which the United States Government may become entitled, I hereby assign to the United States Government all rights, title, and interest in any and all royalties, remunerations and emoluments that have resulted or will result or may result from any divulgence, publication or revelation of information or material by me that is carried out in breach of [the prepublication obligation in] paragraph 5 of

this agreement or that involves information or material prohibited from disclosure by the terms of this agreement."  CIA Secrecy Agreements ¶ 12.

28.    Snowden signed additional nondisclosure agreements during his employment with the CIA.

29.    Upon separating from the CIA, Snowden signed a Security Exit Form certifying that he understands that his CIA Secrecy Agreements' obligations continue to apply to him.  A true and correct redacted copy of the Security Exit Form is attached hereto as Exhibit B.  Snowden signed this Security Exit Form at a CIA facility located in the Eastern District of Virginia.

30.    At no time has Snowden received a release from the terms and conditions of his CIA Secrecy Agreements.

31.    During his employment with the CIA, Snowden was assigned to various positions of trust and was granted regular access to classified information, including information regarding intelligence sources and methods.  In assigning Snowden to such positions and granting him access to such information, the CIA relied on the expectation that Snowden would respect the rights and obligations created by the CIA Secrecy Agreements and his fiduciary duties, including the prepublication review requirement.

**Snowden's Affiliation and Secrecy Agreements with NSA**

32.    At various points in time between 2005 and 2013, Snowden served as a contractor for the NSA on contracts that required him to have access to classified information.  When Snowden served as a contractor for the NSA most recently in 2013, his employer was Booz Allen Hamilton, a company headquartered in McLean, Virginia.

33.    Snowden signed materially identical secrecy agreements with the NSA on July 7, 2005; May 6, 2009; and March 27, 2013.  True and correct redacted copies of these secrecy agreements are attached as Exhibit C to the Complaint (hereafter "NSA Secrecy Agreements").

34.     Snowden voluntarily, willingly, and knowingly entered into these NSA Secrecy Agreements.  These NSA Secrecy Agreements were executed as a condition of his employment as a contractor with the NSA and as a condition of him being granted access to classified information and other information which, if disclosed in an unauthorized manner, would jeopardize intelligence activities of the United States Government.

35.     By signing the NSA Secrecy Agreements, Snowden expressly acknowledged that he understood and accepted that the United States Government was placing special confidence and trust in him by granting him access to classified information.  *See* NSA Secrecy Agreements, pmbl.

36.     As a condition of employment, and under the terms of the NSA Secrecy Agreements, Snowden was required never to discuss matters pertaining to information obtained as a result of his relationship with NSA that is classified or in the process of a classification determination, except when necessary for the proper performance of his duties and only with persons who are currently authorized to receive such information and have a need-to-know.  *See* NSA Secrecy Agreements ¶¶ 1, 6.

37.     As a condition of employment, and under the terms of the NSA Secrecy Agreements, Snowden was required to submit to the NSA for its review "all information or materials, including works of fiction, that [he] prepared for public disclosure which contain or purport to contain, refer to, or are based upon" information obtained as a result of his relationship with NSA which is classified or in the process of a classification determination.  *See* NSA Secrecy Agreements ¶ 9.  This prepublication obligation applies both during his affiliation with the NSA and afterwards.  *See id.* ¶ 9(a).

38.     Snowden was required to submit any material for prepublication review "prior to discussing the information or materials with, or showing them to anyone who is not authorized to

have access to them." NSA Secrecy Agreements ¶ 9(b). Snowden was also required "not to disclose such information or materials to any person who is not authorized to have access to them until I have received written authorization from the NSA that such disclosure is permitted." *Id.* ¶ 9(c).

39.     As Snowden acknowledged in the NSA Secrecy Agreements, the purpose of this prepublication review "is to determine whether material contemplated for public disclosure contains protected information and if so, to give the NSA an opportunity to prevent the public disclosure of such information." NSA Secrecy Agreements ¶ 9. Snowden further acknowledged that "the burden is upon me to determine whether information or materials within my control are considered by the NSA to be protected Information and whether the person(s) to whom disclosure is to be made is/are authorized to receive it." *Id.* ¶ 2.

40.     Snowden acknowledged and agreed in the NSA Secrecy Agreements that the obligations undertaken by him in executing the NSA Secrecy Agreements would remain valid and binding upon him after the termination of his affiliation with the NSA, unless he obtained a written release from the NSA. *See* NSA Secrecy Agreements ¶ 13.

