**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>EDWARD SNOWDEN, )<br><br>Defendant, )<br><br>and )<br><br>MACMILLAN PUBLISHING GROUP, LLC )<br>d/b/a HENRY HOLT AND COMPANY, *et al.*, )<br><br>Relief-Defendants. ) | Case No. 1:19-cv-1197-LO-TCB |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AGAINST SNOWDEN AS TO LIABILITY**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ........................................ 3

I.      The CIA's and NSA's Responsibilities for National Security............................ 3

II.     Snowden's Employment and Secrecy Agreements with the CIA and NSA ...................... 4

III.    Snowden's Publication of *Permanent Record* .................................................. 7

IV.     Snowden's Public Speeches and Compensation.............................................. 10

STANDARD OF REVIEW .............................................................................................. 12

ARGUMENT ..................................................................................................................... 12

I.      Courts Routinely Uphold and Enforce Agency Secrecy Agreements............................. 13

II.     The United States is Entitled to Summary Judgment on Liability as to Count One Based on Snowden's Unauthorized Publication of *Permanent Record*........................... 16

        A.      Snowden Was Obligated to Submit *Permanent Record* for Prepublication Review and Failed to Do So. ................................................. 17

        B.      Snowden Lacks Any Valid Defenses to Enforcement of His Secrecy Agreements. ................................................................................. 21

III.    Snowden's Unauthorized Public Speeches Warrant Summary Judgment on Liability as to Count Two.................................................................................. 24

CONCLUSION................................................................................................................... 26

## INTRODUCTION

The United States hereby moves for partial summary judgment on liability against Defendant Edward Snowden, based on his unauthorized publication of a book entitled *Permanent Record* (Count One of the Amended Complaint), as well as his unauthorized public speeches (Count Two of the Amended Complaint). *See generally* Am. Compl. (ECF No. 15) ¶¶ 109-22. These unauthorized public disclosures violate the plain terms of secrecy agreements that Snowden signed with the Central Intelligence Agency (CIA) and National Security Agency (NSA) prior to and during his employment with those agencies. In particular, Snowden failed to comply with his express commitment that, prior to making any public disclosures, he would submit any and all intelligence-related works to the agencies for prepublication review, to give the agencies an opportunity to determine whether his proposed disclosures contained any classified information. As a result of Snowden's breaches of his prepublication review obligations, and consistent with well-established Supreme Court precedent, *see Snepp v. United States*, 444 U.S. 507 (1980), Snowden is liable to the United States for breach of contract and breach of his fiduciary duties to the United States.

Through this motion, the United States seeks partial summary judgment only as to Snowden's liability. Once Snowden's liability is established, the United States will determine what, if any, information is required from Snowden and/or the Publisher Relief-Defendants in order for the United States to obtain complete relief on its claims.[1] With respect to liability,

---

[1] The entities named as Publisher Relief-Defendants are three related corporate entities, all involved in the publication of *Permanent Record*. *See* Am. Compl. ¶¶ 6-9. They are named only as necessary parties because "in [their] absence, the court cannot accord complete relief among existing parties[.]" Fed. R. Civ. P. 19(a)(1)(A). Because they are only nominal parties, the United States asserts no independent claims against them. *See* Am. Compl. ¶ 9; *see generally CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002) (explaining that "a nominal defendant is part of a suit only as the holder of assets that must be recovered in order to afford complete relief; no cause of action is asserted against a nominal defendant"). Accordingly, because

however, none of the material facts are in genuine dispute.  This Court therefore can—and should—enter summary judgment as to liability now.

With respect to Count One, Snowden breached his secrecy agreements and fiduciary duties by publishing his book *Permanent Record* without submitting it to CIA and NSA for prepublication review.  The book's contents plainly fall within the scope of Snowden's prepublication review obligations, as the book discusses intelligence-related activities of the CIA and NSA, and purported classified matters.  Indeed, Snowden has publicly admitted that he was required to submit *Permanent Record* for prepublication review but failed to do so.  Thus, there are no disputed material facts on this claim.  Nor does Snowden have any valid legal defenses against it.  The United States is thus entitled to summary judgment on liability with respect to Count One.

As for Count Two, Snowden has given unauthorized prepared public speeches in which he discusses intelligence-related information, and even displays and discusses slides that are marked on their face as containing Top Secret information.  Again, Snowden never submitted any of these speeches for prepublication review.  Accordingly, there is likewise no genuine dispute as to liability for Count Two.

As set forth in the declarations and other exhibits attached to this motion, Snowden's breaches of his prepublication obligations are clear.  *See* Decl. of Antoinette B. Shiner, CIA Information Review Officer (Exh. A, hereafter "CIA Decl.") ¶ 20; Decl. of Steven E. Thompson, NSA Chief of Policy, Information, Performance, and Exports (Exh. B, hereafter "NSA Decl.") ¶ 10.  Moreover, Snowden's breaches have resulted in harm to those agencies' abilities to perform their important missions.  *See, e.g.*, CIA Decl. ¶¶ 21-30; NSA Decl. ¶¶ 21-25.  Based on this record,

---

this motion addresses liability only (and not any remedial issues), this motion is filed against Defendant Snowden only, not any of the Relief-Defendants.

and consistent with the overwhelming number of judicial decisions that have upheld and enforced agency secrecy agreements, summary judgment as to liability on both claims is warranted.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**I.    THE CIA'S AND NSA'S RESPONSIBILITIES FOR NATIONAL SECURITY**

1.    The CIA's mission is to assist the Director of the CIA in carrying out her responsibilities, *see* 50 U.S.C. § 3035(b), which include, among other things, "collect[ing] intelligence through human sources and by other appropriate means."   *Id.* § 3036(d)(1). Additionally, the Director is also responsible for protecting CIA intelligence sources and methods from unauthorized disclosure.   *See* 50 U.S.C. § 3507; Exec. Order No. 12333 (as amended) §§ 1.3(b)(8), 1.6(d).

