# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

       v.

EDWARD SNOWDEN,

       Defendant,

and

MACMILLAN PUBLISHING GROUP, LLC
d/b/a HENRY HOLT AND COMPANY, *et
al.*,

       Relief-Defendants.

Case No. 1:19-cv-1197-LO-TCB

**DEFENDANT'S BRIEF IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Victor M. Glasberg (#16184)
VICTOR M. GLASBERG
   & ASSOCIATES
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100 (phone)
(703) 684-1104 (fax)
vmg@robinhoodesq.com

Lawrence S. Lustberg
GIBBONS P.C.
1 Gateway Center
Newark, NJ 07102
(973) 596-4731 (phone)
(973) 639-6285 (fax)
llustberg@gibbonslaw.com

Ben Wizner
Brett Max Kaufman
Vera Eidelman
Alexia Ramirez (N.Y. bar application pending)
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500 (phone)
(212) 549-2583 (fax)
bwizner@aclu.org
bkaufman@aclu.org
veidelman@aclu.org

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

STATEMENT OF GENUINE ISSUES OF MATERIAL FACT .................................................. 4

STANDARD OF REVIEW ....................................................................................................... 12

ARGUMENT ........................................................................................................................... 13

I.     The government's motion fails as a matter of fact and of law as to submission of
speech-related materials. ................................................................................................. 13

     A.     The government has failed to establish that Mr. Snowden breached the
Secrecy Agreements with respect to his public remarks. ................................. 13

          1.     Not one of the four speeches identified by the government as the basis for
liability involved personally prepared materials based on intelligence or
classified information that were not widely available to any member of the
public........................................................................................................... 13

          2.     The plain language of the Secrecy Agreements does not require submission
of publicly available materials that former employees do not personally
create. ........................................................................................................ 15

          3.     Even if the Secrecy Agreements are ambiguous, reading them to reach
works prepared by others that are found in the public domain would be
unreasonable. ............................................................................................. 19

II.    At a minimum, the Court should deny summary judgment on both Counts I and II
because Mr. Snowden has not had an opportunity to conduct discovery regarding the
meaning of the Secrecy Agreements and his possible defenses. .................................. 25

     A.     Requests for discovery under Federal Rule of Civil Procedure 56(d) are broadly
favored by courts deciding summary judgment motions that have been filed
before discovery.............................................................................................. 25

     B.     If the Court finds that the Secrecy Agreements are ambiguous with respect to
Count II, Mr. Snowden requires discovery regarding course of performance,
course of dealing, and common trade practice................................................. 27

     C.     As to both Counts, Mr. Snowden also requires discovery to show that there is a
genuine issue of material fact regarding the enforceability of the Secrecy
Agreements. ................................................................................................... 29

          1.     Mr. Snowden requires discovery to present his defense of
selective enforcement.............................................................................. 29

2.   Mr. Snowden requires discovery to present his defense of
anticipatory breach. ................................................................................. 32

CONCLUSION ................................................................................................................. 37

## INTRODUCTION

In this civil action, the government seeks to impose a constructive trust on proceeds Defendant Edward Snowden has earned and will earn for both his memoir, *Permanent Record*, and for his "speeches." While the government acknowledges that discovery will be required to complete the record necessary to support its requested relief, it has moved for summary judgment before Mr. Snowden has even filed an answer, asserting that undisputed facts establish Mr. Snowden's liability as to both counts. The motion is premature and, at least with regard to Count II, based on a misconception of both the relevant facts and the controlling law.

Mr. Snowden is entitled to discovery to determine whether the government has impermissibly singled him out for enforcement on the basis of animus towards his viewpoints, and whether, in fact, the government has already resolved not to permit him to earn a living by speaking or writing. The public record reveals that in 2016, then–CIA Director John Brennan believed it was "wrong" that Mr. Snowden was being paid for public speaking, and his successor in that position called openly for Snowden's execution. It is reasonably likely, therefore, that evidence in the government's sole possession would support affirmative defenses of selective enforcement and anticipatory breach of contract.

With regard to Mr. Snowden's liability for his public remarks, the government's motion is especially problematic. The government's motion is based on the theory that the CIA and NSA Secrecy Agreements require former employees to submit any prepared or pre-planned materials related to intelligence for censorship and approval before ever speaking aloud to another person. Gov't Br. at 24–26. But the government misapprehends the nature of Mr. Snowden's public remarks, including the four events identified in the government's motion as a basis for liability on Count II. Mr. Snowden did not prepare any text or remarks for these events that were based on intelligence or classified information. Nor did he draft notes, outlines, or summaries of what

he planned to say that were based on that kind of information. Quite simply, Mr. Snowden had nothing to submit.

During these public remarks, Mr. Snowden did refer to material addressing intelligence matters in the public domain that he did not author or create, including videos from C-SPAN and headlines and front pages of the *New York Times* and the *Washington Post*. But Mr. Snowden does not take the government to be arguing that he was required to submit that kind of material for review and approval. Indeed, such a reading is not supported by the Secrecy Agreements' plain language, and in any event it would be unreasonable. Indeed, it would also be foreclosed by longstanding Fourth Circuit precedent. *See United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972).

It is not clear that the government argues to the contrary. If it does, it is relying on one of two implausible interpretations of the Secrecy Agreements. The first would require former public servants to submit for review anything intelligence-related that they ever expected to discuss, for the rest of their lives—not only as invited speakers delivering pre-drafted speeches, but also as panelists or guest commentators answering live questions, as family members discussing the news over morning coffee, or as ordinary citizens in any other extemporaneous circumstance. And this would reach not only to their own remarks, but to any material they did not personally prepare or learn in the course of their employment—from an intelligence-related op-ed, to the president's tweets—that they wanted to reference aloud. Under the second interpretation, former employees would be outright forbidden from speaking publicly about intelligence-related matters unless they drafted submission-capable materials in advance. This would effectively remove an entire class of speakers—one that is uniquely positioned to grasp the impact of policy on the real world—from active public (and even not-so-public) discourse.

Either of those readings would not only be unreasonable, but also impracticable and ineffective. The government's already-overburdened prepublication review offices would face a deluge of submissions. And even such a wide-reaching system could not protect the government's actual interests, as it could never account for individuals going off-script. Unsurprisingly, then—and notwithstanding the frequency with which former government employees, including high-ranking intelligence officials, participate in panel discussions, live question-and-answer sessions, media interviews, and other public appearances—this action would be one of the first times (if not the very first) in which the government has sought to enforce a Secrecy Agreement in this way. That is almost surely because the government has, in practice, relied on the threat of criminal prosecution for divulging national defense information as an adequate means of protecting its interests in these contexts.

If, however, the Court finds that the terms of the Secrecy Agreements are ambiguous and could reasonably be read to require submission of material from the public domain that a speaker did not personally prepare, the government still cannot prevail at this stage, because Mr. Snowden requires discovery under Federal Rule of Civil Procedure 56(d) to present his defenses. This discovery would illuminate the government's course of performance with Mr. Snowden and its trade usage of the Secrecy Agreements with others, and it is reasonably likely to create a genuine issue of material fact in support of his narrower interpretation of the contracts as the governing one. Additionally (and as with respect to Count I), discovery is reasonably likely to show that the government cannot enforce the Secrecy Agreements against Mr. Snowden because doing so would be an unlawful effort to engage in selective enforcement based on viewpoint discrimination, and because Mr. Snowden is excused from performance under the contracts since the government never intended to uphold its end of the bargain.

## STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

### Responses to the Plaintiff's Statement of Undisputed Facts

3.      In order to safeguard the sensitive information critical to their respective missions, both CIA and NSA require employees and contractors, before beginning their official duties, and as a condition of receiving access to classified information, to sign secrecy agreements. *See* CIA Decl. ¶ 7; NSA Decl. ¶ 6; *see also* ¶¶ 6–7, 13, *infra*.

**Response**: Disputed in part. CIA employees are required to sign the Secrecy Agreements as a condition of their CIA employment. *See* CIA Decl. ¶ 7; *see also* CIA Secrecy Agreements ¶ 1. Defendant also disputes the characterization that the secrecy requirements are necessary to safeguard sensitive information critical to the CIA's and the NSA's missions. *See* Snowden Decl. ¶¶ 12, 16 (attached as Exh. 15 to Lustberg Decl.) (explaining that to Mr. Snowden's knowledge, other former intelligence agency employees did not submit public remarks to the government for approval and have not been sued for breach); *see also* Answer ¶ 126 (Second Affirmative Defense).

