# EXHIBIT 2



**COMMENTARY** SURVEILLANCE & PRIVACY

# Secrecy, Security and Self-Government: An Argument For Unauthorized Disclosures

SEPTEMBER 03, 2013

*Editor's note: Barton Gellman delivered the following lecture at Princeton's Woodrow Wilson School in September 2003, shortly after his reporting on intelligence and the war in Iraq. Gellman's lecture takes on a renewed relevance in the wake of his recent reporting on U.S. intelligence-gathering operations. Part 2 of Gellman's lecture is also available.*

Anyone speaking of secrecy should start with some sort of disclosure. Ideally, something embarrassing. My friend Chris was kind enough not to mention it, but I will not flinch from the truth: I am a Woodrow Wilson School reject. I would have stayed one, too, if I hadn't been so mulish about the thing. What I did, I made myself a plague upon the assistant dean. All summer. By September, admitting me had become the lesser of two evils.

I tell stories for a living, so I'll start with one tonight. When journalists lead with an anecdote, we call it backing into the story. It usually means we're not sure what we plan to say. Tonight it doesn't mean that. It means I want to give you the impression that this talk will be entertaining.

A few months ago, I returned from hunting for weapons of mass destruction in Iraq. I didn't have much luck. But I did spent a lot of time among the hunters.

I did not choose to be "embedded" with the U.S. military. I cadged my way, more or less, into a search team, living and traveling as a reporter among its soldiers. I'll tell you about May 1st, a fairly typical day.

On May 1st the team gathered up its gear – sledgehammer, flame spectrometer, pathogen assay kit. We drove to a walled compound that the Defense Intelligence Agency called "Possible SSO Facility Al Hayat" — SSO being Saddam Hussein's Special Security Organization. U.S. Central Command ranked the site 26th of 90 top prospects for weapons of mass destruction. I watched the search team test for booby traps, scan for chemicals, cut through locks, and move by flashlight through a darkened corridor, lined with steel doors. The demolition guy broke through to the innermost chamber. And before our eyes there stood a cache … of vacuum cleaners.

I tell this tale not to make sport of the weapons hunt. Well, not entirely. Vacuum cleaners will take us pretty soon to the question of the evening, about secrecy. A little context first.

Site 26 on the U.S. priority list produced much the same result as Sites 1 through 25 and 27 through 90. I am here to talk about tensions between self-government and secrecy in the cause of national defense. For that purpose I need to make what I think is a modest claim.

I claim that if you wish to assess the U.S. government's motive for and conduct of the war, you may think it relevant that there were no weapons in 90 of the top 90 suspected weapons sites. I don't say this is dispositive of anything; simply that it sounds like something relevant.

So now I come to the point about Site 26. Everything I told you about it – the fact that it was 26 on the priority list, that there were 90 on the list altogether, the date and location of the search, the connection to the SSO, and, yes, no kidding, the vacuum cleaners — every bit of that is classified SECRET. A few of the things I wrote were TOP SECRET. I learned some of it by direct observation, some by persuading people, against the rules, to share their records and memories.

There is nothing anomalous here. I'm a projects reporter, and right now my project is the weapons hunt. Nearly everything I want to know, and much of what I write, is classified. One day my adopted survey team seized a suspicious document, handwritten in Arabic and illustrated with sketches of laboratory glass. The document turned out to be a high school science exercise. The survey team's report was classified. The schoolbook exercise was appended to that report. You see it coming, but I'll say it anyway: Some Iraqi teenager's description of Boyle's Law is now a classified U.S. government secret. A qualified authority made a binding judgment that disclosure of this text would do – quote – "serious damage to national security." So don't ask me about the relationship between the pressure and volume of a gas held at constant temperature. I'd tell you, but I'd have to kill you.

The same survey team found a distillery where a biowar factory was supposed to be — that's classified — and a swimming pool that U.S. intelligence called a chemical bunker. Classified. Looting, as you've read, has been an enormous problem for the weapons hunters. When I was there, Central Command had forces available to guard 153 of the 372 buildings it considered important. That's classified, too.

All these secrets, and I put them in The Washington Post. What are we to make of that?

What the Defense Department made of it was clear enough. Today the weapons hunting team, the Iraq Survey Group, receives no visitors. It will not disclose the number of its personnel, the military and intelligence units involved, or any of the evidence it is collecting.

