# EXHIBIT 8

THE NEW YORKER

# Q. & A.: ALI SOUFAN

By Amy Davidson Sorkin   May 16, 2012

In the past couple of weeks, Ali Soufan, the former F.B.I. agent who led the investigation into the bombing of the U.S.S. Cole and into events surrounding 9/11—and was the subject of a 2006 *New Yorker* piece by Lawrence Wright and is the author of "The Black Banners: The Inside Story of 9/11 and the War Against al Qaeda"—has been drawn back into the debate about torture and the war on terror by the publication of "Hard Measures: How Aggressive C.I.A. Actions After 9/11 Saved American Lives," by Jose Rodriguez, Jr. Rodriguez, in his book and in a "60 Minutes" interview, argued that techniques like waterboarding are necessary tools; Soufan has a different view. Below, he answers questions about post-9/11 interrogations, the roles of the C.I.A. and F.B.I., and whether torture works.

*Who is Jose Rodriguez? What does he know about the waterboarding of detainees after 9/11, and what we did or didn't learn from it?*

Jose was a C.I.A. officer whose area of expertise was in Latin America, but after September 11, 2001, he was put in charge of the C.I.A.'s Counterterrorism Center, and now he's claiming responsibility for introducing the so-called "enhanced interrogation techniques" (E.I.T.s). In 2005, he ordered the destruction of tapes that showed the harsh techniques being used, apparently contrary to orders. He was later reprimanded by the C.I.A.'s inspector general's office.

The claims he's recently been making about the success of the harsh techniques are the same false claims that have appeared in now declassified C.I.A. memos, and which have been thoroughly discredited by the likes of the Department of Justice, the Senate Intelligence Committee, and the C.I.A.'s Inspector General.

The person making those claims isn't the same Jose that I knew. I don't know what he really knows, whether he was fed false information, or if he's trying to defend his legacy, but what he says is at odds with the facts.

*You were involved in the same sequence of events—the interrogation of Abu Zubaydah. How does your memory of them differ from the story Rodriguez is telling?*

In this area it's not a question of memory but of factual record. There are now thousands of pages of declassified memos and reports that thoroughly rebut what Mr. Rodriguez and others are now claiming. For example, one of the successes of the E.I.T.s claimed in the now declassified memos is that after the program began in August, 2002, Abu Zubaydah provided intelligence that prevented José Padilla from detonating a dirty bomb on U.S. soil, and identified Khalid Sheikh Mohammed as the mastermind of the September 11, 2001, attacks. Mr. Rodriguez has been repeating this claims.

The reality is that both of those pieces of intelligence were gained by my partner and me, with C.I.A. colleagues, in early April, 2002—months before the August, 2002, start of the E.I.T. program. But in the memos they were able to promote false facts, even altering dates, to make their claims work. In the so-called C.I.A. Effectiveness Memo, for example, it states that Mr. Padilla was arrested in May, 2003. In reality, he was arrested in May, 2002. But saying 2003 fits with the waterboarding narrative. When the Department of Justice asked Steven Bradbury, acting head of the Justice Department's Office of Legal Counsel and the author of the 2005 O.L.C. memo to reinstate E.I.T.s, why he didn't check the facts, he replied, "It's not my role, really, to do a factual investigation of that."

VIDEO FROM THE NEW YORKER

Throwing Shade Through Crosswords

*What about the identification of Khalid Sheikh Mohammed?*

The claim about waterboarding leading to unmasking of K.S.M. as the mastermind of the September 11, 2001, attacks is similarly false. We got that information in April, 2002, before the contractors hired by the C.I.A. Counterterrorism Center even arrived at the site. One by one, the successes claimed by E.I.T. proponents have been shown to be false.

I went before the Senate Judiciary Committee and under oath recounted what happened. And, as I note in "The Black Banners," I sent daily reports from the secret interrogation location, to Washington, recording what happened, which the U.S. Government has in its possession. After I left the location in 2002, I wondered if they got anything of value. Until 2005, I was still in the government, and I know that nothing of value from E.I.T.s reached us. I thought perhaps the information was only shared with others. But with the declassification of previously secret memos, it became clear that every example given of claimed successes was factually incorrect—and I know this from firsthand experience of how those pieces of intelligence were really gained. It's because of all this that I spoke out in 2009 to correct the false claims the American people were being told.