41.     Snowden also agreed in the NSA Secrecy Agreements that all classified information acquired by him during the course of his employment was the property of the United States Government, *see* NSA Secrecy Agreements ¶ 2, and that if he violated any of the terms of the NSA Secrecy Agreements the Government could institute a civil proceeding seeking compensatory damages or other appropriate relief, *id.* ¶ 8.

42.     Snowden specifically agreed "to assign to the United States Government all rights, title and interest and all royalties, remuneration, or emoluments of whatever form that have

resulted, will result, or may result from any disclosure, publication, or revelation of protected information not consistent with the terms of this agreement." NSA Secrecy Agreements ¶ 9(d).

43.     Snowden signed additional nondisclosure agreements during his affiliation with the NSA.

44.     At no time has Snowden received a release from the terms and conditions of his NSA Secrecy Agreements.

45.     During his affiliation with the NSA, Snowden was assigned to various positions of trust and was granted regular access to classified information, including information regarding NSA's signals intelligence activities and information. In assigning Snowden to such positions and granting him access to such information, the NSA relied on the expectation that Snowden would respect the rights and obligations created by the NSA Secrecy Agreements and his fiduciary duties, including the prepublication review requirement.

**The CIA's Prepublication Review Process**

46.     The CIA Secrecy Agreements' prepublication obligation is further reinforced by CIA's administrative regulations. *See* CIA Administrative Regulation 13-10, *Agency Prepublication Review of Certain Material Prepared for Public Dissemination* (hereafter "CIA Regulation"). A true and correct redacted copy of the CIA Regulation is attached hereto as Exhibit D.

47.     The CIA Regulation "sets forth CIA policies and procedures for the submission and review of material proposed for publication or public dissemination by current and former employees and contractors and other individuals obligated by the CIA secrecy agreement to protect from unauthorized disclosure certain information they obtain as a result of their contact with the CIA." CIA Regulation, pmbl. The CIA Regulation "applies to all forms of dissemination, whether

in written, oral, electronic, or other forms, and whether intended to be an official or nonofficial (that is, personal) publication." *Id.*

48.     Within the Eastern District of Virginia, CIA has established an office known as the Publications Review Board (PRB), which is responsible for reviewing and approving all proposed non-official, personal publications for both current and former CIA employees.  *See* CIA Regulation § II(B).

49.     The CIA Regulation sets forth instructions on how authors may submit material to the PRB for prepublication review and may appeal any decision by the PRB denying approval to publish.  CIA Regulation § II(C), (G).

50.     The CIA Regulation provides that, as a general rule, the PRB will complete prepublication review for non-official publications within thirty days of receipt of the material, but that lengthy or complex submissions may require a longer period of time, especially if they involve intelligence sources and methods.  CIA Regulation § II(C)(4).

51.     The CIA Regulation is explicit that all current and former CIA employees and contractors must obtain the written approval of the PRB prior to publication.  *See* CIA Regulation § II(E) (former employees and contractors); *id.* § II(F) (current employees and contractors).  The CIA Regulation also provides that, for former employees and contractors, the PRB will review material proposed for publication solely to determine whether it contains classified information, and that permission to publish will not be denied solely because the material may be embarrassing to or critical of the Agency.  *Id.* § II(E)(2).

52.     The CIA Regulation also makes clear that the prepublication review requirement applies to all forms of disclosures, including oral disclosures.  When former employees and contractors "mak[e] intelligence-related speeches, media interviews, or testimony, they must

submit all notes, outlines, or any tangible preparatory material to the PRB for review.  Where no written material has been prepared specifically in contemplation of the speech, interview, or oral testimony, the individual must contact the PRB Chair or his representative to provide a summary of any and all topics that it is reasonable to assume may be discussed, and points that will or may be made."  CIA Regulation § II(D)(3)(a).

**The NSA's Prepublication Review Process**

53.     The NSA Secrecy Agreements' prepublication obligation is further reinforced by Department of Defense (DoD) and NSA administrative regulations.  As a DoD agency, NSA and its affiliates are subject to Department of Defense Instruction 5230.09, *Clearance of DoD Information for Public Release* (Jan. 25, 2019) (hereafter "DoDI 5230.09").  A true and correct copy of DoDI 5230.09 is attached hereto as Exhibit E.

54.     Pursuant to DoDI 5230.09, prepublication review is required for "[a]ny official DoD information intended for public release that pertains to military matters, national security issues, or subjects of significant concern to the DoD."  DoDI 5230.09, § 1.2(b).