2.    The NSA—which operates within the Department of Defense (DoD)—is tasked with "the continued operation of an effective unified organization for the conduct of signals intelligence activities."   50 U.S.C. § 3038(b)(1).   The NSA's responsibilities likewise include protecting the security of its activities and information by appropriate means, and prescribing security regulations covering its operating practices.   *See* Exec. Order No. 12333 (as amended) §§ 1.4(f), 1.7(c)(7).

3.    In order to safeguard the sensitive information critical to their respective missions, both CIA and NSA require employees and contractors, before beginning their official duties, and as a condition of receiving access to classified information, to sign secrecy agreements.   *See* CIA Decl. ¶ 7; NSA Decl. ¶ 6; *see also* ¶¶ 6-7, 13, *infra*.

4.    In addition to the secrecy agreements, both CIA and NSA have issued administrative regulations further defining the scope and nature of employees' and contractors' prepublication review obligations.   *See* CIA Administrative Regulation 13-10, *Agency Prepublication Review of Certain Material Prepared for Public Dissemination* (ECF No. 15-4,

hereafter "CIA Regulation"); Department of Defense Instruction 5230.09, *Clearance of DoD Information for Public Release* (Jan. 25, 2019) (ECF No. 15-5, hereafter "DoDI 5230.09"); NSA/CSS Policy 1-30, *Review of NSA/CSS Information Intended for Public Release* (May 12, 2017) (ECF No. 15-6, hereafter "NSA Regulation").   These regulations set forth, among other things, the process that current and former employees and contractors must follow for submitting materials for prepublication review, as well as the rights those individuals have to appeal any decision denying approval to publish.   *See, e.g.*, CIA Regulation §§ II(B), (G); NSA Regulation §§ 6(b)(4), 7.

## II.   SNOWDEN'S EMPLOYMENT AND SECRECY AGREEMENTS WITH THE CIA AND NSA

5.      Between 2005 and 2013, Snowden was generally employed by either the CIA or NSA, sometimes serving as a direct employee and sometimes as a contractor.  *See* CIA Decl. ¶ 7; NSA Decl. ¶ 6.

6.      In each of his roles, Snowden was required to sign a secrecy agreement in which he pledged not to disclose certain information, and further expressly agreed to submit writings or other preparations for prepublication review prior to disclosing or publishing any such writings or other preparations.  *See* CIA Decl. ¶¶ 7-12; NSA Decl. ¶¶ 6-9; *see also* ¶¶ 7, 13-14, *infra*.

7.      With respect to CIA, Snowden signed materially identical secrecy agreements on November 22, 2005; August 28, 2006; and April 16, 2009.  *See* ECF No. 15-1 (hereafter "CIA Secrecy Agreements"); CIA Decl. ¶ 11.  As relevant here, in each of the CIA Secrecy Agreements, Snowden acknowledged that he was accepting "a position of special confidence and trust" that "obligated" him "to protect [information that is classified or in the process of a classification determination] from unauthorized disclosure."  CIA Secrecy Agreements ¶ 2.

8.      As a "further condition of the special confidence and trust reposed in [him],"

Snowden further agreed to

> submit for review by the Central Intelligence Agency any writing or other preparation in any form, including a work of fiction, which contains any mention of intelligence data or activities, or contains any other information or material that might be based on [information that is classified or in the process of a classification determination], that I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment or other service with the Central Intelligence Agency or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to [such information]. I further agree that I will not take any steps towards public disclosure until I have received written permission to do so from the Central Intelligence Agency.

*Id.* ¶ 5.

9.     Snowden also acknowledged in the CIA Secrecy Agreements that the purpose of prepublication review "is to give the Central Intelligence Agency an opportunity to determine whether the information or material that I contemplate disclosing publicly contains any information or material that I have agreed not to disclose." *Id.* ¶ 6.

10.     Snowden agreed in the CIA Secrecy Agreements that the obligations undertaken by him in executing these agreements would remain valid and binding upon him after he left CIA, unless he obtained a written release from the Agency. *Id.* ¶ 13.

11.     In the CIA Secrecy Agreements, Snowden "assign[ed] to the United States Government all rights, title, and interest in any and all royalties, remunerations and emoluments that have resulted or will result or may result from any divulgence, publication or revelation of information or material by me that is carried out in breach of [the agreed prepublication process set forth in] paragraph 5 of this agreement[.]" *Id.* ¶ 12.

12.     During Snowden's periods of employment with the CIA (including as a contractor), CIA assigned Snowden to various positions of trust and granted him regular access to classified, national security-related information, including information regarding intelligence sources and methods.  CIA Decl. ¶ 19.  In taking these actions, the CIA relied on the expectation that Snowden

would respect and adhere to the rights and obligations created by the CIA Secrecy Agreements, including the prepublication review requirement. *Id.*

13.     Snowden also signed materially identical secrecy agreements with the NSA on July 7, 2005; May 6, 2009; and March 27, 2013.  *See* ECF No. 15-3 (hereafter "NSA Secrecy Agreements); NSA Decl. ¶ 6.

14.     In those agreements, Snowden likewise agreed to a similar prepublication requirement, agreeing that he would "submit for security review . . . all information or materials, including works of fiction, that I have prepared for public disclosure which contain or purport to contain, refer to, or are based upon" information that is classified or in the process of a classification determination.  NSA Secrecy Agreements ¶ 9.

15.     Snowden further acknowledged that the "purpose of the prepublication review procedure is to determine whether material contemplated for public disclosure contains protected information and, if so, to give the NSA an opportunity to prevent the public disclosure of such information," *id.*, and that he has the burden to find out "whether information or materials within my control are considered by the NSA to be protected information[.]"  *Id.* ¶ 2.

16.     The NSA Secrecy Agreements also make clear that the prepublication review obligation extends beyond the time of employment with NSA, *id.* ¶ 9(a); that prepublication review must be sought "prior to discussing the information or materials with, or showing them to anyone who is not authorized to have access to them," *id.* ¶ 9(b); and that such materials cannot be disclosed until the author has "received written authorization from the NSA that such disclosure is permitted," *id.* ¶ 9(c).