4.      In addition to the secrecy agreements, both CIA and NSA have issued administrative regulations further defining the scope and nature of employees' and contractors' prepublication review obligations. *See* CIA Administrative Regulation 13-10, *Agency Prepublication Review of Certain Material Prepared for Public Dissemination* (ECF No. 15-4, hereafter "CIA Regulation"); Department of Defense Instruction 5230.09, *Clearance of DoD Information for Public Release*  (Jan. 25, 2019) (ECF No. 15-5, hereafter "DoDI 5230.09"); NSA/CSS Policy 1-30, *Review of NSA/CSS Information Intended for Public Release* (May 12, 2017) (ECF No. 15-6, hereafter "NSA Regulation"). These regulations set forth, among other things, the process that current and former employees and contractors must follow for submitting materials for prepublication review, as well as the rights those individuals have to appeal any

decision denying approval to publish. *See, e.g.*, CIA Regulation §§ II(B), (G); NSA Regulation §§ 6(b)(4), 7.

**Response:** To the extent a response is deemed required, Defendant disputes Plaintiff's assertion that the purported CIA and NSA regulations define the scope of prepublication review requirements. *See infra* Argument I.A.3.

8.      As a "further condition of the special confidence and trust reposed in [him]," Snowden further agreed to

> submit for review by the Central Intelligence Agency any writing or other preparation in any form, including a work of fiction, which contains any mention of intelligence data or activities, or contains any other information or material that might be based on [information that is classified or in the process of a classification determination], that I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment or other service with the Central Intelligence Agency or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to [such information]. I further agree that I will not take any steps towards public disclosure until I have received written permission to do so from the Central Intelligence Agency.

*Id.* ¶ 5.

**Response:** Defendant disputes that the bracketed language is an accurate reflection of his Secrecy Agreements with the CIA. The bracketed language replaces "either of the categories set forth in paragraph 3," which are "information or material *received or obtained in the course of my employment or other service with the [CIA]* that is marked as classified or *that I know* is classified" and "information or material received or *obtained in the course of my employment or other service with the [CIA]* that is marked as classified or *that I know* is in the process of a classification determination." CIA Secrecy Agreements ¶ 3 (emphasis added).

13.     Snowden also signed materially identical secrecy agreements with the NSA on July 7, 2005; May 6, 2009; and March 27, 2013. *See* ECF No. 15-3 (hereafter "NSA Secrecy Agreements); NSA Decl. ¶ 6.

**Response:** Defendant disputes that the three NSA Secrecy Agreements are materially identical. The 2005 and 2009 NSA Secrecy Agreements cite NSA/CSS Regulation 10-63 at ¶¶ 9 and 13; the 2013 NSA Secrecy Agreement cite NSA/CSS Policy 1-30 at ¶¶ 9 and 13.

14.     In those agreements, Snowden likewise agreed to a similar prepublication requirement, agreeing that he would "submit for security review . . . all information or materials, including works of fiction, that I have prepared for public disclosure which contain or purport to contain, refer to, or are based upon" information that is classified or in the process of a classification determination.  NSA Secrecy Agreements ¶ 9.

**Response:** Defendant disputes this characterization of the NSA Secrecy Agreements. The language of the NSA Secrecy Agreements actually requires Mr. Snowden to "submit for security review . . . all information or materials, including works of fiction, that I have prepared for public disclosure which contain or purport to contain, refer to, or are based upon protected information, as defined in paragraph 1[.]" NSA Secrecy Agreements ¶ 9. Paragraph 1 defines "protected information" as "*information obtained as a result of my relationship with NSA* which is classified or in the process of a classification determination[.]" *Id.* ¶ 1 (emphasis added).

33.     Snowden has publicly admitted that he was required to submit *Permanent Record* for prepublication review but failed to do so. For example, in an interview with The Daily Show, Snowden stated that "while [the Government is] technically right" about the secrecy agreements he signed, he did not want to "let the CIA . . . edit [his] life story."  Exh. E (Daily Show Tr.) at 5–6. Additionally, Snowden's attorney stated that:  "Had Mr. Snowden believed that the government  would review his book in good faith, he would have submitted it for review."  Exh. F (ACLU Stmt. on Edward Snowden Lawsuit) at 1.

**Response:** Disputed in part. Defendant did not admit that "[the Government] is

technically right" or that he did not want to "let the CIA . . . edit [his] life story." Defendant actually stated:

> Well, first off, I am a noted rule follower. But, well, they are technically right. There is no oath of secrecy. A lot of people think there's an oath of secrecy. There's an oath of service, which is not to the agency. It's not to the Government. It's to support and defend the Constitution of the United States against all enemies, foreign and domestic.
>
> But there is a secrecy agreement, and that's what he's talking about. It's called Standard Form 312, and it basically says, no, after I know all the secrets and I know where the aliens are, I'm not going to tell anybody about it. However, if the thing that you see in your secrecy agreement conflicts with that oath of service, if the thing that you see is that the Government itself—the agency itself—is actually violating that Constitution, well, now you're kind of screwed.
>
> And then if you try to explain what happened and if you write a book about how it happened and then how we get out of it, and then you're supposed to send that book to the CIA and let the CIA kind of edit your life story, would you do that?

Exh. E at 5–6.

34.     Snowden's failure to comply with the prepublication review process with respect to the publication of *Permanent Record* harms the United States, including by harming the CIA's and NSA's abilities to perform their important missions. *See* CIA Decl. ¶¶ 21–30; NSA Decl. ¶¶ 21–25. For example, failure to comply with the prepublication review process undermines the agencies' abilities to ensure the secrecy of sensitive information, and also erodes the trust and confidence necessary for partners and allies to share sensitive information with the agencies. *See* CIA Decl. ¶¶ 21–30; NSA Decl. ¶¶ 21–25.

**Response:** To the extent a response is deemed required, Defendant disputes that his failure to comply with the prepublication review process harmed the United States or the CIA's or the NSA's abilities to perform their missions. The cited declarations, which state as a general matter that failure to comply with the prepublication review process harms the CIA's and the NSA's ability to perform their missions, do not establish that Mr. Snowden's discussion of

publicly-available materials created additional harm.

35. Snowden frequently gives public speeches involving prepared and/or pre-planned remarks, and is frequently compensated for those speeches. *See* Exh. G (NPR Fresh Air Tr.) at 20 (Snowden "run[s] [his] own studio" because he "make[s] [his] living" by "giv[ing] lectures" to the public); Exh. H (Open Mic Website) at 3 (Snowden "has been invited to speak at venues ranging from international investment conferences to the TED stage to the Sorbonne—receiving glowing reviews and passionate applause from audiences around the world"); Exh. I (Snowden Speaker Contracts & Invoices) at 2, 5, 13 (contracting to provide Snowden compensation for giving prepared remarks and participating in moderated panel interviews).

**Response:** The evidence Plaintiff cites in support of this assertion does not establish it. The NPR Transcript and Open Mic Website establish that Defendant gives speeches, but not that they involve prepared and/or pre-planned remarks. Exh. G at 20; Exh. H at 3. The Contracts & Invoices similarly provide that Defendant will be compensated for "remarks," a "[m]oderated [c]onversation," and a "[p]anel discussion," not prepared remarks. Exh. I at 2, 5, 13; *see also* Snowden Decl. ¶¶ 13–15, 17–18.

37. For example, in March 2014, Snowden gave a "TED Talk" in which he discussed a purported slide that was marked, on its face, as classified at the Top Secret level, and that referred to a purported government surveillance program. *See* Exh. J (2014 TED Speech Tr.) at 6–9; *see* also https://www.youtube.com/watch?v=yVwAodrjZMY at 5:05. Snowden also discussed another purported NSA program for tracking the location of communications it intercepts. Exh. J (2014 TED Speech Tr.) at 10–12.

**Response:** Defendant disputes the characterization that he gave a "TED Talk" in March 2014. Defendant was interviewed on stage at a TED conference and he extemporaneously responded to questions. Snowden Decl. ¶ 9.

38.     Similarly, in October 2015, Snowden gave a speech at an Internet security trade fair known as "it-sa" by remote video, in which Snowden displayed and discussed a purported slide that was marked, on its face, as classified at the Top Secret level, and that referred to purported government surveillance programs. *See* Exh. K (2015 it-sa Speech Tr.) at 7–8; *see also* https://www.youtube.com/watch?v=4WCqGHcFyCg at 06:42.

**Response**: Defendant disputes the characterization that he gave a "speech" at it-sa in October 2015. Defendant's remarks were extemporaneous and not the result of advance preparation. Snowden Decl. ¶ 10.

39.     In April 2017, Snowden gave a speech at the College of William & Mary by remote video, in which he discussed purported government surveillance programs, including by displaying and discussing three purported slides each of which was marked, on its face, as classified at the Top Secret level. *See* Exh. L (2017 William & Mary Speech Tr.) at 43–44, 56–57; *see also* https://www.youtube.com/watch?v=gWbaUfFfhlY at 51:30, 52:00, 1:05:45.

**Response**: Defendant disputes the characterization that he gave a "speech" at the College of William & Mary in April 2017. Defendant's remarks were extemporaneous and not the result of advance preparation. Snowden Decl. ¶ 11.

40.     In May 2019, Snowden gave a speech at Dalhousie University by remote video, in which Snowden discussed the purported capacities and operation of purported government surveillance programs, including by displaying and discussing a purported slide that was marked, on its face, as classified at the Top Secret level. *See* Exh. M (2019 Dalhousie Univ. Speech Tr.) at 25–26; *see also* https://www.youtube.com/watch?v=oizhVJstxC4 at 32:15.