My question is, was the Pentagon right? Was I wrong to publish things the government tried to withhold?

You're waiting for me to cite the First Amendment. You can stop waiting. Today, at least, I will look elsewhere.

For the record, here are three more things I will not invoke.

1. Weber's maxim on the fondness of bureaucracies for their secrets;

2. The harmlessness, as I see it, of my disclosures; or

3. 3. The vital public interest in reading stories by Bart Gellman.

I do not need you to believe that governments mismeasure the risks of disclosure; or that publication of secrets does no harm; or that any particular story is essential to public debate.

What I want to consider is how to navigate disputes over national security secrecy, and who gets to hold the rudder. And my answer, or part of it, is that government is incompetent to do so on its own. By incompetent I do not mean unskilled. I mean that government has no legitimate claim to sole control of secrecy decisions, even on matters of common defense. The lawful application of a classified stamp is the beginning, not the end, of my inquiry.

Hard questions about government secrecy involve a clash of core values. Call them self-preservation and self-government. Any answer that fails to take both of those values seriously, and address them both explicitly, has not even engaged the central problem.

Forgive the following act of reductionism. I undertake it in the cause of brevity, and the hope that my history grades are no longer subject to change. I propose two brief phrases, adjacent in the text, as the animating value of the Declaration of Independence. The purpose of government is "to secure unalienable rights." And government therefore derives its "just powers from the consent of the governed."

The Constitution gives primacy to precisely this assertion in its first three words. "We the People." Everything in the document, literally and philosophically, follows from that statement of authorship. "We the People" is the foundational statement of our foundational document.

The Preamble goes on to identify the six basic purposes that we, the people, intend our government to advance. Fourth among them is to "provide for the common defence." (Gold star if you can name all six. Union, Justice and Tranquility precede that goal; Welfare and Liberty follow.) There is a tone of catholicity here. We the People care a lot about the common defense, but defense has peers in our Pantheon. Hold that thought when it comes time to address the supremacy ascribed to that value in the "national security state" that arose after World War II.

Lincoln, in the face of a mortal threat, vowed that "government of the people, by the people, for the people, shall not perish from the earth." Two thoughts there, not one: "by the people," and "shall not perish."

Compare that to the Supreme Court in Haig v. Agee, which stated as an opening principle that "it is 'obvious and inarguable'" that "the security of the Nation" is its preeminent interest. This presumption has its roots in the First World War, which thrust America into an alarming new world of great power conflict. The enemy came from overseas, but for the first time the United States conceived a parallel enemy within. Ethnic German and Irish, and later communist, conspiracies – some real, some imagined – forever altered the relationship of our government to its citizens. And the man for whom this school is named, a former Princeton president who in many ways embodied reason and moderation in governance, plays an unhappy role in this story. Woodrow Wilson's State of the Union address in 1915 invoked a language of fear that few presidents have matched. Here is one sentence among many: "There are citizens of the United States, I blush to admit, born under other flags but welcomed under our generous naturalization laws to the full freedom and opportunity of America, who have poured the poison of disloyalty into the very arteries of our national life." Wilson called for new laws, and he got them. Among others were the Espionage Act of 1917, which is with us today.

In many ways beyond our scope tonight, the new laws thwarted democracy in the name of saving it. For example, they enabled the conviction of Eugene Debs for espionage on the sole ground of his opposition to U.S. entry into the war. But for my purpose here, the notable thing is that the Espionage Act established a new regime of secrecy that came to full expression in the National Security Act of 1947. Once it focused on an enemy within, government began to cast its citizens as potential threats. It asserted aims and prerogatives framed in opposition to the electorate, or in the belief that the public good could not be served in public view. That new framework remains with us.

What happens when government conceals from us its deeds on behalf of our defense?

With stakes of life and death, it is easy to see the vital need to deny advantage to an enemy. But life-and-death stakes give equal urgency to the project of holding our leaders accountable for their use of power. If we are sovereign, we rule those who rule us. Secrecy corrodes self-government, just as it strengthens self-defense. Both interests reach peak importance in time of war.