"60 Minutes," in a [Web piece](#) that accompanied its interview with Rodriguez called "Interrogations: The FBI's side of the Story," presented this as a he-said, he-said, or Agency-said, Bureau-said: "What really happened in the interrogation of high-level detainees like Abu Zubaydah? Depends on who you ask: the FBI or the CIA." Is that what it comes down to?

It was a factual mistake for "60 Minutes" and others to present it as an F.B.I. versus C.I.A. issue. They had in their possession the C.I.A. Inspector General's report, the Department of Justice report, and the Senate Intelligence Committee's information, all of which make this clear.

The more accurate way to portray it is that it's the professionals from the F.B.I. and the C.I.A. versus bureaucrats in Washington. The C.I.A. professionals in the field weren't happy that outside contractors with no Al Qaeda or terrorism experience were put in charge and they were pushed out. One C.I.A. colleague even left the secret location where we questioning Abu Zubaydah before I did—in protest of what was happening. Mr. Rodriguez, too, was not an Al Qaeda or terrorism expert, as he himself writes.

Because these C.I.A. professionals were unhappy with what bureaucrats in Washington were doing, they complained to their inspector general, John Helgerson. He looked into the program

and issued a damning report about its lack of verifiable successes, among other things. This is why, back in 2005, still under the Bush Administration, the program was shelved.

Today, those responsible for the program, who made a decision that was terrible for our national security—both in the short term and the long term—are doing their best to try to salvage their reputation. And part of their tactic is to portray this as F.B.I. versus C.I.A., but that's dishonest.

*You mentioned the videotapes Rodriguez says he destroyed—ninety-two of them. Why would he do that?*

On "60 Minutes," Jose said he destroyed the evidence of the interrogations "to protect the people" who worked for him, from Al Qaeda going "after them and their families." But that's not the reason Mr. Rodriguez gave at the time, and it's a shame he wasn't challenged on it.

One declassified C.I.A. e-mail, dated November 10, 2005, and written by the deputy to Kyle (Dusty) Foggo, then executive director of the C.I.A., notes that Rodriguez thought that "if the tapes ever got into [the] public domain… they would make us look terrible." It was about their reputation, not safety.

The tapes also contained our interrogations, done with traditional techniques. The tapes would have shown under which circumstances Abu Zubaydah coöperated and when he stopped coöperating. But while the tapes were destroyed, our daily reports from the location are luckily safe and still in the government's possession.

And while Rodriguez claims he had approval to destroy the tapes, a second declassified e-mail from Foggo's deputy shows that someone either "lied" to Rodriguez about approval, or Rodriguez "misstated the facts." The C.I.A.'s then general counsel, John Rizzo, is recorded in the same e-mail as being "clearly upset" about the destruction.

*Is there a cultural difference between the F.B.I. and C.I.A. that played into decisions about torture and civil liberties? As Lawrence Wright wrote in The New Yorker, you also learned, after 9/11, that failures in intelligence—particularly in the investigation of the 2000 attack on the U.S.S. Cole, which you led—may have cost us a chance to stop the attacks. Is the situation better?*

As we discussed, there's no difference between the views of the C.I.A. and F.B.I. professionals in the field, who know what works and what doesn't. My colleagues and I in the F.B.I., however, were fortunate to have leadership that shared our views, with the Assistant Director of the F.B.I., Pat D'Amuro, saying to Director Robert Mueller, "We don't do that," and Mueller agreeing.

Many of my colleagues in the C.I.A. turned to their C.I.A. Inspector General to complain about what was happening—which led to the eventual shelving of the program, in 2005.

Regarding 9/11, I outline that sequence of events in "The Black Banners," and it's tragic. The 9/11 Commission listed that investigation as one of the best chances to stop 9/11. I often wonder how different the last decade would have been if we had been given the information we requested.

I'm out of the government now, but I sincerely hope the situation is better today.

*I have to ask you about a small revelation in the military-tribunal arraignment of K.S.M. and other 9/11 suspects last week: the judge said that he had recently read your book, "The Black Banners." Were you surprised?*

I was honored that Judge Pohl singled out "The Black Banners." The book, as you know, covers the history of Al Qaeda, from its roots in 1979 through to the death of Osama bin Laden. (Harsh interrogation issues only make up a few pages.) The book, based on my personal experiences and information given to me and colleagues by Al Qaeda operatives, outlines how many of the people—who became the group's leaders, and today are facing trial for the attacks of 9/11—like Abd al-Rahim al-Nashiri and Khallad bin Attash were recruited to the group, how they rose through the ranks, and how they planned and carried out their operations. My aim with the book was to create a manual for anyone really wishing to understand Al Qaeda and our efforts against the group.