55.     In order to implement the requirements of DoDI 5230.09 with respect to NSA employees and contractors, NSA has issued NSA/CSS Policy 1-30, *Review of NSA/CSS Information Intended for Public Release* (May 12, 2017) (hereafter "NSA Regulation").  A true and correct copy of the NSA Regulation is attached hereto as Exhibit F.

56.     The NSA Regulation similarly sets forth the processes by which the appropriate Prepublication Review Authority reviews submissions.  The NSA Regulation provides instructions on how authors should submit materials for review, *see* NSA Regulation § 6(b)(4), as well as how authors may appeal adverse prepublication review determinations, *id.* § 7.  The NSA Regulation also provides that the Prepublication Review Authority "shall, as practicable, issue the determination to the affiliate within 25 business days of receipt."  *Id.* § 6(b)(7).

57.     The NSA Regulation underscores that, with respect to former employees and contractors, "prepublication review is required" where "the material contains official NSA/CSS information that may or may not be UNCLASSIFIED and approved for public release[.]"  NSA Regulation § 6(b).  The NSA Regulation also underscores that the prepublication review obligation applies not only to written works, but also to oral disclosures such as "videos, speeches, [and] conference briefings."  *Id.*

**Snowden's Publication of a Book Entitled *Permanent Record***

58.     On August 1, 2019, Snowden publicly announced that he had written a book entitled *Permanent Record*.  He made this announcement via Twitter:[1]



---

[1] https://twitter.com/Snowden/status/1156916530527035393





59.     Shortly afterwards that same day, Snowden also wrote on Twitter:[2]



---

[2] https://twitter.com/Snowden/status/1156920361537200133

60.     Also on August 1, 2019, Macmillan issued a press release announcing the upcoming publication of *Permanent Record*.  *See* Macmillan Publishers, *Macmillan announces global publication of Edward Snowden's memoir Permanent Record* (Aug. 1, 2019).[3]  Macmillan stated that "Macmillan is proud to be publishing *Permanent Record*, in which Edward Snowden will tell his story for the first time, on 17 September 2019."  *Id.*

61.     Macmillan's press release described *Permanent Record* as "tell[ing] the story of [Snowden's] time working as a CIA agent and NSA contractor, and the disillusionment he felt with the American intelligence establishment that led him to give up his future to share the truth about the US government's pursuit of a mass surveillance system."  *Id.*

62.     Macmillan's press release also described *Permanent Record* as Snowden "tell[ing] his story for the very first time, bringing the reader along as he helps to create this system of mass surveillance, and then experiences the crisis of conscience that led him to try to bring it down."  *Id.*

63.     Macmillan's press release further promoted *Permanent Record* as follows: "Edward Snowden, spy, whistleblower and the Internet's conscience, reveals the story of his life for the first time, from his suburban childhood to clandestine CIA and NSA postings and his decision to try to bring the US government's system of mass surveillance down. *Permanent Record* is a crucial memoir for our digital age."  *Id.*

64.     Snowden was obligated to submit *Permanent Record* to the CIA and NSA for prepublication review and not to publish it, or share drafts of it with others, until receiving written permission to do so from CIA and NSA.

---

[3] https://www.panmacmillan.com/blogs/general/edward-snowden-book-permanent-record

65.     Snowden did not, at any time, submit the manuscript for *Permanent Record* to either the CIA or NSA for prepublication review.  Nor did Snowden obtain written approval from CIA or NSA prior to sharing manuscripts with Macmillan or prior to the book's publication.

66.     Snowden's book *Permanent Record* was published and made publicly available for sale on September 17, 2019.

67.     Pursuant to the terms of Snowden's secrecy agreements, all rights, title, and interest in any and all royalties, remunerations, and emoluments that have resulted, or will result, from *Permanent Record* have been assigned to the United States Government.

**Macmillan's Possession of Proceeds Related to *Permanent Record***

68.     Macmillan is publishing Snowden's book *Permanent Record*.  Upon information and belief, Macmillan has possession over ill-gotten funds, and will continue to come into possession of such funds, held on behalf of Snowden but that properly belong to the United States.

69.     Upon information and belief, when an author's book is being published by a publishing company such as Macmillan, the author has typically signed a contract assigning to the publishing company the right to publish and sell the book (and perhaps other rights), and in exchange the publishing company agrees to provide the author a certain percentage of the proceeds earned from each copy of the book sold (commonly known as a royalty).  Upon information and belief, the publishing company will sometimes agree to pay an author an advance on royalties earned—*i.e.*, payment of a fixed sum to an author even before that sum of royalties is actually earned by the author.