17.     Snowden agreed in the NSA Secrecy Agreements that the obligations undertaken by him in executing these agreements would remain valid and binding upon him after he left NSA,

unless he obtained a written release from the NSA. *Id.* ¶ 13.

18.     Through the NSA Secrecy Agreements, Snowden expressly assigned to the United States "all rights, title and interest and all royalties, remuneration, or emoluments of whatever form that have resulted, will result, or may result from any disclosure" inconsistent with the terms of the agreements.  *See id.* ¶ 9(d).

19.     During Snowden's periods of employment as an NSA contractor, the NSA assigned Snowden to various positions of trust and granted him regular access to classified, national security-related information, including information regarding intelligence sources and methods. NSA Decl. ¶ 9.  In taking these actions, the NSA relied on the expectation that Snowden would respect and adhere to the rights and obligations created by the NSA Secrecy Agreements, including the prepublication review requirement.  *Id.*

20.     The CIA and NSA prepublication review requirements apply to any covered disclosure, regardless of the form of disclosure (*e.g.*, written or oral).  *See* CIA Decl. ¶¶ 12, 29; NSA Decl. ¶¶ 7-8; *see also* CIA Secrecy Agreements ¶ 5; CIA Regulation § II(D)(3)(a); NSA Secrecy Agreements ¶ 9; NSA Regulation § 6(b).

21.     At no time has Snowden ever received a release from the terms and conditions of his CIA Secrecy Agreements or NSA Secrecy Agreements.  *See* CIA Decl. ¶ 14; NSA Decl. ¶ 10.

## III.     SNOWDEN'S PUBLICATION OF *PERMANENT RECORD*

22.     On September 17, 2019, Snowden, through the Publisher Relief-Defendants, published a book titled *Permanent Record*.  *See* Exh. C (excerpts of *Permanent Record*).

23.     Snowden's book *Permanent Record* purports to discuss intelligence-related activities at the CIA and NSA.  *See* Exh. C; ¶¶ 24-29, *infra*.  Snowden's book also purports to contain, refer to, and might be based on classified information or information in the process of a classification determination.  *See* Exh. C; ¶¶ 24-29, *infra*.

24.     Snowden's book *Permanent Record* describes itself as addressing "an unprecedented system of mass surveillance" in which "the United States government was secretly pursuing the means to collect every single phone call, text message, and email," and in *Permanent Record* Snowden purportedly "reveals for the very first time how he helped to build this system and why he was moved to expose it."  Exh. C at 3.[2]

25.     Snowden's book *Permanent Record* also describes itself as "[s]panning the bucolic Beltway suburbs of [Snowden's] childhood and the clandestine CIA and NSA postings of his adulthood," and as being "the extraordinary account of a bright young man who grew up online— a man who became a spy, a whistleblower, and, in exile, the Internet's conscience."  *Id.*

26.     Chapters 12-20 of *Permanent Record* purport to discuss, among other things, Snowden's time and activities while employed by the CIA and NSA.  *See id.* at 16-125.

27.     On pages 150-60 of *Permanent Record*, Snowden purports to discuss intelligence-related activities of the CIA, including a story about the CIA purportedly attempting to recruit an asset.  *See id.* at 54-64.

28.     On pages 175-78 of *Permanent Record*, Snowden purports to discuss classified NSA activities and a document that was subject to significant restrictions on access.  *Id.* at 78-81. And on pages 224-26 of *Permanent Record*, Snowden purports to explain how NSA's purported "upstream collection" process works.  *Id.* at 123-25.

29.     Snowden has publicly described *Permanent Record* as containing "details of [the CIA's and NSA's classified crimes[.]"  *See* Exh. D.

---

[2] For ease of reference, all citations to Exhibit C are to the PDF file's page numbers, not the book's original page numbers.  As discussed further below, for purposes of this litigation only, the United States does not confirm or deny whether *Permanent Record* contains any classified information, or whether anything in *Permanent Record* is even true or not.

30.     Consistent with the CIA and NSA Secrecy Agreements as well as the agencies' administrative regulations, Snowden's book *Permanent Record* was required to be submitted to CIA and NSA for prepublication review.  *See* ¶¶ 23-29, *supra*; CIA Secrecy Agreement ¶ 5; NSA Secrecy Agreement ¶ 9; CIA Regulation § II(D)(1); NSA Regulation § 6(b).

31.     Snowden did not, at any time, submit the manuscript for *Permanent Record* to either CIA or NSA for prepublication review.  *See* CIA Decl. ¶ 20; NSA Decl. ¶ 4.

32.     Nor did Snowden obtain either agency's written approval prior to sharing manuscripts with the Publisher Relief-Defendants or prior to the book's publication.  *See* CIA Decl. ¶ 20; NSA Decl. ¶ 4.

33.     Snowden has publicly admitted that he was required to submit *Permanent Record* for prepublication review but failed to do so.  For example, in an interview with The Daily Show, Snowden stated that "while [the Government is] technically right" about the secrecy agreements he signed, he did not want to "let the CIA . . . edit [his] life story."  Exh. E (Daily Show Tr.) at 5-6.  Additionally, Snowden's attorney stated that:  "Had Mr. Snowden believed that the government would review his book in good faith, he would have submitted it for review."  Exh. F (ACLU Stmt. on Edward Snowden Lawsuit) at 1.

34.     Snowden's failure to comply with the prepublication review process with respect to the publication of *Permanent Record* harms the United States, including by harming the CIA's and NSA's abilities to perform their important missions.  *See* CIA Decl. ¶¶ 21-30; NSA Decl. ¶¶ 21-25.  For example, failure to comply with the prepublication review process undermines the agencies' abilities to ensure the secrecy of sensitive information, and also erodes the trust and confidence necessary for partners and allies to share sensitive information with the agencies.  *See* CIA Decl. ¶¶ 21-30; NSA Decl. ¶¶ 21-25.