**Response**: Defendant disputes the characterization that he gave a "speech" at Dalhousie University in May 2019. Defendant's remarks were extemporaneous and not the result of

advance preparation. Snowden Decl. ¶ 13.

43.     Snowden's failure to comply with the prepublication review process with respect to his speeches harms the United States, including by harming the CIA's and NSA's abilities to perform their missions. *See* CIA Decl. ¶¶ 21–30; NSA Decl. ¶¶ 21–25. For example, failure to comply with the prepublication review process undermines the agencies' abilities to ensure the secrecy of sensitive information, and also erodes the trust and confidence necessary for partners and allies to share sensitive information with the agencies. *See* CIA Decl. ¶¶ 21–30; NSA Decl. ¶¶ 21–25.

**Response:** To the extent a response is deemed required, Defendant disputes that his failure to comply with the prepublication review process harmed the United States or the CIA's or the NSA's abilities to perform their missions. The cited declarations, which state as a general matter that failure to comply with the prepublication review process harms the CIA's and the NSA's ability to perform their missions, do not establish that Mr. Snowden's discussion of publicly-available materials created additional harm. Defendant also disputes the assertion that failure to comply with the prepublication review process undermines the agencies' described abilities or erodes trust and confidence as described above. *See infra* Argument I.A.3.

### Defendant's Statement of Additional Potentially Disputed Facts

In addition to those material disputed facts set forth above, as described below, Defendant has raised the following facts, which the government may dispute:

1.     The parties' course of dealing establishes that the government does not enforce the Secrecy Agreements as against speeches or other public remarks, and therefore that the Secrecy Agreements do not apply to speeches or other public remarks such as those at issue here. *See infra* Argument II.B; *see also* Answer ¶ 127 (Third Affirmative Defense).

2.      The course of dealing between the government and other parties also establishes that the government does not enforce the Secrecy Agreements as against speeches or other public remarks, and therefore that the Secrecy Agreements do not apply to speeches or other public remarks such as those at issue here. *See infra* Argument II.B; *see also* Answer ¶ 127 (Third Affirmative Defense).

3.      The United States has engaged in selective prosecution and viewpoint discrimination against Defendant; the government has animus towards Mr. Snowden's viewpoints on privacy and secrecy matters and has initiated these proceedings against him because of that animus, rather than based upon genuine concerns about the disclosure of classified information. Answer ¶ 126 (Second Affirmative Defense); *see also infra* Argument II.C.1.

4.      The government anticipatorily breached its contracts with Mr. Snowden. It has made clear through its statements and conduct that it has never intended to review any submissions by Mr. Snowden within a reasonable time and for the sole purpose of determining if they contain classified information. Answer ¶¶ 123–25 (First Affirmative Defense); NSA Secrecy Agreements ¶ 9; CIA Secrecy Agreements ¶ 6.

5.      In particular, the government has evidenced through its conduct a clear intention to refuse to review Defendant's book *Permanent Record* or any other pertinent materials in a good faith and timely fashion. *See* Answer ¶¶ 123–25 (First Affirmative Defense). Intelligence community officials have expressed through numerous public statements their intention to refuse Mr. Snowden's submissions to the prepublication review process a fair hearing. *See* Exhs. 11–14. This conduct has convinced Mr. Snowden that any submission to such a process would ultimately be fruitless. Snowden Decl. ¶ 7.

## STANDARD OF REVIEW

As the moving party, the government bears the burden of demonstrating that summary judgment is appropriate. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To do so, it must establish with "perfect[ ] cl[arity] that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). And Mr. Snowden is aided by the fact that "on summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Summary judgment is not appropriate if any rational trier of fact could conclude that the record supports finding for the non-moving party. *Id.* (citing *Matsushita*, 475 U.S. at 587–88); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). To defeat summary judgment, then, Mr. Snowden need only show a single genuine dispute between the parties as to a material fact—that is, any fact that could affect the outcome of the case. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002); *Teamsters*, 947 F.2d at 118–19; *see also* Fed. R. Civ. P. 56(a). That showing is not a difficult one to make where, as here, a party's intent or the parties' course of performance regarding a contract is an issue. *See, e.g.*, *Lowman v. Md. Aviation Admin.*, No. JKB-18-1146, 2019 WL 133267, at *9 (D. Md. Jan. 8, 2019) (citing *Evans v. Techs. Applications & Servs.*, 80 F.3d 954, 959 (4th Cir. 1996)); *see infra* Part II.

Moreover, Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be [postponed] when the nonmovant has not had the opportunity to discover information that is essential to his opposition." *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 250 (4th Cir. 2018) (quotation marks omitted). That is why summary judgment is appropriate before discovery

"[o]nly in the rarest of cases." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). As explained more fully below, Mr. Snowden has identified, by way of an appropriate sworn pleading, the specific information that "could possibly create a genuine issue of material fact sufficient to survive summary judgment or otherwise affect the court's analysis." *Neal v. Luedtke*, 713 F. App'x 177, 181 (4th Cir. 2017); *see Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015); *see infra* Part II; 56(d) Lustberg Decl. Mr. Snowden is, of course, not required to prove those facts at this point, as it "is unfair to argue in a motion for summary judgment that the non-moving party has not provided sufficient evidence when discovery has not even been commenced." *JMT Capital Holdings, LLC v. Johnson*, No. 3:15-cv-00291-LB, 2015 WL 3832674, at *10 (N.D. Cal. June 19, 2015).

## ARGUMENT

I.   **The government's motion fails as a matter of fact and of law as to submission of speech-related materials.**

    A.   **The government has failed to establish that Mr. Snowden breached the Secrecy Agreements with respect to his public remarks.**

        1.   **Not one of the four speeches identified by the government as the basis for liability involved personally prepared materials based on intelligence or classified information that were not widely available to any member of the public.**

In its motion, the government seeks to impose liability upon Mr. Snowden for his "public speeches involving prepared and/or pre-planned remarks" before even identifying them. Gov't Br. 10 (MF ¶ 35); *see* Gov't Br. 11 (MF ¶ 41). That Mr. Snowden "frequently" gives such speeches, Gov't Br. 10 (MF ¶ 35), is not, as the government presents it, an undisputed fact. To the contrary, Mr. Snowden flatly disputes it. *See* Snowden Decl. ¶¶ 14–18 (explaining that the contracts the government characterizes as "provid[ing him] compensation for giving prepared remarks" did not require him to prepare his remarks).

In fact, the government's motion points to just four examples of Mr. Snowden's public remarks that it believes are sufficient to establish his liability as to Count II, writ large—yet, as explained below, none of them involved the kind of personally prepared materials that must be submitted pursuant to the Secrecy Agreements. *See* Gov't Br. 10–11 (MF ¶¶ 37–40); *see supra* Statement of Genuine Issues of Material Fact ¶¶ 37–40. Mr. Snowden did not prepare remarks based on intelligence or classified information for any of those four occasions. *See* Snowden Decl. ¶ 9 (no such prepared remarks for TED); *id.* ¶ 10 (same for it-sa); *id.* ¶ 11 (same for College of William & Mary); *id.* ¶ 13 (same for Dalhousie University). Nor did he rely on personally prepared notes or outlines based on that kind of information. *Id.* ¶¶ 9–11, 13. Although on one of those four occasions, the hosts provided Mr. Snowden in advance with a list of questions to guide his remarks, he did not prepare any written materials in response. *See id.* ¶ 10.[1]

To be sure, in many of Mr. Snowden's public remarks, he displays information that the government considers to be embarrassing or subject to official secrecy, but he did not personally create this material, and it is already broadly available to the public at the click of a button. For example, Mr. Snowden often shows congressional testimony from C-SPAN, or headlines from Pulitzer Prize–winning stories from the *Washington Post* and the *Guardian*. *See id.* ¶ 19. He also, as the government points out, shows government slides published by news organizations that the

---

[1] One of those hosts was Lawrence Wilkerson, a former U.S. Army Colonel and high-ranking State Department official, who is subject to other agencies' prepublication review requirements. *See* Snowden Decl. ¶¶ 11–12. To Mr. Snowden's knowledge, Mr. Wilkerson did not interact with any prepublication review officials prior to their public discussion, nor has he been sued for breach. *Id.* ¶ 12. Similarly, Ray McGovern, a former CIA analyst, and Coleen Rowley, a former FBI employee, were Mr. Snowden's co-panelists during the University of Iowa event referenced in one of his contracts, *see* Gov't Br., Exh. I; Snowden Decl. ¶ 15. To Mr. Snowden's knowledge, neither of them interacted with any prepublication review officials prior to the panel, nor have they been sued for breach. *Id.* ¶ 16.