Consider the debate of the moment in hypothetical form. Suppose the president lied about Iraq's nonconventional weapons, and thereby took the nation to war in Iraq by a kind of fraud. There is nothing like enough evidence on the public record to prove that charge. There is nothing like enough evidence to refute it, either. This is not an epistemological problem. The evidence exists. It stands behind barriers of classification and executive privilege. The question is whether to pierce them.

This is the very paradigm of a hard question on secrecy, and we cannot define our way out of it. We are not going to discover, after careful consideration, that there is no national security interest, properly understood, in the secrecy of CIA files. We are not going to find a definition of accountability that is indifferent to proof of the president's declaration that Saddam Hussein's illegal weapons posed a grave and present threat.

Opening the files would resolve the mystery but undoubtedly carry high costs. It might put the safety of human sources at risk, reveal enough about intelligence methods to enable their defeat, compromise ongoing operations or warn enemies of operations to come.

Withholding the evidence, on the other hand, renders citizens unable to judge what may be the most consequential act of this presidency. It deprives us of information that might define our votes on Election Day, but that is not the only stake for democracy. Ignorance hobbles us as participants in an ongoing act of national choice. Iraq will cost lives and money for a long time to come, and many decisions lie ahead. The president cannot make most of them by command. He must use powers of suasion to carry the public and Congress. Is it suasion, though, if those persuaded form their opinions in the dark?

Five years ago, Pat Moynihan chaired a U.S. government commission on secrecy. His report made a fascinating conceptual claim. It described government secrecy as a form of regulation. As a general proposition, regulation in domestic affairs prescribes what citizens may do. The regulations are published and debated, and so is the manner of their enforcement. Regulation in foreign affairs prescribes what citizens may know. Here the regulations and their effects are opaque, or entirely unknown.

Democracy on the American model is not a spectator sport. We need not merely cast a ballot and commence passive contemplation of our choice … four years hence. If we want something from government, we may petition. If we object to something, we may protest. Commentators propose debates, organized interests prosecute demands and opinion polls propel and constrain every choice. Sooner or later, the public conversation sways Congressional votes, or the number of Army reservists who reenlist, or the willingness of allies to expend political capital on the president's behalf. Public debate shifts our nation's course, every day. It matters.

This is not a brief for "direct democracy." No one, I think, supposes that we the people should or possibly could decide every question by referendum. But it is no less a cartoon — one might even say un-American — to discount the role of civil society in the struggle for levers of power.

It cannot be enough, therefore, to demonstrate that any given disclosure carries risks, or even the certainty of harm to what could reasonably be described as the nation's security. It cannot be true, if we hold self-government to be fundamental, that no risk is worth taking to uphold it. I was a tourist in the Soviet Union in 1984. It did not surprise me that I kept getting lost, because in all modesty I may have the worst sense of direction in journalism. But it turned out I had help: the Kremlin had rendered its published maps inaccurate by design. That cannot be called irrational. Any information, in principle, might be of use to an enemy. But the mangled maps were one among thousands of decisions in which the Soviet state subordinated all other values to its security. It comforts me that this turned out to be a losing model, but even if it had succeeded we could not follow it.

So there is a balance to be struck. Return now to our hypothetical. Who might resolve the inherent conflict over prewar intelligence on Iraqi weapons programs? Two weighty interests are on the scale, democracy and defense. Is there anyone with a legitimate claim to balance them?

A long list of incompetents comes to mind. Suppose we begin with me. I am not qualified to assess harms to national security. Don't tell my editors, but they aren't either. Our newsroom, in truth, has some relevant expertise and experience. But we are not trained to weigh the risks, and we are not responsible to anyone for the consequences.

The president, for his part, is not qualified to decide what the public needs to know in order to hold him accountable. That is actually too weak a formula. The president is forbidden to define the terms by which we may judge him.

Where else might we turn?

The judiciary comes to mind, but for one thing it is disinclined to play the role. The leading judicial doctrine on national security is deference to the executive branch, which is a judicious way to say, "Leave us out of it." The U.S. Court of Appeals for the District of Columbia gave a characteristic display of that approach in June. The court held that government need not disclose the name of anyone detained on suspicion of terrorist ties, whether or not the suspicion proves true and whether or not

the detainee remains in custody. The court declined to balance the competing public interest in establishing whether detainees have been abused, and it declined to inquire whether comprehensive secrecy bears even a "rational relationship" to the government's stated interest. Once the executive invoked national security, the case was as good as over.