I only hope that Judge Pohl will soon have the opportunity to read it unredacted.

*Your book was heavily redacted; why? And did Rodriguez's book get the same treatment?*

The F.B.I. sent my manuscript to various departments in the Bureau, and after a three-month review process there was not a single redaction. Of course I had been careful not to put in any information that compromised national security, or sources and methods, and the F.B.I. recognized this.

Right before publication certain people in the C.I.A. claimed authority over the entire manuscript—putting the book through "double jeopardy" of an unheard-of second full review. They issued redactions clearly aimed at controlling the narrative over key moments, like the events leading to 9/11 and what happened with the harsh techniques.

Their redactions are a violation of the classification guidelines, which are designed to protect the public from agencies illegally classifying information for non-national-security reasons, such as trying to censor embarrassment or cover up mistakes.

Some of the redactions are blatantly ridiculous even without knowing what's underneath, such as censoring a portion of a public exchange between myself and U.S. Senator Lindsay Graham that was broadcast live on national television and that is still available on a government Web site. The redactions also expose double standards: while I'm prevented from talking about certain things, they allow others to talk about the same things, even to talk about me, as long as it fits their narrative.

I'm requesting that these abuses of authority be reviewed by the F.B.I. and the government, and that the redactions on my book be lifted.

The one piece of good news, through this effort to restrict the public from knowing that they deserve to know, is that while those trying to hide the truth may think they scored a success by redacting "The Black Banners," ironically, in the long run, they've done a great service to the truth: Because you only redact what is true, when people eventually get to read the book unredacted, they'll know it contains the truth. Also, despite the redactions, it's pretty obvious what happened and what people are trying to cover up—so the thinking public can work it out.

Incidentally, books defending E.I.T.s, like Mr. Rodriguez's, don't appear to have such redactions. After all, you can only redact the truth, you cannot redact fiction.

*What is your take on the military tribunals? How has the judicial handling of the 9/11 suspects been shaped, or warped, by their interrogation?*

I'm a believer in both federal and military courts. I think the focus should be on which venue would be most effective in insuring that the terrorist is locked up for as long as possible. I've been a witness in terrorism trials in both venues, and I know that federal courts are more effective, but sometimes military commissions are better.

The use of E.I.T.s have made prosecutions more difficult, that's one of the reasons why it's taken so long to begin the trials—those behind the techniques never thought about the end game. Information from E.I.T.s is considered unreliable, it's inadmissible in court, and is considered "fruit of the poisonous tree," and so naturally it makes the process more difficult. Thankfully, in regard to those suspects, we have a considerable amount of evidence from pre-E.I.T.s to convict them.

*What do you say to Jose Rodriguez's basic message: that in order to protect our country, we have to be willing to use torture?*

That's not true. On the contrary, using torture only makes us less safe. Not only does it generate false leads and unreliable information, passing up chances to get actionable intelligence, it also helps terrorists recruit—as we saw with Abu Ghraib in Iraq. Under torture, Ibn al-Shaykh al-Libi gave the information they wanted to hear, which turned out to be false, and that information was used to justify the Iraq War—it even made it to Colin Powell's speech at the U.N. When Ibn Shaykh was asked why he lied, to paraphrase, he said because you were torturing me and I wanted it to stop. How did that make us safe?

We're at our best and most effective when our laws and strategies are in sync.

*Does torture—our willingness to use it, our opposition to it—have an effect on things like the recruitment of sources, or the willingness of people in other countries to coöperate with us?*

It makes it very difficult. The top intelligence and law-enforcement agencies around the world don't use torture, because it's unreliable and ineffective. Those who do use it are looked down upon, and the information they provide isn't trusted and can't be used in their courts. And allied countries won't hand over suspects to a country that tortures people—and the U.S. won't, either.

*Do you think that we have put the darkest moments of the global war on terror—the black sites, the torture—behind us?*

I hope so. Given the conclusive evidence that damns the use of E.I.T.s, one would think no leader in their right mind would ever authorize it again. However, many of those behind E.I.T.s are still in influential positions, or are given free passes to spout their falsehoods, so it does worry me.

*Photograph by Zinta Lundborg/Bloomberg/Getty Images.*



*Amy Davidson Sorkin has been a staff writer at The New Yorker since 2014.*  *Read more »*