70.     Upon information and belief, a publishing company such as Macmillan typically gains possession of the proceeds earned from a book's sales; the publishing company will thereafter calculate the royalty payments owed to the author and then disburse those payments to the author at certain intervals.  Upon information and belief, depending on the contract negotiated

between the publishing company and the author, a publishing company may disburse royalty payments directly to the author, or may disburse the royalty payments to an agent, assignee, or other person or entity acting on the author's behalf.

71.    There is no publicly available information regarding the financial arrangement between Snowden and Macmillan with respect to *Permanent Record*.  *See* Associated Press, *Edward Snowden book coming out Sept. 17* (Aug. 1, 2019) ("Financial details were not disclosed for a book that was itself a covert project, quietly acquired a year ago by Macmillan and identified under code names in internal documents.").[4]

72.    The Associated Press reported in connection with *Permanent Record* that "Snowden's primary contact with the publisher was his principal legal adviser, Ben Wizner, director of the American Civil Liberties Union's Speech, Privacy, and Technology Project." *Id.* Mr. Wizner's biography on the ACLU website describes him as being, since July of 2013, "the principal legal advisor to NSA whistleblower Edward Snowden." Biography, Ben Wizner, Director, ACLU Speech, Privacy, and Technology Project.[5]

73.    Upon information and belief, as a result of Snowden's contract with Macmillan, Snowden (and/or his agents, assignees, or others acting on his behalf) have earned, and will continue to earn, monetary proceeds stemming from the sale and publication of *Permanent Record* (hereafter "Snowden's Earnings").   Upon information and belief, Macmillan currently has possession over some or all of Snowden's Earnings.  Upon information and belief, Macmillan will, in both the immediate and long-term future, continue to come into possession of some or all of Snowden's Earnings.

---

[4] https://www.apnews.com/eaf726bd05e3491bb03852a10e10b1bf

[5] https://www.aclu.org/bio/ben-wizner

74.     Snowden's Earnings have resulted, and will continue to result, from Snowden's unlawful breaches of his contractual obligations and fiduciary duties to the United States, CIA, and NSA.  Macmillan has no legitimate claim to Snowden's Earnings, which properly belong to the United States.  With respect to Macmillan, the United States asserts herein only claims regarding Snowden's Earnings as defined above.

75.     Upon information and belief, pursuant to Snowden's contract with Macmillan, Macmillan will disburse Snowden's Earnings to Snowden and/or his agents, assignees, or others acting on his behalf.  Upon information and belief, Macmillan may disburse some or all of Snowden's Earnings to those people or entities before a final judgment can be reached in this matter.

76.     It is significantly more difficult, if not impossible, for the United States to enforce a domestic judgment against assets that exist outside the United States.  Accordingly, Macmillan's disbursement of Snowden's Earnings to any person or entity outside the United States, or to any person or entity who intends to facilitate the transfer of those assets outside the United States, will result in irreparable harm to the United States and its ability to recover Snowden's Earnings.

77.     Macmillan is therefore a necessary party because "in that person's absence, the court cannot accord complete relief among existing parties[.]"  Fed. R. Civ. P. 19(a)(1)(A).

**<u>Snowden's Speeches</u>**

78.     Since approximately 2014, Snowden has been giving speeches and is frequently compensated for those speeches.  According to media reports, Snowden has sometimes earned more than $10,000 per appearance.  *See* N.Y. Times, *Snowden Sees Some Victories, From a Distance* (May 19, 2015) ("Mr. Snowden's main source of income, his lawyer said, is speaking

fees, which have sometimes exceeded $10,000 for an appearance.")[6]; Yahoo! News, *In exile, Edward Snowden rakes in speaking fees while hoping for a pardon* (Aug. 11, 2016) ("Over the past year, he has collected more than $200,000 in fees for digital speaking appearances that have been arranged by one of the country's elite speakers' bureaus, according to a source close to Snowden who is intimately familiar with his business affairs.").[7]

79.     Many of Snowden's speeches discuss intelligence-related activities at the CIA and NSA, and/or contain, refer to, or are based on information that is classified or in the process of a classification determination.