IV.     **SNOWDEN'S PUBLIC SPEECHES AND COMPENSATION**

35.     Snowden frequently gives public speeches involving prepared and/or pre-planned remarks, and is frequently compensated for those speeches.  *See* Exh. G (NPR Fresh Air Tr.) at 20 (Snowden "run[s] [his] own studio" because he "make[s] [his] living" by "giv[ing] lectures" to the public); Exh. H (Open Mic Website) at 3 (Snowden "has been invited to speak at venues ranging from international investment conferences to the TED stage to the Sorbonne—receiving glowing reviews and passionate applause from audiences around the world"); Exh. I (Snowden Speaker Contracts & Invoices) at 2, 5, 13 (contracting to provide Snowden compensation for giving prepared remarks and participating in moderated panel interviews).[3]

36.     Many of Snowden's speeches purport to discuss intelligence-related activities at the CIA and NSA, and purport to contain, refer to, and might be based on information that is classified or in the process of a classification determination.  *See* Exh. G (NPR Fresh Air Transcript) at 20 ("[P]laces book me to speak about the future of cybersecurity, what's happening with surveillance and about conscience and whistleblowing."); Exh. H (Open Mic Website) at 3 (through his speeches, "Snowden continues to sound the alarm on mass surveillance and the collection of data by both governments and corporate entities"); *see also, e.g.*, Exh. J (2014 TED Speech Tr.); Exh. K (2015 it-sa Speech Tr.); Exh. L (2017 William & Mary Speech Tr.); Exh. M (2019 Dalhousie Univ. Speech Tr.).

37.     For example, in March 2014, Snowden gave a "TED Talk" in which he discussed a purported slide that was marked, on its face, as classified at the Top Secret level, and that referred

---

[3] Exhibit I was obtained and posted online by Yahoo! News, in connection with the article *In exile, Edward Snowden rakes in speaking fees while hoping for a pardon* (Aug. 11, 2016), https://www.yahoo.com/news/edward-snowden-making-most-digital-000000490.html.       The documents were apparently obtained from universities under state public records laws. *See id.*

to a purported government surveillance program.  *See* Exh. J (2014 TED Speech Tr.) at 6-9; *see also*  https://www.youtube.com/watch?v=yVwAodrjZMY  at 5:05. Snowden also discussed another purported NSA program for tracking the location of communications it intercepts.  Exh. J (2014 TED Speech Tr.) at 10-12.

38.     Similarly, in October 2015, Snowden gave a speech at an Internet security trade fair known as "it-sa" by remote video, in which Snowden displayed and discussed a purported slide that was marked, on its face, as classified at the Top Secret level, and that referred to purported government surveillance programs.  *See* Exh. K (2015 it-sa Speech Tr.) at 7-8; *see also* https://www.youtube.com/watch?v=4WCqGHcFyCg at 06:42.

39.     In April 2017, Snowden gave a speech at the College of William & Mary by remote video, in which he discussed purported government surveillance programs, including by displaying and discussing three purported slides each of which was marked, on its face, as classified at the Top Secret level.  *See* Exh. L (2017 William & Mary Speech Tr.) at 43-44, 56-57; *see also* https://www.youtube.com/watch?v=gWbaUfFfhlY at 51:30, 52:00, 1:05:45.

40.     In May 2019, Snowden gave a speech at Dalhousie University by remote video, in which Snowden discussed the purported capacities and operation of purported government surveillance programs, including by displaying and discussing a purported slide that was marked, on its face, as classified at the Top Secret level.  *See* Exh. M (2019 Dalhousie Univ. Speech Tr.) at 25-26; *see also* https://www.youtube.com/watch?v=oizhVJstxC4 at 32:15.

41.     Consistent with the CIA and NSA Secrecy Agreements as well as the agencies' administrative regulations, Snowden was obligated to submit these speeches—and/or associated materials such as notes, outlines, slides, or other summaries of the speeches—to CIA and NSA for prepublication review.  *See* CIA Secrecy Agreements ¶ 5; CIA Regulation § II(D)(3)(a); NSA

Secrecy Agreements ¶ 9; NSA Regulation § 6(b).

42.    Snowden did not, at any time, submit his speeches and/or associated materials to the CIA and NSA for prepublication review.  *See* CIA Decl. ¶ 20; NSA Decl. ¶ 4.

43.    Snowden's failure to comply with the prepublication review process with respect to his speeches harms the United States, including by harming the CIA's and NSA's abilities to perform their missions.  *See* CIA Decl. ¶¶ 21-30; NSA Decl. ¶¶ 21-25.  For example, failure to comply with the prepublication review process undermines the agencies' abilities to ensure the secrecy of sensitive information, and also erodes the trust and confidence necessary for partners and allies to share sensitive information with the agencies.  *See* CIA Decl. ¶¶ 21-30; NSA Decl. ¶¶ 21-25.

## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

Based on the undisputed facts set forth above, the United States is entitled to summary judgment on liability for both of its claims.  With respect to Count One, Snowden violated the terms of his CIA and NSA Secrecy Agreements by publishing *Permanent Record* without submitting the manuscript to CIA and NSA for prepublication review.  Similarly, with respect to Count Two, Snowden has repeatedly made speeches discussing intelligence-related matters without submitting those speeches and/or associated materials for prepublication review.  None of these facts can be genuinely disputed, nor are any other facts material to the United States' claims

-12-

in this case.  Accordingly, the United States is entitled to summary judgment as to liability on both of its claims.  Indeed, Snowden's liability is compelled by binding Supreme Court precedent, *see Snepp*, 444 U.S. at 514-16, as well as the numerous other judicial decisions enforcing agency secrecy agreements.

## I.  COURTS ROUTINELY UPHOLD AND ENFORCE AGENCY SECRECY AGREEMENTS.

The United States is entitled to summary judgment as a matter of law because Snowden made disclosures covered by his secrecy agreements without complying with his prepublication review obligations.  Under binding precedent, those are the only facts material to liability:  the Supreme Court, the Fourth Circuit, and this Court have all upheld the validity and enforceability of secrecy agreements entered into between the U.S. Government and its employees who, like Snowden, have been given access to classified information in the course of their employment.