government still deems classified. *See id.* ¶ 19; Gov't Br. 24. But even when the government has

not officially declassified this kind of information, it is available to anyone with an Internet

connection, and it is plainly part of the public debate on critical, pressing, and consequential

issues of public policy.[2]

> **2.** **The plain language of the Secrecy Agreements does not require submission of publicly available materials that former employees do not personally create.**

Government contracts are interpreted under the same general rules as others. *Lockheed*

*Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997). These include the rule

that "interpretation begins with the language of the written agreement," *NVT Techs., Inc. v.*

*United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004), and that, when an agreement's meaning is

"plain and unambiguous," it ends there, too. *Arko Exec. Servs., Inc. v. United States*, 553 F.3d

---

[2] The government argues that "[a]s to any information Snowden *himself* disclosed to the media, he cannot evade his non-disclosure obligations by claiming the information is already public." Gov't Br. 23. But as a factual matter, Mr. Snowden only has access to, and ever displays, slides published by news organizations—slides that any member of the public can access and display. *See* Snowden Decl. ¶ 21. In addition, contrary to the government's contention that "Snowden [is attempting to] unilaterally vitiate his non-disclosure obligations through his prior disclosures," Gov't Br. 23, the slides did not become public as a result of his unilateral decision; their publication was the result of consultations between news organizations and senior government officials and included consideration of government objections based on the possibility of resulting harm. *See, e.g.*, Glenn Greenwald, *Some Facts About How NSA Stories Are Reported*, Intercept, Mar. 23, 2014, https://theintercept.com/2014/03/23/facts-nsa-stories-reported (attached as Exh. 1 to Lustberg Decl.) (explaining that Mr. Snowden "played no role . . . in deciding which documents are or are not reported"); *see also, e.g.*, Barton Gellman, *Secrecy, Security and Self-Government: An Argument For Unauthorized Disclosures*, Century Found., Sept. 3, 2013, https://tcf.org/content/commentary/secrecy-security-and-self-government-an-argument-for-unauthorized-disclosures (national-security reporter explaining the process through which the "*Washington Post* and its peers routinely consult responsible agencies before publishing anything classified") (attached as Exh. 2 to Lustberg Decl.). Moreover, accepting the government's argument that Mr. Snowden somehow "prepared" the slides would offer it a vehicle for using this lawsuit to seek liability for any disclosures Mr. Snowden may have made to major news publications in 2013. That would be improper. If it seeks to hold Mr. Snowden liable under the Secrecy Agreements for those purported disclosures, it must bring a civil action on that basis. That it has not done so is likely a reflection of the fact that it has at its disposal, and has relied on, a more effective tool: criminal prosecution.

1375, 1379 (Fed. Cir. 2009). For unambiguous provisions, extrinsic evidence is irrelevant. *See*

*Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011–12 (Fed. Cir.

2019); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).[3]

The NSA Secrecy Agreements provide, in relevant part, that signers agree to submit,

during and after their employment, "*all information or materials*, including works of fiction, *that*

*[they] have prepared for public disclosure* which contain or purport to contain, refer to, or are

based upon Protected Information." NSA Secrecy Agreements ¶ 9 (emphases added). "Protected

Information" is defined, in relevant part, as information obtained during employment that is

classified or in the process of being classified, including "intelligence and intelligence-related"

information. *Id.* ¶ 1. The scope of the CIA Secrecy Agreements is similar. Those agreements

require signers to submit "*any writing or other preparation* in any form, including a work of

fiction, which contains any mention of intelligence data or activities, or contains any other

information or material that might be based on" Protected Information, "that [they] contemplate

disclosing publicly or that [they] have actually prepared for public disclosure." CIA Secrecy

Agreements ¶ 5 (emphasis added).

These contract terms do not require submission of the kinds of materials Mr. Snowden

displayed during the four events the government has identified as the basis for liability. The

---

[3] Unless otherwise noted, the relevant terms of the three NSA Secrecy Agreements executed by the parties in 2005, 2009, and 2013 ("NSA Secrecy Agreements") are identical. *See* Am. Compl., Exh. C. The same is true for the relevant terms of the three CIA Secrecy Agreements, executed by the parties in 2005, 2006, and 2009 ("CIA Secrecy Agreements"). *See id.*, Exh. A. The NSA and CIA Secrecy Agreements state that the contract "shall be interpreted under and in conformance with the law of the United States." *Id.*, Exh. A ¶ 19; *Id.*, Exh. C ¶ 12. Thus, as is the norm with respect to contracts to which the federal government is a party, the relevant contract law is the federal common law. *See Aegis Def. Servs., LLC v. Chenega-Patriot Grp., LLC*, 141 F. Supp. 3d 479, 488 (E.D. Va. 2015) (federal common law applies to suits brought by the United States on its contracts); *see also Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67 (1943).

contracts' submission requirements apply only to things that former employees "[have] prepared," suggesting that the materials must have been planned in advance, and personally prepared by the employee. The requirements apply only to "information or material" obtained during employment, explicitly excluding matters that former employees learned about outside of their jobs. They require "disclosure," a word whose primary definition and most common understanding is limited to the release of "new or secret information." "Disclosure," *Oxford English Dictionary*, https://www.lexico.com/en/definition/disclosure. And, in both agencies' Secrecy Agreements, the only named example of materials that must be submitted for review are "works of fiction." NSA Secrecy Agreements ¶ 9; *see* CIA Secrecy Agreements ¶ 5. This would be a strange choice if "writing or preparation" encompassed public domain materials created by others, but it is illustrative if the phrase refers—as it must—to materials prepared by the former employee. That phrase is plainly meant to cover intelligence-related fiction personally authored by the signatory government employee, not by John Le Carré.

This straightforward and sensible reading is required by Fourth Circuit precedent that has controlled for more than forty years. In *United States v. Marchetti*, the Court of Appeals held that while, under CIA Secrecy Agreements, a former employee "may not disclose classified information obtained . . . during the course of his employment which is not already in the public domain," the same is not true where "[i]nformation, though classified, may have been publicly disclosed." 466 F.2d 1309, 1317–18 (4th Cir. 1972). In those circumstances, former employees "should have as much right as anyone else to republish it." *Id.* at 1318 (narrowing an injunction against a former CIA employee to allow the agency to "withhold[] approval of publication only of information which is classified and which has not been placed in the public domain by prior disclosure").

This reading is also consistent with the only opinion the government cites for the proposition that its Secrecy Agreements apply to anything speech-related at all.[4] In *Agee v. CIA*, the court found it "far too farfetched" that the government would ever seek to apply its Secrecy Agreements to works prepared by others that could be found in the public domain. 500 F. Supp. 506, 510 (D.D.C. 1980). In an excess of caution, however, the court entered an injunction that explicitly relieved the defendant former intelligence official of having to submit such materials, through what the court called "redundant" injunction provisions that ruled out liability for "reading a passage aloud from a book to another person, or telling his wife what a newspaper has reported." *Id.* The court also pointedly noted that the CIA had never tried to apply a Secrecy Agreement to publicly available materials created by others, and that the injunction "provisions [were] express agency policy and ha[d] been endorsed, if not mandated, by reviewing courts." *Id.* (citing *Snepp v. United States*, 444 U.S. 507 (1980), and *Marchetti*, 466 F.2d at 1318).[5]

_____

[4] The government's other citation is to *United States v. Bisonnette*, which is not a judicial opinion, but a negotiated settlement. *See* Consent Decree, *United States v. Bisonnette*, No. 16-cv-1070 (E.D. Va. Sept. 23, 2016), ECF No. 2.

[5] At various points, the government appears to claim that it is also entitled to a judgment as to liability based on a theory of fiduciary duty. *See, e.g.*, Gov't Br. 18. While the government does not explicitly identify the source of any fiduciary duty, it does cite to the district court opinion in *Snepp*, which considered a "fiduciary dut[y] . . . to submit to the CIA for its initial review all manuscripts which contain information *gained by him as a result of his CIA employment*." *United States v. Snepp*, 456 F. Supp. 176, 177 (E.D. Va. 1978) (emphasis added). Much like the contract terms, this obligation cannot reasonably be understood to reach information that is not personally created and is already in the public domain.

The Restatement (Second) of Agency defines a former agent's obligation regarding the use of confidential information as reaching only "confidential matters given to [an agent] only for the principal's use or acquired by the agent in violation of duty"; it does not extend to information in the public domain. Restatement (Second) of Agency § 396(b) (1958); *id.* § 395 (Even a current agent, who has stricter obligations to a principal than does a former one, may "use or . . . communicate information confidentially given him by the principal . . . or in violation of his duties as agent" as long as "the information is a matter of general knowledge."). This understanding is also reflected in the most recent Restatement of Agency. *See* Restatement (Third) Of Agency § 8.05 cmt. c (2006) ("confidential client information encompasses all information, *not generally known*" (emphasis added)). Thus, even under a fiduciary theory, Mr.