What about the legislative branch? By Constitutional design Congress shares war-making authority with the president. In practice that day is gone. It is true that the government's secrets are overseen by the House and Senate Select Committees on Intelligence. It is equally true that the committees know only the secrets the president chooses to tell them. Even when they know something, legislators are helpless to call it to public attention. Public attention is not only the most powerful tool of challenge to the executive, it is the only tool that could carry the burden of our argument about accountability to the people. Consider, therefore, this episode. For a few days last year, President Bush cut off all information to the select committees, to express his displeasure over a leak. The chairmen and ranking members humbly apologized, though it is far from clear their committees were responsible. Even in drafting its own reports, Congress is subject to White House editing. The joint House-Senate inquiry into the events of September 11, 2001, did not have the power to declassify its own report. The White House insisted that 27 pages be excised. Congress objected strenuously for months, but last week the Senate committee caved. In truth, it had no recourse.

Could a quasi-independent government entity – say, an Inspector General — perform the balancing role? I think not. An Inspector General's office has no power to declassify, and its independence is compromised at least potentially by the agency within whose budget, culture and personnel system it resides.

Most fundamentally, there is no imaginable council, in or out of government, that can be entrusted with a proxy to choose what the people ought to know. I can't resist quoting Learned Hand on this: "It would be most irksome," he said, "to be ruled by a bevy of Platonic guardians, even if I knew how to choose them, which I assuredly do not." An American may vote on the basis of ideology, theology, astrology, phrenology — I'm not even out of "ologies." Adherents of these disparate voting blocs will have comparably disparate objects of desire for information. I am emphatically not arguing that every one of those desires must be fulfilled. I have already said that harms to security and self-government must be balanced. What I am saying is that there can be no institution qualified to exert binding power over both the imperative interests at stake.

By now I have painted myself deep in a corner. Remember that next time you ask a reporter to commit an act of philosophy. I have posed a question, declared its cosmic importance and found no one competent to resolve it.

Welcome to my corner. I believe we are standing in it together.

It turns out that I am making an argument for something like the status quo. In practice today, the flow of information is regulated by a process of struggle. The government tries to keep its secrets, and people like me try to find them out. Intermediaries, with a variety of motives, perform the arbitrage. No one effectively exerts coercive authority at the boundary. And that's a good thing.

There are formal and informal structures that keep this system in equilibrium.

The letter and practice of law enforcement make it difficult, but not enormously dangerous, to broach secrets in print. That is a fine balance, and the status quo I'm about to describe depends on it.

Those with lawful access to classified information are forbidden by contract to disclose it. They face loss of their jobs and civil penalties, and there are available — though seldom-employed — theories of criminal prosecution for theft, conversion of government property or even espionage. A government official needs a very good reason to take these risks.

Having found such an official, reporters and their publishers incur little risk themselves. No law on its face, and unambiguously, forbids me to possess or publish a government secret. A novel interpretation of espionage might be offered – I'll thank Woodrow Wilson for that if it happens – but no Attorney General has felt provoked enough to try.

It is surely possible for a government to work harder than this to suppress its secrets. If we look overseas, most do. Every White House would prefer a tighter grip on its secrets. But on balance, at the systemic level, the behavior of recent presidents implies a tacit belief that such a grip cannot be had at acceptable cost.

There is, you may be astonished to learn, a comparable form of self-restraint on the part of the press. And it leads to an unexpected collaboration when a secret is nearing disclosure. The Washington Post and its peers routinely consult responsible agencies before publishing anything classified. My most frequent interlocutor says his job in these conversations is to "shed light and shed darkness." Sometimes he corrects a fact or supplies a point of context. Sometimes he blusters. Sometimes he chooses not to engage. And sometimes he asks on behalf of his agency that The Post suppress publication of something he acknowledges to be true. We often ask for explanation of the stakes. And it happens from time to time that the government tells me something very sensitive, which I did not know, to explain why I should not publish something I did know.

Usually we find accommodation at the working level. Now and then it goes higher. In December, on a particularly sensitive point, we did not reach a meeting of minds until a conference call — at her request — with Condoleezza Rice. Twice that I know of, a president has called the publisher.