80.     Snowden was obligated to submit such speeches—and/or notes, outlines, or other summaries of his speeches—to the CIA and NSA for prepublication review, consistent with the relevant CIA and NSA regulations, and not to give such speeches until receiving written permission to do so from the CIA and NSA.

81.     Snowden did not, at any time, submit his speeches—and/or notes, outlines, or other summaries of his speeches—to the CIA and NSA for prepublication review.  Nor did Snowden obtain the Government's written approval prior to giving his speeches.

82.     Pursuant to the terms of Snowden's secrecy agreements, all rights, title, and interest in any and all royalties, remunerations, and emoluments that have resulted, or will result, from Snowden's speeches divulging information in violation of his prepublication review obligations have been assigned to the United States Government.

---

[6] https://www.nytimes.com/2015/05/20/world/europe/snowden-sees-some-victories-from-a-distance.html

[7] https://www.yahoo.com/news/edward-snowden-making-most-digital-000000490.html

## CAUSES OF ACTION

### Count One: Breach of Contract and Fiduciary Duty Related to the Publication of *Permanent Record*

83.     All preceding paragraphs are incorporated by reference, as if fully set forth herein.

84.     Snowden voluntarily, willingly, and knowingly entered into contractual agreements with the United States of America when he signed his CIA Secrecy Agreements and NSA Secrecy Agreements and he agreed to be bound by their terms and conditions.  Among those terms and conditions was an express requirement that Snowden submit certain materials to the CIA and NSA for prepublication review, and that he refrain from publishing any such materials until he received written permission to do so from CIA and NSA.

85.     Snowden knowingly, willfully, and deliberately breached both his CIA Secrecy Agreements and NSA Secrecy Agreements by failing to submit his *Permanent Record* manuscript to the CIA and NSA for prepublication review before disclosing the manuscript to Macmillan and before causing the manuscript to be published.

86.     Under both the common law and the CIA and NSA Secrecy Agreements, Snowden had a fiduciary relationship with the United States of America, the CIA, and the NSA based on his placement in positions of trust and special confidence.  Snowden was a contractor and staff employee for the CIA and was a contractor for the NSA, transacted business on behalf of both agencies, was given regular access to classified national security information, and entered into secrecy agreements with both agencies.

87.     Snowden owes to the United States, the CIA, and NSA a fiduciary duty of loyalty to protect from unauthorized disclosure information pertaining to intelligence sources and methods, including signals intelligence activities and information; to submit to the CIA and NSA for review any materials subject to his prepublication review obligations; and to not publish or

disseminate those materials or information unless and until the CIA and NSA completed their prepublication review processes and provided written approval of public disclosure.

88.     Snowden breached his fiduciary duties by publishing *Permanent Record* without submitting it for prepublication review or receiving the Government's permission to publish.

89.      As a direct and proximate result of Snowden's breach of his contractual and fiduciary duties, the United States has been damaged and irreparably harmed by, *inter alia*, the undermining of confidence and trust in the CIA, NSA, and their prepublication review processes, thereby hampering the ability of those agencies to perform their respective duties, including the protection of sensitive national security information.  Additionally, Snowden has been, and will continue in the future to be, unjustly enriched in the amount of profits, advances, royalties, and other advantages resulting from the unauthorized publication of his book.

90.     To the extent Snowden and/or his agents, assignees, or others acting on his behalf have received, or will receive, proceeds resulting from the unauthorized publication of *Permanent Record* and the proceeds are transferred outside the United States, or are intended to be transferred outside the United States, the United States has been, and will continue to be, irreparably harmed based on the significant difficulty of recovering those proceeds.

91.     Snowden has engaged in a course of conduct evidencing a propensity to commit further breaches of his contractual and/or fiduciary duties and to cause further damage to the United States, including irreparable injury for which the United States has no adequate remedy at law.

### Count Two: Breach of Contract and Fiduciary Duty Related to Speeches

92.     All preceding paragraphs are incorporated by reference, as if fully set forth herein.

93.     Snowden knowingly, willfully, and deliberately breached both his CIA Secrecy Agreements and NSA Secrecy Agreements by giving speeches subject to his prepublication review

obligations, without submitting those speeches or associated materials for prepublication review and without receiving written permission from CIA and NSA to disclose the information publicly.

94.     Snowden also breached his fiduciary duties to the United States, CIA, and NSA by giving speeches subject to his prepublication review obligations, without submitting those speeches or associated materials for prepublication review and without receiving written permission from CIA and NSA to disclose the information publicly.