The seminal case in this area is *Snepp v. United States*, 444 U.S. 507 (1980), which involved a former CIA agent who, in violation of his secrecy agreement, published a book about CIA activities without first obtaining the Agency's approval.  Subsequent to publication of the book, the United States sued Snepp for breach of contract and breach of fiduciary duties, seeking and obtaining imposition of a constructive trust over all of Snepp's profits from the book, as well as an injunction against future unauthorized disclosures by Snepp.  *See id.* at 508.  The Supreme Court affirmed the imposition of both remedies.  *See id.* at 514-16.

In affirming these remedies, the Supreme Court held that a prepublication review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint.  *See id.* at 510-11.  The Court found the secrecy agreement to be a "reasonable means" for vindicating the Government's "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so

essential to the effective operation of our foreign intelligence service." *Id.* at 509 n.3.  Importantly, the Court also recognized that "[w]hether Snepp violated his trust does not depend upon whether his book actually contained classified information." *Id.* at 511.  Rather, Snepp violated that trust when he breached his secrecy agreement by not giving the CIA the opportunity to determine whether his book contained classified information.  "When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA—with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful." *Id.* at 512.  The Court held that, because Snepp "deliberately and surreptitiously violated his obligation to submit all material for prepublication review," *id.* at 511, a constructive trust over his book's proceeds would appropriately "require[] him to disgorge the benefits of his faithlessness." *Id.* at 515.

Even before *Snepp*, the Fourth Circuit upheld the validity and enforceability of secrecy agreements in *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972).  Like *Snepp* and the instant case, *Marchetti* was an affirmative case brought by the United States against a former CIA employee to enforce a secrecy agreement; the United States sought to prevent Marchetti from publishing a book about his intelligence experiences. *Id.* at 1311.  The court held that the United States could properly require Marchetti to submit all intelligence-related materials intended for publication for prepublication review to protect classified information. *Id.* at 1313-17.  In so holding, the court reasoned that because Congress had imposed on the CIA Director responsibility for protecting intelligence sources and methods, secrecy agreements were "entirely appropriate to a program in implementation of the congressional direction of secrecy." *Id.* at 1316.  The court further held that there was no First Amendment problem with the secrecy agreements, because Marchetti would be entitled to judicial review of any action by the CIA disapproving publication

of the material, though the burden of obtaining judicial review was on Marchetti, not the CIA.  *Id.*; *see also United States v. Snepp*, 897 F.2d 138, 143 (4th Cir. 1990) (confirming that the burden is on the author to seek judicial review of any agency decision not to approve publication).

Consistent with this controlling authority, this Court has likewise granted summary judgment as to liability in materially identical circumstances—*i.e.*, where an author has published a book in violation of his or her prepublication review obligations.  For example, in *United States v. Jones*, No. 10-cv-765 (E.D. Va. filed July 9, 2010), this Court granted summary judgment on liability against a former CIA employee for unauthorized publication of a book discussing the employee's experience as a covert agent.  *See Jones*, ECF No. 45 (June 20, 2011) (Lee, J.) (order as to summary judgment); *see also Jones*, ECF No. 29 (Tr. of Bench Ruling, attached hereto as Exh. N).  Similarly, in *United States v. Scherck*, No. 12-cv-754 (E.D. Va. filed July 11, 2012), this Court granted summary judgment as to liability against a former CIA contractor for unauthorized publication of a book discussing his experiences in the CIA's Counter Proliferations Center.  *See Scherck*, ECF No. 39 (April 12, 2013) (Hilton, J.) (Order Granting Government's Partial Motion for Summary Judgment as to Liability); *see also Scherck*, ECF No. 41 (Tr. of Bench Ruling, attached hereto as Exh. O).  And even more recently, in *United States v. Bissonnette*, No. 16-cv-1070 (E.D. Va. filed Aug. 19, 2016), this Court entered a consent decree establishing liability against a former Department of Defense employee for unauthorized publication of a book describing his participation in the raid that killed Osama bin Laden.  *See Bissonnette*, ECF No. 2 (Sept. 23, 2016) (Lee, J.).

Finally, even outside the context of affirmative suits filed by the United States, numerous courts have upheld secrecy agreements against First Amendment challenges in cases brought by current and former employees and contractors seeking judicial review of agencies' prepublication

classification determinations.  *See, e.g.*, *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) (explaining, in a suit claiming that agencies violated former employee and contractor's First Amendment rights by refusing to authorize publication of his manuscript, that "[i]f the Government classified the information properly, then Stillman simply has no first amendment right to publish it"); *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) (holding that CIA censorship of secret information contained in former agents' writings and obtained by agents during course of CIA employment does not violate First Amendment); *Shaffer v. Defense Intelligence Agency*, 102 F. Supp. 3d 1 (D.D.C. 2015) (granting in part the Government's motion for summary judgment and rejecting First Amendment claim on the ground that, with the exception of one redaction, the Government provided sufficient evidence that the information redacted is properly classified and has not been officially released); *Wilson v. McConnell*, 501 F. Supp. 2d 545, 548 & n.3 (S.D.N.Y. 2007) (rejecting former agent's challenge to CIA determination prohibiting agent from publishing information concerning her dates of employment, explaining that secrecy agreement required her to submit manuscript for prepublication review and that "[t]o the extent the agreement has the effect of censoring classified information, it does not violate the First Amendment"), *aff'd*, 586 F.3d 171 (2d Cir. 2009).

Based on this overwhelming precedent confirming that secrecy agreements and prepublication review requirements are valid and enforceable, Snowden's liability is straightforward:  both his book *Permanent Record* and his intelligence-related speeches are all covered by his secrecy agreements, and he failed to submit any of them for prepublication review. No other facts are relevant, and summary judgment on liability for both claims is warranted.