3. **Even if the Secrecy Agreements are ambiguous, reading them to reach works prepared by others that are found in the public domain would be unreasonable.**

It is not entirely clear whether the government even disputes this interpretation.[6] Repeatedly, it purports to seek liability only as to Mr. Snowden's "public speeches involving prepared and/or pre-planned remarks." Gov't Br. 24; *see* Gov't Br. 2 ("prepared public speeches discussing intelligence-related information"). That would be a sensible line to draw, in part because it could not be read to require the submission of materials that do not exist. But if the government instead means to argue that the terms of the contract reach beyond personally drafted materials, that reading could not govern because it would be unreasonable. *See Premier Office Complex*, 916 F.3d at 1011 ("To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term, rather, both interpretations must be reasonable." (alterations and citation omitted)).

Reading the Secrecy Agreements to require former employees to submit any intelligence-related materials that they might possibly mention aloud to another person, even when prepared by others and widely available to the public, is unreasonable. This view would require former employees to submit the *New York Times* before discussing an article about the CIA's drone program,[7] or a presidential tweet about Syrian rebels,[8] before speaking in support of or against

_____

Snowden is not obligated to submit publicly available materials created by others to his former employers for approval.

[6] That the government's legal and factual theories of this case are unclear is surely due in part to its decision to speed towards summary judgment before engaging in discovery (or even awaiting Mr. Snowden's answer). It would not be appropriate, as the government suggests, to defer questions about which of Mr. Snowden's individual remarks he had to submit for review until "the remedial phase of this case." Gov't Br. 26. Whether Mr. Snowden breached his contract by failing to submit materials in advance of any particular public speaking engagement is plainly a question of liability, not remedy.

[7] Despite the fact that the CIA's use of drones has been an ongoing matter of public debate for more than a decade, the agency still considers it to be an official secret. *See* Joe Penney et al.,

them. They would have to submit CIA and NSA Director Michael Hayden's memoir (even though it was apparently cleared through prepublication review) before including it in a class syllabus for discussion or reading excerpts aloud to a class. And, as silly as it sounds, they would have to submit the *Washington Post* before, over morning coffee, discussing with their spouses an article about the two psychologists who designed, implemented, and oversaw the CIA's torture program.[9] These are almost exactly the scenarios the court in *Agee* found "far too farfetched" to be actually implicated by the government's prepublication review requirements. *See* 500 F. Supp. at 510. And, in effect, this interpretation would likely preclude former government employees from engaging in extemporaneous speech about matters of public concern—or, at a minimum, from discussing newspaper articles, public testimony, and other materials available to the general public—without prior government censorship and approval.

Equally, to the extent that the government is arguing that former government employees cannot ever speak publicly about "intelligence" without first creating written materials to submit, that interpretation cannot govern because it, too, is unreasonable.[10] Not only would it lead to an

---

*C.I.A. Drone Mission, Curtailed by Obama, Is Expanded in Africa Under Trump*, N.Y. Times, Sept. 9, 2018, https://nyti.ms/2O43rDA (attached as Exh. 3 to Lustberg Decl.).

[8] *See* @realDonaldTrump, Twitter (July 24, 2017, 7:23 PM), https://twitter.com/ realDonaldTrump/status/889672374458646528 ("The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad…..") (attached as Exh. 4 to Lustberg Decl.); *see also Leopold v. CIA*, No. 19-978, 2019 WL 5814026 (D.D.C. Nov. 7, 2019) (rejecting CIA refusal to confirm or deny the existence of records responsive to a FOIA request based on the official acknowledgment of classified information in President Trump's tweet).

[9] *See* Ellen Nakashima & Julie Tate, *Architects of CIA Interrogation Program Settle Lawsuit Brought on Behalf of Brutalized Detainees*, Wash. Post, Aug. 17, 2017, http://wapo.st/2iaGTpu (attached as Exh. 5 to Lustberg Decl.).

[10] The government points to the agencies' internal prepublication review policies to support its contention that "prepublication review is required for speeches and other prepared or pre-planned remarks." Gov't Br. 25. As an initial matter, the policies postdate Mr. Snowden's government employment. *See K-Con Bldg. Sys., Inc. v. United States*, 107 Fed. Cl. 571, 601 (2012) (content

avalanche of submissions to government censors, but—because of its impracticality, burdensomeness, and inherent delay—it would effectively bar former employees from speaking extemporaneously about their past government experience. The only conversations that could take place would be those in which a speaker asked for all possible questions in advance, wrote out complete answers, received approval from the government, and shut down any discussion that went off that script.

These interpretations are unreasonable because the contracts cannot mean to entirely remove former government employees from the public conversations about matters of public concern that most critically require the sharing of their views. Such individuals are amongst the most knowledgeable, experienced, and insightful participants in important, public (and private) debates. In particular, former members of the intelligence community are prized for their unique grasp of the real-world impact of policy and their ability to translate sensitive information into safely digestible form, especially given that their areas of expertise are so frequently shrouded in secrecy.[11]

---

that postdates a contract is "of little value in interpreting the intent of the parties in negotiating and executing the [contract]"). In addition, CIA Policy AR 13-10 (Am. Compl., Exh. D), "Agency Prepublication Review of Certain Material Prepared for Public Dissemination," is not mentioned anywhere in the CIA Secrecy Agreements, nor is NSA/CSS Policy 1-30 (Am. Compl., Exh. F) referenced in the 2005 or 2009 NSA Secrecy Agreements, and so they cannot be analyzed as part of those contracts' plain language. In any event, the policies cannot reasonably be read to require submission of works prepared by others that are found in the public domain. *See* NSA/CSS Policy 1-30 ¶ 2 (describing when "NSA/CSS affiliates . . . may *prepare information* for public release without . . . review"), ¶ 6(b) (same), ¶ 6(b)(4) (requiring former affiliates to "submit the full and final material intended for public release"); CIA Policy AR 13-10 § D.3(a) (noting that "[u]nprepared or unrehearsed oral statements do not exempt an individual from possible *criminal*"—not civil or equitable—"liability in the event they involve an unauthorized disclosure of classified information"). Nor, as explained further below, would such an interpretation satisfy the Constitution.

[11] The government's interpretation further ignores whether the public interest in the information's discussion outweighs the government's interest in enforcing official secrecy. *See, e.g.*, *N.Y. Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713, 730 (1971) (Stewart, J.,

Just as important for the reasonableness analysis, while such a rule would have a breathtaking sweep, it would ultimately be pointless. Even such a broad submission requirement could not reasonably, predictably, and effectively account for the spontaneity of live discussion. Nor—as the CIA itself recognized more than three decades ago—could it effectively prevent intentional disclosures of unclassified information. *See* Memorandum from [REDACTED], Chairman, to Deputy Director, Intelligence Community Staff ¶¶ 2–3 (June 6, 1984), https://www.cia.gov/library/readingroom/docs/CIA-RDP86M00886R002800020021-0.pdf (CIA task force report explaining that its "primary lesson" is that "prepublication review has little to do with leaks" and that "leakers will not be deterred by prepublication review agreements").[12] And besides, it would be farcically avoidable— for example, former employees could simply ask audience members to find the same public material on their smartphones. The Secrecy Agreements exist to protect the government's interests, not its prerogatives. At bottom, the only effective (if imperfect) remedy with respect to extemporaneous remarks is criminal prosecution.

The sheer breadth of the government's position can be seen through a historical analogy to a case that is this case, in every way that matters. In 1972, Daniel Ellsberg awaited trial on Espionage Act charges for leaking classified secrets about the government's unlawful and immoral conduct of the Vietnam War. Suppose that, because he was not detained in advance of trial, he accepted an invitation to read excerpts of the momentous *New York Times* and

---

concurring) (Even where questions of allegedly urgent national security interests are involved, the government must show that "disclosure . . . will surely result in direct, immediate, and irreparable damage to our Nation or its people."); *id.* at 719 (Black, J., concurring) (noting that "security" is a "broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment").

[12] As the sheer number of classified secrets has ballooned, anonymous leaks of government information, including national-security information, continue to happen regularly, even as the government's system of prepublication review has expanded on every axis. *See, e.g.*, Steven Aftergood, *Leaks of Classified Info Surge Under Trump*, Secrecy News (Apr. 8, 2019), https://fas.org/blogs/secrecy/2019/04/leaks-surge (attached as Exh. 6 to Lustberg Decl.).

*Washington Post* stories based on his leaks at a local bookstore—including excerpts of the Pentagon Papers themselves. Had it applied at the time, a rule requiring submission of materials prepared by others would have required him to submit those newspapers for censorship and approval. Would the government really have this Court believe that this rule would have been an effective way to prevent the release (or even the further release) of classified information, and— over and above the serious criminal charges that awaited Mr. Ellsberg—to warn others not to engage in similar behavior?