A model of ad hoc collaboration, I confess, is unsatisfying on any question of constitutional gravity. It is certainly inelegant. But it need not be unprincipled.

There may be no Great Balancer of the interests at stake, but it is possible to describe some normative elements of the balance. We can identify more and less harmful forms of secrecy, better and worse reasons to withhold information from "we the people," and factors that heighten and diminish the case for disclosure.

I am short on time, so I'll sketch only a few. There are some reasons for secrecy that a self-governing people could never accept. One of them — I have heard it offered many times — is that the people will form the wrong views, or make the wrong choices, and therefore must not be told. It is antithetical to anything I call consent that government should assume such a power.

There are forms of secrecy that are more and less damaging to the project of self-government.

Simple secrets are those we know we don't know. We can leave room for that uncertainty as we form our views. A complex secret, the very existence of which is unknown, is harder to justify. It can have an impact that compares to coercion or fraud. In a used car sale, a simple secret is when the seller says he has another offer but won't disclose the terms. A complex secret is when the seller forgets to mention that the transmission fell out last week.

We can also distinguish honest and deceptive secrets. Churchill said the truth in wartime is so valuable that it must be "attended by a bodyguard of lies." I do not believe we can reconcile deception for our own good with any meaningful understanding of self-government. In principle, it is never acceptable.

The duration of a secret makes a difference. A fleeting embargo on information has far less impact on self-government than a secret maintained beyond a point of decision — an election, for example, or the passage of a law to which the secret is pertinent.

There are easy questions of secrecy as well as hard ones. Sometimes strong security interests collide with weak public interests in disclosure. We do not publish the names of clandestine agents; future combat operations of the U.S. military; technical details that would enable defeat of U.S. weapons or defenses; or anything, broadly speaking, that puts lives at concrete and immediate risk.

At other times the mismatch of interests is reversed. The U.S. military almost never permits the whereabouts of its deployed units to be disclosed. That reflects a valid concern when a small force, for example, is operating behind enemy lines. It is far less so when the unit dominates its surroundings, is well known to those nearby and is garrisoned in a well-defended redoubt.

I am quite certain I do not speak for The Washington Post, but here are some personal observations about its practice. We seldom if ever agree to withhold information that exposes a government lie, even a well intended one. We give no special weight to preventing diplomatic embarrassment. We acknowledge no right of privacy for individuals acting in their capacity as government officers, and so their positions in internal debate are fair game.

One last word about our hypothetical. It has been put as a question now in Congress and in print: Did the U.S. government dissemble about Iraq? On a question of this magnitude, a journalist's highest calling is to unearth evidence. Not opinion, not surmise. Evidence.

A month ago I wrote a very long story examining prewar claims that Iraq had revived – or "reconstituted," as the Bush administration put it – a nuclear weapons program. My partner Walter Pincus and I found a striking disparity between what the White House knew and what it said.

The most important example had to do with specialized aluminum tubes, which Iraq tried to buy overseas. You may have heard about them a year ago. If you didn't, you weren't watching Cheney, Rice, Powell, Rumsfeld or Bush on television. All of them said Iraq planned to use the tubes to build a gas centrifuge cascade, to enrich uranium for a bomb. Iraq said the tubes were for artillery rockets. The Bush administration scoffed. No one, it said, would use so costly an alloy for expendable munitions.

You know what? Someone does use that alloy for rockets. The rocket is a standard NATO munition, called the Medusa. The Bush administration knew that. It also knew that the Medusa tube is identical in every dimension to the ones at issue. And it knew that Iraq reverse-engineered the Medusa and was building copies just outside Baghdad.

There was another secret. The U.S. government's leading centrifuge physicists – all of them, unanimously – said the aluminum tubes were grossly unsuitable for uranium enrichment.

As curious citizens, you might ask the Bush administration for an explanation. You might ask about the Medusa or the persistence of a theory that the government's own scientists debunked. You might ask what Iraqi scientists say now about the nuclear program, or what U.S. forces have discovered on the ground. Do not expect an answer. All those things, too, are classified.



### Barton Gellman, Senior Fellow

Barton Gellman is a critically honored author, journalist, and blogger. His professional distinctions include two Pulitzer Prizes (individual and team), the George Polk Award, and Harvard's Goldsmith Prize for investigative reporting.