95.     As a direct and proximate result of Snowden's breaches of his contractual and fiduciary duties, the United States has been damaged and irreparably harmed by, *inter alia*, the undermining of confidence and trust in the CIA, NSA, and their prepublication review processes, thereby hampering the ability of those agencies to perform their respective duties, including the protection of sensitive national security information.  Additionally, Snowden has been unjustly enriched by the proceeds and all other advantages resulting from his unauthorized speeches.

96.     Snowden has engaged in a course of conduct evidencing a propensity to commit further breaches of his contractual and/or fiduciary duties and to cause further damage to the United States, including irreparable injury for which the United States has no adequate remedy at law.

### **PRAYER FOR RELIEF**

**WHEREFORE**, the United States of America respectfully requests that the Court award the following relief:

A.     Declare that Snowden has breached his contractual obligations, embodied in his CIA Secrecy Agreements and NSA Secrecy Agreements, as well as his fiduciary obligations;

B.     Impose a constructive trust for the benefit of the United States over, and require an accounting of, all monies, gains, profits, royalties, and other advantages that Snowden and his agents, assignees, or others acting on his behalf have derived, or will derive, from the publication,

sale, serialization, or republication in any form, including any movie rights or other reproduction rights, of *Permanent Record*;

C.      Require Snowden and/or his agents, assignees, or others acting on his behalf to relinquish to the United States all monetary proceeds earned by them from *Permanent Record*;

D.      Impose a constructive trust for the benefit of the United States over, and require an accounting of, all monies, gains, profits, royalties, and other advantages that Snowden and his agents, assignees, or others acting on his behalf have derived, or will derive, from speeches he has given disclosing information subject to his prepublication review obligations;

E.      Require Snowden and/or his agents, assignees, or others acting on his behalf to relinquish to the United States all monetary proceeds earned by them from such speeches;

F.      To the extent that any proceeds, revenues, gains, royalties or other advantages derived from *Permanent Record* or his speeches are no longer in Snowden's possession or the possession of his agents, assignees, or others acting on his behalf, award the United States monetary damages against Snowden (and/or his agents, assignees, or others acting on his behalf) for such proceeds wrongfully obtained as a result of his breaches;

G.      Enter a temporary restraining order and preliminary injunction freezing all assets in Macmillan's possession relating to *Permanent Record* that belong to Snowden or his agents, assignees, or others acting on his behalf; prohibiting transfer or encumbrance of any of those assets; and requiring production of all contracts between Macmillan and Snowden (and/or his agents, assignees, or others acting on his behalf), as well as an accounting of all proceeds earned by *Permanent Record*, a description of all persons and entities with financial interests relating to *Permanent Record* and the nature of those interests, and a description of the process of disbursing funds to Snowden (and/or his agents, assignees, or others acting on his behalf);

H.      Enter a permanent injunction requiring Macmillan to transfer to the United States all proceeds in Macmillan's possession that Snowden and his agents, assignees, or others acting on his behalf have derived, or will derive, from the publication, sale, serialization, or republication in any form, including any movie rights or other reproduction rights, of *Permanent Record*;

I.      Permanently enjoin Snowden from any further violations of his contractual and fiduciary obligations, including but not limited to public speeches discussing *Permanent Record*; any further written works; and any additional speeches that are within the scope of his prepublication review obligations without first undertaking the prepublication review process; and

J.      Grant to the United States such other relief as the Court may deem just and proper, including, but not limited to, the Government's costs herein.


Dated:  September 17, 2019                    Respectfully Submitted,

                                              JOSEPH H. HUNT
                                              Assistant Attorney General

                                              G. ZACHARY TERWILLIGER
                                              United States Attorney

                                              JAMES M. BURNHAM
                                              Deputy Assistant Attorney General

                                              ALEXANDER K. HAAS
                                              Director, Federal Programs Branch

                                              ANTHONY J. COPPOLINO
                                              Deputy Director, Federal Programs Branch


                                              _____/s/_____
                                              R. TRENT MCCOTTER
                                              Assistant United States Attorney
                                              Office of the United States Attorney
                                              2100 Jamieson Avenue
                                              Alexandria, Virginia 22314

Tel:     (703) 299-3845
Fax:     (703) 299-3983
Email:   trent.mccotter@usdoj.gov


            /s/
DANIEL SCHWEI
Senior Trial Counsel
ANTONIA KONKOLY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 12024
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:     (202) 616-8470
Email: daniel.s.schwei@usdoj.gov

*Counsel for the United States*