## II.   THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY AS TO COUNT ONE BASED ON SNOWDEN'S UNAUTHORIZED PUBLICATION OF *PERMANENT RECORD.*

Because Snowden was obligated to submit *Permanent Record* for prepublication review

and failed to do so, the United States is entitled to summary judgment as to liability on Count One. The only material facts—whether Snowden was required to submit *Permanent Record* for prepublication review, and whether he in fact did so—are not in genuine dispute.  Nor does Snowden have any valid defense as to liability.  Thus, consistent with the ample legal authority discussed above, the United States is entitled to summary judgment on this claim.

**A.  Snowden Was Obligated to Submit *Permanent Record* for Prepublication Review and Failed to Do So.**

As explained above, as an express condition of his employment with the CIA and NSA, and as a further express condition of being granted access to classified information, Snowden entered into Secrecy Agreements with both agencies.  *See* CIA Decl. ¶¶ 7-12; NSA Decl. ¶¶ 4, 6-9.  By each act of executing a Secrecy Agreement, Snowden contractually committed (and repeatedly re-committed) to comply with each agency's prepublication procedures before making any public disclosure of any materials "contain[ing] any mention of intelligence data or activities," CIA Secrecy Agreements ¶ 5, or "which contain or purport to contain, refer to, or are based upon" information that is classified or in the process of a classification determination.  NSA Secrecy Agreements ¶ 9.

Specifically, Snowden committed to submitting his material for prepublication review "prior to discussing [the work] with or showing it to anyone who is not authorized to have access to" classified information, and to not "take any steps towards public disclosure until [he] received written permission to do so" from the relevant agency.  CIA Secrecy Agreements ¶ 5; *see also* NSA Secrecy Agreements ¶ 9.  As Snowden acknowledged in both sets of agreements, the purpose of prepublication review is to give *the agencies* an opportunity to determine—*prior* to any publication—whether the materials he contemplates disclosing publicly contain any information or material that he agreed not to disclose.  CIA Secrecy Agreements ¶ 6; *see also* NSA Secrecy

Agreements ¶¶ 2, 9.  Snowden further acknowledged and agreed that all of his Secrecy Agreements would remain valid and binding upon him after the termination of his employment with the United States, unless he obtained a written release from the CIA or NSA, as applicable.  *See* CIA Secrecy Agreements ¶13; *see also* NSA Secrecy Agreements ¶ 13.

During Snowden's periods of employment with the CIA and NSA, and subject to the above-discussed terms and conditions, the CIA and NSA each assigned Snowden to various positions of trust and granted him regular access to classified, national security-related information, including information regarding intelligence sources and methods.  *See* CIA Decl. ¶ 19; NSA Decl. ¶ 9.  In assigning Snowden to such positions and granting him access to such information, both the CIA and the NSA relied on the expectation that Snowden would respect the rights and obligations created by their respective Secrecy Agreements with Snowden and his fiduciary duties, including the prepublication review requirement.  *See* CIA Decl. ¶ 19; NSA Decl. ¶ 9.

Notwithstanding the binding contractual commitments set forth in the CIA and NSA Secrecy Agreements—from which he has never been released—Snowden has published *Permanent Record* without engaging in either agency's prepublication review procedures or obtaining the requisite written authorizations prior to sharing manuscripts with his publisher or prior to the book's publication.  *See* CIA Decl. ¶ 20; NSA Decl. ¶ 4.  The failure to comply with his prepublication review obligations amounts to a breach of his contractual and fiduciary duties to the United States.  *See, e.g.*, *United States v. Snepp*, 456 F. Supp. 176, 179 (E.D. Va. 1978) (holding that Snepp "willfully, deliberately and surreptitiously breached his position of trust with the CIA and the secrecy agreement" by publishing his book "without specific prior approval by the Central Intelligence Agency"), *aff'd*, 444 U.S. 507 (1980).

There can be no genuine doubt that Snowden's publication of *Permanent Record* constituted a breach of his secrecy agreements and fiduciary duties. Indeed, subsequent to publication of *Permanent Record* and in response to the filing of this lawsuit, Snowden publicly admitted the only facts relevant here—*i.e.*, that he was required to submit *Permanent Record* for prepublication review but failed to do so. In an interview with The Daily Show, Snowden admitted that the Government was "technically right" about the secrecy agreements he signed, but he did not submit *Permanent Record* for prepublication review because he did not want to "let the CIA . . . edit [his] life story." *See* Exh. E (Daily Show Tr.) at 5-6. Additionally, in response to this lawsuit, Snowden's attorney also confirmed that Snowden did not submit *Permanent Record* for prepublication review. *See* Exh. F (ACLU Stmt. on Snowden Lawsuit) at 1 ("Had Mr. Snowden believed that the government would review his book in good faith, he would have submitted it for review.").

There can also be no doubt that the contents of *Permanent Record* fall within Snowden's prepublication review obligations. Again, the book unquestionably discusses purported intelligence-related activities of CIA and NSA, including purported classified matters. Snowden himself, in response this lawsuit, described his book on Twitter as follows: "Yesterday, the government sued the publisher of #PermanentRecord for—not kidding—printing it without giving the CIA and NSA a chan[c]e to erase details of their classified crimes from the manuscript." Exh. D. By that description alone, Snowden has admitted that his book falls within his prepublication review obligations. *See* NSA Secrecy Agreements ¶ 9 (prepublication review applies to any materials "purport[ing] to contain" classified information); *see also* CIA Secrecy Agreements ¶ 5 (prepublication review is required for works that "contain[] any other information or material that might be based" on classified information). Moreover, the book's own summary

-19-

of its contents describes *Permanent Record* as containing descriptions of "secret[]" government systems of mass surveillance, Snowden's "clandestine CIA and NSA postings," and an account of Snowden's time as a "spy."  Exh. C at 3.