Such a rule would also be unconstitutional. The government insists that *Snepp* dictates that Mr. Snowden's "liability is straightforward" on Count II. Gov't Br. 16. But the government does not even attempt to address how *Snepp*, which was about the prepublication review of written manuscripts, governs the kinds of materials Mr. Snowden used in the four speeches the government identifies as the basis for his Count II liability. *Snepp* was about a book—one "[b]ased on [Frank Snepp's] experiences as a CIA agent" about "certain CIA activities in South Vietnam." 444 U.S. at 507. And the agreement he signed required only that he "promis[e] that he would 'not . . . *publish* . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency." *Id.* at 508 (alterations in original) (emphasis added). The Court did not consider, or even tangentially address, the reach of prepublication review requirements to materials beyond written manuscripts, let alone the use of materials in wide public circulation that were not personally prepared by former employees in extemporaneous settings. Not surprisingly, variations of the words "publish" and "publication" appear 48 times in *Snepp*, while "speak" or "speech" appear just five—all but one in dissent.

Indeed, only one of the judicial decisions the government cites even considered the

application of Secrecy Agreements to speech-related materials—*Agee,* which, as noted above, found the defendant's concerns that the government's prepublication review requirements might reach materials in the public domain created by others "farfetched," 500 F. Supp. at 510. *See* Gov't Br. 13–16, 25. The government does not cite a single case that squarely holds that former employees must submit to prepublication review before engaging in public remarks of the kind it seeks to punish here—because there isn't one.

Even if *Snepp*'s analysis applied,[13] requiring prepublication review of publicly available materials not personally prepared by a former employee would fail to satisfy *Snepp*'s standard of constitutional reasonableness. It is one thing to say that requiring a former CIA officer to submit a memoir about his service to the agency for an opportunity to redact classified information is a "reasonable means for protecting" the government's interest in protecting national security secrets. *See* 444 U.S. at 509 n.3. It is distinctly another to conclude that it is reasonable to require former employees—in perpetuity—to submit to the government for redaction, or outright suppression, publicly available materials every time they wish to speak aloud about intelligence issues.[14] And that is exactly what the Fourth Circuit meant in *Marchetti* when, citing *Snepp*, it excluded this kind of material from its prepublication review injunction. *See* 466 F.2d at 1318.

As the Fourth Circuit has explained, "a threat of criminal or civil sanctions chills speech,"

---

[13] It is not clear that it does. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (holding that prior restraints on public-employee speeches are constitutional only where the interests of prospective speakers and their audiences are outweighed by the expression's actual impact on the government's interests).

[14] What's more, this absurdly broad requirement would exist without any contractual terms guaranteeing review within a definite time frame—a particularly acute need for spoken remarks. *See, e.g.*, CIA Secrecy Agreements ¶ 6; *see also Chesapeake B & M, Inc. v. Harford Cty.*, 58 F.3d 1005, 1011 (4th Cir. 1995) (holding that a licensing scheme is unconstitutional if it does not "ensure a prompt administrative decision"); *see also Marchetti*, 466 F.2d at 1317 (stating that prepublication review of a former employee's book-length manuscript should take place within thirty days).

but that kind of retrospective "enforcement 'punish[es] the few who abuse rights of speech *after*

they break the law.'" *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1233 (4th Cir. 1989)

(alteration and emphasis in original) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559

(1975)). As compared to the "limits on expression imposed by criminal penalties," the

"presumption against prior restraints is heavier—and the degree of protection broader[.]" *Se.

Promotions*, 420 U.S. at 558–59. The government cannot overcome that heavy presumption

here.[15]

## II.     At a minimum, the Court should deny summary judgment on both Counts I and II because Mr. Snowden has not had an opportunity to conduct discovery regarding the meaning of the Secrecy Agreements and his possible defenses.

### A.     Requests for discovery under Federal Rule of Civil Procedure 56(d) are broadly favored by courts deciding summary judgment motions that have been filed before discovery.

Summary judgment is particularly inappropriate in this case because Mr. Snowden has

had no opportunity to conduct discovery. As noted above, "summary judgment [should] be

refused where the nonmoving party has not had the opportunity to discover information that is

essential to his opposition." *Anderson v. Liberty Lobby*, 477 U.S. at 250 n.5; *see Hodgin*, 885

F.3d at 250. That mandate is strongest where, as here, "the nonmovant seeks necessary

---

[15] If, after considering all possible interpretations of the Secrecy Agreements, including what is shown by discovery, *see infra* Part II, the Court cannot resolve any ambiguities in favor of either party, Mr. Snowden's interpretation must prevail. Under the doctrine of *contra proferentem*, where a court considers both parties' constructions of a contract to be reasonable, the terms "should be construed less favorably to that party which selected the contractual language"—here, the government. *United States v. Seckinger*, 397 U.S. 203, 216 (1970). Before applying the doctrine, a court must "[a]scertain[ ] the most reasonable construction of contract language utilizing other tools of contract interpretation." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006). *Contra proferentum* may be necessary to resolve the government's claim regarding liability as to Count II, but it is "a 'rule of last resort' that 'is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved.'" *Valley Realty Co. v. United States*, 96 Fed. Cl. 16, 31 (2010) (quoting *Gardiner*, 467 F.3d at 1352).

information possessed only by the movant," *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014), and where "fact-intensive issues, such as intent, are involved." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). Indeed, in *Snepp* itself, the district court denied the government's motion for similarly premature relief, "immediate judgment on the pleadings," and ordered that discovery proceed. *United States v. Snepp*, 456 F. Supp. 176, 178 (E.D. Va. 1978).

Moreover, "in order to protect non-moving parties from premature summary judgment motions" like the government's, denials of summary judgment pursuant to Rule 56(d) are "broadly favored and should be liberally granted." *Dufau v. Price*, 703 Fed. Appx. 164, 167 (4th Cir. 2017) (quoting *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014)); *see also Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("To the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution."). Courts thus deny summary judgment on Rule 56(d) grounds unless non-movants failed to file an affidavit or declaration in favor of their motion (as required under the rule), had the opportunity to conduct discovery but chose not to, or asserted the need to discover only non-material evidence. *See McCray*, 741 F.3d at 484.

Mr. Snowden has a "legitimate need[]" for such discovery, *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995), which "could possibly create a genuine issue of material fact sufficient to survive summary judgment or otherwise affect the court's analysis." *Neal*, 713 F. App'x at 181; *see Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (denial of summary judgment appropriate where discovery is "reasonably expected to create a genuine issue of material fact"). With respect to Count II, there is a legitimate need for discovery because, if the Court finds that the meaning of the Secrecy Agreements is ambiguous, it must "look to extrinsic

evidence" to resolve it. *Tidewater Contractors, Inc. v. United States*, 131 Fed. Cl. 372, 392 (2017) (citing *Metro. Area Transit Co. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006)). This includes evidence regarding course of performance, course of dealing, and common trade practice—none of which Mr. Snowden has had the opportunity to obtain through discovery. *Id.* (citing Restatement (Second) of Contracts § 203 (Am. L. Inst. 1981)). And, with respect to both Count I and II, discovery is reasonably expected to create a genuine issue of material fact regarding viewpoint discrimination and selective enforcement, as well as regarding the government's anticipatory breach—any of which would render the Secrecy Agreements unenforceable in these contexts.

Here, of course, the government filed its motion for summary judgment before Mr. Snowden even answered, much less had the opportunity to conduct any discovery. *See, e.g.*, *Sixty Internet Domain Names*, 302 F.3d at 245–47 (reversing grant of summary judgment issued just six weeks after the amended complaint was filed, and three months before discovery was to be completed, in a "case involv[ing] complex factual questions about intent and motive"). At a minimum, therefore, Mr. Snowden respectfully requests that the Court deny the government's motion as premature pursuant to Federal Rule of Civil Procedure 56(d). In the alternative, Mr. Snowden asks that the Court defer a decision on the motion and allow him time to obtain affidavits or declarations or to take discovery.

> **B.** **If the Court finds that the Secrecy Agreements are ambiguous with respect to Count II, Mr. Snowden requires discovery regarding course of performance, course of dealing, and common trade practice.**

"Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, *any course of performance accepted or acquiesced in without objection* is given great weight in the interpretation of the agreement." *Metro. Area Transit*, 463 F.3d at 1260 (emphasis in original)

(quoting Restatement (Second) of Contracts § 202(4)). "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." Restatement (Second) of Contracts § 202 cmt. g.

Here, it is likely that discovery regarding course of performance will dispel any ambiguity in favor of Mr. Snowden's interpretation of the submission requirements. According to news reports, the government has been aware of Mr. Snowden's public speaking for years. *See, e.g.*, Michael Isikoff & Michael B. Kelly, *In Exile, Edward Snowden Rakes in Speaking Fees While Hoping for a Pardon*, Yahoo! News, Aug. 11, 2016, https://www.yahoo.com/news/edward-snowden-making-most-digital-000000490.html (attached as Exh. 7 to Lustberg Decl.) (quoting then–CIA Director John Brennan as saying that Mr. Snowden "[g]etting remuneration" for speeches "is very unfortunate and wrong"). But the government has never before sought to hold Mr. Snowden liable for breach of the Secrecy Agreements. This suggests that discovery regarding course of performance—specifically any communications from or involving the CIA and NSA regarding Mr. Snowden's speeches, including possible enforcement of the secrecy agreements against him, *see* 56(d) Lustberg Decl. ¶¶ 7–8—will support Mr. Snowden's position that the contracts' submission requirements do not reach the kinds of materials Mr. Snowden employs in his public talks.