Finally, to the extent there were even any remaining doubt, the contents of *Permanent Record* further confirm that, consistent with his CIA and NSA Secrecy Agreements, Snowden was required to submit *Permanent Record* to CIA and NSA for prepublication review.  To take just a few examples: on pages 150-60, Snowden discusses a story about the CIA purportedly attempting to recruit an asset; on pages 175-178, Snowden purports to discuss a  highly classified NSA document; and on pages 224-26, Snowden purports to explain how NSA's purported "upstream collection" process works.  *See* Exh. C at 54-64, 78-81, 123-25.  This and similar information plainly purports to discuss intelligence-related activities at the CIA and NSA, and purports to contain, refer to, and might be based on classified information or information in the process of a classification determination—and as such, was indisputably subject to Snowden's prepublication review obligations for both CIA and NSA.  *See* CIA Secrecy Agreements ¶ 5; NSA Secrecy Agreements ¶ 9.

To be clear, for purposes of this lawsuit, the United States does not confirm or deny whether any of the above information—or anything at all in Snowden's book—is classified, or even whether anything in the book is true or not.  Those facts are irrelevant, because as the Supreme Court confirmed in *Snepp*, the obligation to submit a manuscript for review, and the violation of a trust to do so, exists wholly apart from whether information in the book is classified. 444 U.S. at 511 ("Whether Snepp violated his trust does not depend upon whether his book actually contained classified information.").  Indeed, Snowden's prepublication review obligations would apply even if *Permanent Record* were a work of pure fiction.  *See* CIA Secrecy Agreements ¶ 5

(prepublication review applies to "any writing or other preparation in any form, including a work of fiction"); NSA Secrecy Agreements ¶ 9 (prepublication review is required for "all information or materials, including works of fiction").  Thus, the classified nature—or even the truth—of the information contained within *Permanent Record* is irrelevant.  The only material facts here are whether Snowden was required to submit *Permanent Record* for prepublication review, and whether he in fact did so.  Both of those facts are straightforward and cannot be disputed:  he was required to submit the manuscript to both CIA and NSA for prepublication review, and he entirely failed to do so.  Based on those facts, and consistent with the legal authority discussed above, the United States is entitled to summary judgment as to liability on Count One.

**B.     Snowden Lacks Any Valid Defenses to Enforcement of His Secrecy Agreements.**

Although the only material facts here are straightforward, in Snowden's public statements following the filing of this lawsuit, he has attempted to defend his failure to submit his manuscript for prepublication review on a variety of different grounds.  None of those defenses has merit.

First, during his interview with The Daily Show, Snowden appeared to suggest that his failure to comply with his secrecy agreements should be excused because the only "oath" he took was an oath to support and defend the Constitution, and his book is about revealing violations of the Constitution.  *See* Exh. E at 5-6.  Such a defense would be entirely meritless if Snowden offered it here.  The operative legal constraint—Snowden's obligation to submit *Permanent Record* for prepublication review—is fully in accord with constitutional requirements, as the Supreme Court and Fourth Circuit have already confirmed.  *See Snepp*, 444 U.S. at 509 n.3; *Marchetti*, 466 F.2d at 1316-17.  And in any event, to the extent Snowden contends he had a constitutional right to publish *Permanent Record*, the proper course would have been to submit the manuscript for prepublication review, challenge any denials of permission to publish, and submit the

constitutional question to a court *before* disclosures that might harm national security.  As the Fourth Circuit has already explained, it is the *author's* burden to challenge an agency's denial of permission to publish.  *See Snepp*, 897 F.2d at 143; *Marchetti*, 466 F.2d at 1317.  What is not permissible is for an author to ignore the prepublication review process entirely, to decide for the Executive Branch—indeed, for the entire nation—what information should be disclosed, and to decide for himself, without any role for courts, what information the First Amendment allows him to publish, all without giving the agencies any advance opportunity to review such information.

For similar reasons, the assertion by Snowden's attorney that "[h]ad Mr. Snowden believed that the government would review his book in good faith, he would have submitted it for review," would, if repeated here, provide no valid defense.  *See* Exh. F at 1.  Again, if Snowden submitted his manuscript and was dissatisfied with the agencies' decisions, he could have initiated a judicial action seeking to challenge those decisions.  Instead, Snowden chose to ignore the process entirely and publish his manuscript without even attempting to engage with the agencies.  That is not what the law requires:  Snowden had "an obligation to obtain 'clearance' from the CIA prior to publication," and "[t]he *only substitute* for CIA clearance would be a judicial declaration that clearance had been improperly withheld."  *Snepp*, 897 F.2d at 143 (emphasis added).  Because Snowden never even attempted to engage in the prepublication review process, he cannot turn around and claim that the agencies would have acted unfairly towards him.  *See Jones*, Exh. N (Tr. of Bench Ruling) at 20 (granting the United States summary judgment as to liability, holding that the author "had a remedy . . . to come to U.S. District Court and to pursue a claim to have the Court determine if the Agency's withholding of permission was unreasonable," but "[n]ot having exercised that right," the author cannot accuse the United States of improper actions in the prepublication review process).

Finally, Snowden's attorney asserts that *Permanent Record* "contains no government secrets that have not been previously published by respected news organizations."  Exh. F at 1. Such a defense would also be patently meritless.  As to any information Snowden *himself* disclosed to the media, he cannot evade his non-disclosure obligations by claiming the information is already public.  Snowden cannot unilaterally vitiate his non-disclosure obligations through his prior disclosures.  Moreover, Snowden's prepublication review obligations exist wholly apart from whether the information has been previously published or not.  *See* CIA Secrecy Agreements ¶ 5; NSA Secrecy Agreements ¶ 9.  Snowden is required to submit manuscripts pertaining to CIA and NSA intelligence activities before any disclosure so that the Government can determine what information should be protected.  An author like Snowden, subject to non-disclosure obligations, may challenge such agency determinations, but has no right to decide for himself what information remains properly classified.  The Constitution confers that role on the Executive Branch, *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (citing U.S. Const., Art. II, § 2), and the law is clear that the mere fact that certain information may be publicly available does not constitute an official disclosure or acknowledgment by an Executive Branch agency.  *See Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) (classified information "was not in the public domain unless there had been official disclosure of it").