Similarly, evidence regarding the government's lack of enforcement against *others* for speaking publicly without submitting to prepublication review would offer trade usage evidence to establish that the contracts do not require submission of materials not personally prepared by former employees. *See Tidewater Contractors*, 131 Fed. Cl. at 399 (citing *W. States Constr. Co. v. United States*, 26 Cl. Ct. 818, 821–24 (1992)); *see also* Snowden Decl. ¶¶ 12, 16. A trade usage is defined as "having such regularity of observance in a place, vocation, or trade as to

justify an expectation that it will be observed with respect to a particular agreement."

Restatement (Second) of Contracts § 222(1). Its existence and scope is a question of fact. *Id.* §

222(2).

Here, a regularly observed practice across the Intelligence Community concerning the

enforcement of the Secrecy Agreements with regard to speech-related materials would be

material to interpreting any ambiguity. For this reason, Mr. Snowden will request discovery of

any and all materials, such as legal or policy memoranda or instructions to government staff or

prosecutors, that address the enforcement of prepublication review of scheduled speeches and

live speaking events; discovery regarding the number and type of "preparations" related to

planned speeches and live speaking events submitted to prepublication review; and records

detailing past government enforcement of any Secrecy Agreements against scheduled speeches

and live speaking events. 56(d) Lustberg Decl. ¶ 9.

### C. As to both Counts, Mr. Snowden also requires discovery to show that there is a genuine issue of material fact regarding the enforceability of the Secrecy Agreements.

#### 1. Mr. Snowden requires discovery to present his defense of selective enforcement.

The evidence Mr. Snowden seeks through discovery is also relevant and material to the

enforceability of the contract based on its selective enforcement of the Secrecy Agreements to

discriminate based on viewpoint. The historical record is replete with evidence showing that the

CIA's enforcement of prepublication review requirements significantly "correlat[es] with the

agency's perception of the extent to which the material is favorable to the agency." *Agee*, 500 F.

Supp. at 509; *see, e.g.*, Amy Davidson Sorkin, *Q. & A.: Ali Soufan*, New Yorker, May 16, 2012,

https://www.newyorker.com/news/amy-davidson/q-a-ali-soufan (attached as Exh. 8 to Lustberg

Decl.) (explaining that the CIA applied "redactions clearly aimed at controlling the narrative" in

Mr. Soufan's manuscript about torture, and that "books defending [torture techniques], like [former CIA officer Jose] Rodriguez's, don't appear to have such redactions"). But this record is incomplete and not currently in admissible form, while the relevant information is in the government's possession. Indeed, the CIA's Inspector General possesses a secret report on the topic. *See* Greg Miller & Julie Tate, *CIA Probes Publication Review Board Over Allegations of Selective Censorship*, Wash. Post, May 31, 2012, http://wapo.st/2iLpUuP (attached as Exh. 9 to Lustberg Decl.) (discussing a 2012 CIA internal investigation sparked by "growing concern in the intelligence community that the review process is biased toward agency loyalists, particularly those from the executive ranks").

Discovery is therefore necessary to address the factual issue of whether animus towards certain speakers or to the content of their messages, rather than concerns about the disclosure of classified information, has informed the government's past and current enforcement of the Secrecy Agreements. *See Agee*, 500 F. Supp. at 509 (explaining that discovery would be required to develop a factual record sufficient to support a decision on the defendant's viewpoint-discrimination and selective-enforcement argument). It is a fundamental principle of the First Amendment that the government may not "punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017). Discrimination on the basis of viewpoint is an "egregious form of content discrimination," which is "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. at 829 (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

It is notable that the government's only case even remotely suggesting that prepublication review could, either contractually or constitutionally, cover speech-related materials that are not personally created and that are widely available to the public also explained that "it is certain that the government cannot use enforcement of [a secrecy agreement] for the sole purpose of suppressing speech that is unfavorable to the agency." *Agee*, 500 F. Supp. at 508. The court in *Agee* was seriously concerned by the prospect of discriminatory enforcement of a secrecy agreement—for example, on "the impermissible ground that the agency was offended by the unfavorable material." *Id.* The court explained that enforcing the contract to "suppress[] speech that is unfavorable to the agency" would be as self-evidently unconstitutional as enforcing it "solely on the grounds of sex or of race, i.e., by enforcing it only against women or against blacks." *Id.* The court determined that the defendant had "raised a factual issue as to whether the Government's past enforcement [of prepublication review requirements] has been clouded by content considerations rather than wholly legitimate concerns for security," and—especially relevant to Count I—rejected the government's request to impose a constructive trust over the proceeds from two books the defendant did not submit for review. *Id.* at 509.

To determine if viewpoint discrimination is present, a court should look to whether "the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 137 S. Ct. at 1766. Obviously, discovery is necessary to resolve this issue. Mr. Snowden therefore will seek, among others, records regarding instances in which the government has sought to enforce the Secrecy Agreements in the past, including the subject matter of the relevant material, the government's enforcement steps, and the results. 56(d) Lustberg Decl. ¶ ¶ 10–11. Additionally, he will request discovery about instances in which the government was aware that an individual bound by the Secrecy Agreements gave a speech or appeared on television

(whether they in fact revealed classified information or not) but nevertheless chose not to sue to enforce the contract. *Id.* ¶ 11. And he will request the CIA's secret report on these issues, any other government reports or memoranda on similar topics, and related materials. *Id.* ¶ 11.

A selective enforcement claim "requires a plaintiff to demonstrate that the government's enforcement process 'had a discriminatory effect and that it was motivated by a discriminatory purpose' . . . [A] plaintiff must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'" *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 634–35 (4th Cir. 2016) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985); *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 825 (4th Cir. 1995)). The Fourth Circuit has identified a list of factors that are probative in determining discriminatory intent:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Cent. Radio Co. Inc.*, 811 F.3d at 635 (citing *Sylvia Dev.*, 48 F.3d at 819). This list of factors, which the Court must analyze in resolving this defense of Mr. Snowden's, makes clear the need for discovery, including the requests described above.

## 2. Mr. Snowden requires discovery to present his defense of anticipatory breach.

Equally, if, as Mr. Snowden believes discovery will show, the NSA and CIA would not have conducted a good-faith review of *Permanent Record*, then he would be excused from performing under the contract's prepublication review term as a result of the government's anticipatory breach. *See* Snowden Decl. ¶ 7; 10 Corbin on Contracts § 54.17 (2019) ("[A] repudiation of the duty of one of the parties . . . gives to the [other] the legal privilege of refusing

to tender the return performance."). Anticipatory breach excuses performance on a contract where one party declares, either expressly or through clear actions, that "he will not perform at the time set for his performance." *Fairfax v. Wash. Metro. Area Transit Authority*, 582 F.2d 1321, 1325 (4th Cir. 1978) (doctrine also known as "breach by anticipatory repudiation"); *see Elliott v. Great Point Partners, LLC*, No. 1:09-cv-863, 2011 WL 63660, at *6 (E.D. Va. Jan. 5, 2011); *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 449 (E.D. Va. 2009). Significantly, a "repudiation . . . need not be express or dependent on 'spoken words' alone." *Fairfax*, 582 F.2d at 1327.

Where a party anticipatorily breaches, that breach is a "good defense" to a claim of liability under the contract. 10 Corbin on Contracts § 54.17. Thus, Mr. Snowden has a valid affirmative defense that the government anticipatorily breached if it, through its conduct, "evinc[ed] a clear intention to refuse performance in the future." *Fairfax*, 582 F.2d at 1326–27 (quotation marks omitted). Where, as here, discovery on that question is necessary to resolve the defense, summary judgment should be denied. *See, e.g.*, *Jade Grp., Inc. v. Cottman Transmission Ctrs., LLC*, No. 16-01237, 2016 WL 3763024, *8 (E.D. Pa. July 13, 2016) (denying summary judgment to allow discovery on anticipatory breach); *Borden v. Hartford Life & Accident Ins. Co.*, No. CIV-15-00687-PHX-DJH, 2016 WL 9280237, at *1 (D. Ariz. Apr. 7, 2016) (same); *Cafaro v. Zois*, No. 15-CIV-80150, 2015 WL 3821752, at *13 (S.D. Fla. June 1, 2015) (same).