Moreover, as *Snepp* and other cases confirm, Snowden's breach of trust turns not on whether classified information is disclosed, but on a "breach of his explicit obligation to submit his material—classified or not—for prepublication clearance[.]"  *Snepp*, 444 U.S. at 513.  The breach of *that* obligation has irreparably harmed the United States, as the record here demonstrates, and as *Snepp* confirms.  *See id.* at 511-13; *see also* CIA Decl. ¶¶ 21-30; NSA Decl. ¶¶ 21-25.  Thus, regardless of whether *Permanent Record* contains classified information or not, summary

judgment is warranted on Count One because it cannot reasonably be disputed that Snowden was required to submit *Permanent Record* for prepublication review but failed to do so.  Based on those facts alone, the United States is entitled to summary judgment on liability.

## III.  SNOWDEN'S UNAUTHORIZED PUBLIC SPEECHES WARRANT SUMMARY JUDGMENT ON LIABILITY AS TO COUNT TWO.

The Government is also entitled to summary judgment on Count Two with respect to Snowden's speeches.  Many of Snowden's speeches are likewise subject to his prepublication review obligations, but he has not submitted any of those speeches for review.  Thus, the United States is entitled to recover all proceeds attributable to Snowden's speeches encompassed within his prepublication review obligations.

As the record here reflects, Snowden frequently gives public speeches involving prepared and/or pre-planned remarks.  *See* Stmt. of Material Facts ("SMF") ¶¶ 35-36, *supra*.  And even based on the subset of speeches that have been recorded and made publicly available, it is clear that Snowden's speeches frequently address topics falling within his prepublication review obligations.  *See* SMF ¶¶ 36-40, *supra*.  For example, in at least four speeches Snowden has displayed and/or discussed slides that, on their face, purport to be classified at the Top Secret level. *See* SMF ¶¶ 37-40, *supra*.

Moreover, Snowden's speeches frequently discuss intelligence-related activities at CIA and NSA.  For example, in his 2014 TED Talk, Snowden discusses a purported NSA program in which "the NSA intentionally misleads corporate partners" by "building in backdoors" to corporations' systems.  Exh. J at 17-18.  Similarly, in his 2017 William & Mary speech, Snowden asserted that various "Internet companies in the United States . . . began providing the Government with access to their customers' records beyond what the law required," and also discussed a purported "upstream collection" program.  Exh. L at 43-44.  And in his 2019 Dalhousie University speech,

Snowden discussed various geographic locations and the purported amount of U.S. Government surveillance that occurred within each country.  Exh. M at 25-26.

There is no doubt that Snowden was required to submit these kinds of prepared speeches for prepublication review.  The secrecy agreements expressly apply to disclosures in any form, including verbal "discussi[ons]."  CIA Secrecy Agreements ¶ 5; NSA Secrecy Agreements ¶ 9(b). Additionally, the governing regulations likewise make clear that prepublication review is required for speeches and other prepared or pre-planned remarks.  *See* CIA Regulation §§ II(A)(1) (prepublication review obligation applies to "all intelligence-related materials intended for publication or public dissemination, whether they will be communicated in writing, speeches, or any other method"), II(D)(3) (clarifying the materials that must be submitted for "intelligence-related speeches, media interviews, or testimony"); NSA Regulation § 6(b) (prepublication review obligations extend to "videos, speeches, conference briefings").

Notwithstanding his clear obligation to submit his speeches to the CIA or NSA for prepublication review, Snowden never once did so.  *See* CIA Decl. ¶ 20; NSA Decl. ¶ 4.  For all of the same reasons liability exists with respect to *Permanent Record*, liability thus also exists with respect to Snowden's speeches.   Indeed, just as with written works, courts have upheld the enforcement of secrecy agreements with respect to former employees' speeches.  *See Agee v. CIA*, 500 F. Supp. 506, 510 (D.D.C. 1980) (enjoining former CIA agent from future breaches of secrecy agreements, and rejecting the argument "that the injunction should not extend to oral speech"); *see also Bissonnette*, No. 16-cv-1070 (E.D. Va.), ECF No. 2 at ¶ 7 (court-entered Consent Decree, directing that former DoD employee remit $100,000 to the United States based on proceeds from "leadership presentations" that were not submitted for prepublication review).

Here, Snowden's prepublication review obligations extend to all of his speeches purporting

to discuss intelligence-related matters at CIA and NSA, and/or that purport to contain, refer to, or might be based on information that is classified or in the process of a classification determination. Snowden did not submit any of those speeches for prepublication review.  Because these facts are not subject to genuine dispute, summary judgment as to liability is also warranted on Count Two.

At the remedial phase of this case, the Government may require discovery to determine the full universe of speeches that should have been submitted for prepublication review, and the full universe of speeches for which Snowden has improperly earned proceeds.  The facts pertaining to liability, however, are undisputed:  Snowden has previously given speeches falling within his prepublication review obligations; Snowden did not submit any such speeches for prepublication review; and thus all proceeds earned from such speeches properly belong to the United States.  The Court should enter summary judgment as to liability on Count Two, and direct the United States to thereafter propose further remedial proceedings (including any discovery, if necessary) to determine the full scope of relief properly belonging to the United States.

## CONCLUSION

The Court should grant the United States' motion for partial summary judgment as to liability on both Count One and Count Two, and direct the United States to file, within 30 days of granting partial summary judgment, a proposed plan for further remedial proceedings.


Dated:  October 23, 2019                    Respectfully Submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            G. ZACHARY TERWILLIGER
                                            United States Attorney

                                            JAMES M. BURNHAM
                                            Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch


*/s/ R. Trent McCotter*
R. TRENT MCCOTTER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:      (703) 299-3845
Fax:      (703) 299-3983
Email:    trent.mccotter@usdoj.gov


*/s/ Daniel Schwei*
DANIEL SCHWEI
Senior Trial Counsel
ANTONIA KONKOLY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 12024
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:     (202) 616-8470
Email:  daniel.s.schwei@usdoj.gov

*Counsel for the United States*