Here, the likelihood of anticipatory breach necessitates discovery. In particular, the public record suggests that the government did not intend to perform its end of the NSA and CIA Secrecy Agreements—specifically, to review any submissions by Mr. Snowden "in a reasonable time," NSA Secrecy Agreements ¶ 9; *see* CIA Secrecy Agreements ¶ 6, and solely "to determine whether [they] . . . contain[ ]" any "Protected Information," NSA Secrecy Agreements ¶ 9, or

"any material or information that [he had] agreed not to disclose," CIA Secrecy Agreements ¶ 6. These restrictions on review and timing are central to the contracts. They are precisely the limitations that the government has relied on time and again to justify the enforceability of the entire prepublication review system. *See, e.g.*, *Marchetti*, 466 F.2d at 1317 (explaining that "to the extent that [a secrecy agreement] purports to prevent disclosure of unclassified information . . . [it] would be in contravention of his First Amendment rights," and "[u]ndue delay would impair the reasonableness of the restraint," which "is to be maintained if the restraint is to be enforced"). But the limitations appear to have been entirely absent as applied to Mr. Snowden.[16] *See, e.g.*, Snowden Decl. ¶ 7; Gov't Br. 9 (MF ¶ 33) (quoting one of Mr. Snowden's attorneys stating that "Had Mr. Snowden believed that the government would review his book in good faith, he would have submitted it for review" (citing Gov't Br. Exh. F at 1)).

    While the public record is incomplete, it suggests that discovery would be reasonably likely to create a genuine issue of material fact regarding whether the government had already decided, prior to Mr. Snowden's publication of *Permanent Record*, never to clear anything Mr. Snowden ever submitted. As explained above, the CIA's and NSA's prepublication review regimes are susceptible to political pressures, viewpoint discrimination, and selective enforcement. *See supra* Part II.C.1. And there is a strong likelihood that the government would have subjected Mr. Snowden specifically to such discriminatory treatment. A review of the

---

[16] While it is true that former government employees may generally challenge prepublication review determinations (or delays) in federal court, that option would have been a mirage for Mr. Snowden. Had he filed such a lawsuit, the government would undoubtedly have sought to prevent him from invoking the power of the courts by relying upon the fugitive disentitlement doctrine, which would have insulated its prepublication review of Mr. Snowden's submissions, no matter how biased or unreasonable, from judicial review. *See, e.g. Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 595 (4th Cir. 2002) ("[A] court may 'dismiss an appeal or writ of certiorari if the party seeking relief is a fugitive while the matter is pending.'" (quoting *Degen v. United States*, 517 U.S. 820, 824 (1996))).

parties' history reveals why: a whistleblower the government considers to be a traitor would have been seeking permission from the very agencies on which he blew the whistle to speak about his views on surveillance, which is central to their work. It is hardly a stretch to conclude that discovery is legitimately needed to determine whether the same government that once violated the sovereign privileges of a foreign head of state in order to chase down a rumor concerning Mr. Snowden's whereabouts did not plan to give him a fair shake in prepublication review. *See* Max Fisher, *Evo Morales's Controversial Flight Over Europe, Minute by Heavily Disputed Minute*, Wash. Post, July 3, 2013, https://wapo.st/2pvpdt4 (attached as Exh. 10 to Lustberg Decl.); *see also* Isikoff & Kelly, *supra* (quoting then–CIA Director Brennan's comment that it was "wrong" that Mr. Snowden could "[g]et[] remuneration" for speaking while in exile).

Moreover, the government has charged Mr. Snowden under the Espionage Act and other federal statutes, *see* Criminal Complaint, *United States v. Snowden*, No. 1:13-CR-265 (CMH) (E.D. Va. June 14, 2013), *available at* https://wapo.st/37iMSOv (attached as Exh. 11 to Lustberg Decl.), and it is unclear whether the government has ever cleared an author's work through prepublication review while that individual awaited apprehension and trial on federal charges. Members of the Intelligence Community have publicly expressed their animosity towards Mr. Snowden in extreme terms, and have suggested that this sentiment is widespread throughout its ranks. Former CIA Director James Woolsey called for Mr. Snowden to be "hanged by the neck until he's dead, rather than merely electrocuted." Bradford Richardson, *Ex-CIA Director: Snowden Should Be 'Hanged' for Paris*, The Hill (Nov. 19, 2015), https://thehill.com/blogs/blog-briefing-room/260817-ex-cia-director-snowden-should-be-hanged-for-paris (attached as Exh. 12 to Lustberg Decl.). The man President Trump chose to be his first CIA Director declared on television that "the proper outcome" of Mr. Snowden's actions "would be that he would be given

a death sentence." *Benghazi Investigation and Hillary Clinton's Emails*, C-SPAN (Feb. 11, 2016), https://cs.pn/2qZmnNf; Joe Mullin, *Trump's Pick for CIA Director Has Called for Snowden's Execution*, Ars Technica, Nov. 18, 2016, https://arstechnica.com/tech-policy/2016/11/trumps-pick-for-cia-director-has-called-for-snowdens-execution (attached as Exh. 13 to Lustberg Decl.) (reporting on Mr. Pompeo's comments). And members of the intelligence community said they would "love to put a bullet in [Snowden's] head," fantasized about poisoning Mr. Snowden and having him "die[] in the shower," and explained that "[a] lot of people share this sentiment." Benny Johnson, *America's Spies Want Edward Snowden Dead*, Buzzfeed News, Jan. 16, 2014, https://www.buzzfeednews.com/article/bennyjohnson/americas-spies-want-edward-snowden-dead (attached as Exh. 14 to Lustberg Decl.).

Discovery is, then, reasonably likely to create a genuine issue of material fact regarding whether, for Mr. Snowden, prepublication review would have been a demonstrably futile process—and that is the essence of an anticipatory breach. As detailed above, discovery is also reasonably likely to create a genuine issue of material fact as to whether prepublication review is infected with bias against authors advocating for positions with which the government disagrees, including through an interminable cycle of oppressive redactions and delay. 56(d) Lustberg Decl. ¶¶ 10–11. And more significantly, discovery—including any internal communications regarding how the government planned to respond to submissions by Mr. Snowden—would reveal the government's intent (or lack thereof) to review any submissions by Mr. Snowden only for Protected Information and within a reasonable time, as required under the contract. *Id.* ¶¶ 12–13.[17]

---

[17] Such evidence may well include statements of individuals that will reflect on an organization-wide intention to breach. *See, e.g.*, *WeCare Holdings, LLC v. Bedminster Int'l Ltd.*, No. 08-CV-6213, 2009 WL 604877, at *7 (W.D.N.Y. Mar. 9, 2009) (anticipatory breach claim buttressed by contemporaneous internal email by defendant expressing willingness to walk away from

In sum, discovery would allow the defense an opportunity to establish whether internal government communications included admissions that Mr. Snowden would *never* be allowed to publish his book or otherwise speak publicly—in effect, that the government intended not to comply with its duties under the Secrecy Agreements contract. *Id.* ¶ 13. Moreover, these kinds of facts—which go directly to questions of intent, motive, and bias—are matters of mental state, which are highly fact-intensive and therefore cannot be decided on summary judgment without the benefit of a full and fair discovery process. *See Evans*, 80 F.3d at 958. As such, they are "essential to [Defendant's] opposition" and require the denial of Plaintiff's motion for summary judgment under Rule 56(d). *Hodgin*, 885 F.3d at 250.

## CONCLUSION

Mr. Snowden respectfully requests that the Court deny summary judgment on both Counts I and II, and order the parties to commence discovery forthwith.

Dated:  November 20, 2019               Respectfully submitted,

Edward Snowden
*By Counsel*

Counsel for Defendant:

*/s/ Victor M. Glasberg*
Victor M. Glasberg (#16184)
VICTOR M. GLASBERG
   & ASSOCIATES
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100 (phone)
(703) 684-1104 (fax)
vmg@robinhoodesq.com
Lawrence S. Lustberg

---

transaction), *Radiologix, Inc. v. Radiology & Nuclear Medicine, LLC*, No. 15-4927-DDC, 2017 WL 1437300, at *5 (D. Kan. Apr. 24, 2017) (individuals may have relevant evidence concerning a corporate entity's intent to anticipatorily breach).

GIBBONS P.C.
1 Gateway Center
Newark, NJ 07102
(973) 596-4731 (phone)
(973) 639-6285 (fax)
llustberg@gibbonslaw.com

Ben Wizner
Brett Max Kaufman
Vera Eidelman
Alexia Ramirez (N.Y. bar application pending)
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500 (phone)
(212) 549-2583 (fax)
bwizner@aclu.org
bkaufman@aclu.org
veidelman@aclu.org

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of November, 2019, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

R. Trent McCotter
United States Attorney's Office (Alexandria)
2100 Jamieson Ave
Alexandria, VA 22314
(703) 299-3845 (phone)
trent.mccotter@usdoj.gov

Daniel Peter Reing
Davis Wright Tremaine LLP (DC)
1919 Pennsylvania Ave NW
Suite 800
Washington, DC 20006
(202) 973-4200 (phone)
(202) 973-4249 (fax)
danielreing@dwt.com

/s/ Victor M. Glasberg
Victor M. Glasberg (#16184)
VICTOR M. GLASBERG
   & ASSOCIATES
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100 (phone)
(703) 684-1104 (fax)
vmg@robinhoodesq.com

*Counsel for Defendant*