**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 1:19-cv-1197-LO-TCB |
| EDWARD SNOWDEN, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| MACMILLAN PUBLISHING GROUP, LLC d/b/a HENRY HOLT AND COMPANY, *et al.*, | ) ) ) | |
| Relief-Defendants. | ) ) | |

**REPLY MEMORANDUM OF PLAINTIFF UNITED STATES IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST SNOWDEN
AS TO LIABILITY**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

I.      Snowden Concedes His Liability on Count I Regarding Publication of *Permanent Record*. ....................................................................................................................... 3

II.     Snowden Is Also Liable on Count II for Giving Unauthorized Speeches Pertaining to Intelligence Matters. ................................................................................................ 4

        A.     Prepublication Review Requirements Also Apply to Speeches. ........................... 6

        B.     Snowden's Particular Speeches and/or Associated Materials Were Required to be Submitted for Prepublication Review. ......................................................... 8

              1.     Snowden's Speeches Were Prepared in Advance, and At Least the Purported Slides Should Have Been Submitted for Prepublication Review. ................................................................................................... 8

              2.     The Purported Government Slides Needed to be Submitted, Regardless of Whether they are Available Publicly ................................ 11

        C.     Snowden Is Not Entitled to Any Discovery on This Claim. ................................ 15

III.    Snowden's Affirmative Defenses Are Waived, Are Facially Meritless, and Do Not Warrant Any Discovery. ............................................................................................. 17

        A.     Snowden Waived Any Affirmative Defenses When He Unilaterally Bypassed Prepublication Review. ...................................................................... 17

        B.     The Affirmative Defenses Are Meritless, and Do Not Warrant Any Discovery. .......................................................................................................... 21

              1.     Selective Enforcement .......................................................................... 22

              2.     Anticipatory Breach .............................................................................. 26

CONCLUSION ................................................................................................................ 30

## **INTRODUCTION**

In response to the United States' motion for partial summary judgment, Defendant Edward Snowden concedes all of the material facts establishing his liability on both claims.  With respect to Count I, Snowden concedes that he published a book that he was required to submit to the Central Intelligence Agency (CIA) and National Security Agency (NSA) for prepublication review, but that he failed to submit the manuscript for such review.  *See* Pl.'s MSJ Br. (ECF No. 22) at 7-8, ¶¶ 22-32; Def.'s Opp'n to MSJ (ECF No. 51) at 6 (not disputing any of these paragraphs) [hereafter "Opp'n"].   Accordingly, with respect to his book *Permanent Record*, the facts establishing liability are undisputed, none of Snowden's affirmative defenses have any merit as explained below, and therefore the Court should now enter summary judgment for the Government as to Snowden's liability on Count I.  Following entry of liability, the United States will promptly pursue the full range of remedies available for this breach—*i.e.*, imposition of a constructive trust over all of Snowden's proceeds from the book, an order requiring him to remit those proceeds to the United States, and an injunction against any further violations of his non-disclosure obligations.

With respect to Count II, Snowden again does not dispute that he has given many intelligence-related speeches; that he was required to submit those speeches and/or associated materials (such as notes, outlines, slides, or other summaries of the speeches) for prepublication review; and that he never submitted the speeches or associated materials for such review.  *See* Pl.'s MSJ Br. at 10-12, ¶¶ 36, 41-42; Opp'n at 8-10 (not disputing any of these paragraphs).  Notwithstanding these concessions, Snowden has offered a variety of arguments seeking to avoid liability.  Snowden first contends that his speeches are "extemporaneous" and that he does not prepare notes about them in advance.  Even if that were true, however, it is undisputed that, during his speeches, Snowden displays and discusses purported government slides that are marked on their face as containing classified information.  At a minimum, then, the slides accompanying these

speeches were required to be submitted for prepublication review, regardless of whether any notes or other materials exist.

As for the slides themselves, Snowden contends that they need not be submitted for prepublication review because they were not created by him and are publicly available. But the Secrecy Agreements make clear that the purported slides still need to be submitted for review, precisely so that the agencies can determine whether the information is classified. Additionally, Snowden's request for discovery into the Government's "course of dealing" is meritless, including because Snowden himself concedes that extrinsic evidence is irrelevant when interpreting an unambiguous contract, and the Secrecy Agreements here unambiguously cover Snowden's speeches and/or associated materials.

To be clear, the Government does not seek to restrain Snowden from publishing a book or making speeches that are critical of the Government or governmental policy. Rather, the Government seeks to enforce a requirement—to which Snowden voluntarily and repeatedly agreed—that he submit for prepublication review any manuscripts or other planned disclosures that include certain intelligence-related information. Snowden has conceded liability for his failure to do so with respect to his book *Permanent Record*, and the same requirements apply to speeches to the extent they contain information and materials subject to his Secrecy Agreements. Accordingly, Snowden's liability on both claims is straightforward.

Finally, Snowden's interposition of two purported "affirmative defenses"—selective enforcement and anticipatory breach—also fails, and cannot entitle him to any discovery. Most fundamentally, *Snepp* and its progeny establish that Snowden had two, and only two, permissible options before publishing *Permanent Record* and making the relevant speeches: he could either seek prepublication review and obtain agency approval for the disclosures, or he could pursue a

judicial action before publishing or making the speeches to challenge any restrictions on his proposed disclosures.  *See United States v. Snepp*, 897 F.2d 138, 143 (4th Cir. 1990).  By making the unilateral decision to forego these exclusive options, Snowden waived any ability to litigate his asserted affirmative defenses after-the-fact in this enforcement action.

Even if the Court were to consider either defense, both are meritless as the Fourth Circuit's first *Snepp* opinion makes clear.  *See United States v. Snepp*, 595 F.2d 926 (4th Cir. 1979).  First, the "selective enforcement" defense is barred as a matter of law in this civil context.  *See id.* at 933. Additionally, Snowden neither identifies nor presents any evidence of anyone similarly situated to him who has not been subject to similar enforcement proceedings.  Indeed, the Government has regularly brought actions against persons who fail to abide by prepublication review obligations. As for anticipatory breach, Snowden speculates that the Government would not have properly followed its prepublication review process if he had submitted his materials, but that speculation is wholly unfounded.  Additionally, Snowden's concerns would not have excused him from his prepublication review obligations in any event.  *See id.* at 934.  Accordingly, the undisputed record here demonstrates the United States' entitlement to summary judgment on liability for both counts.

## <u>ARGUMENT</u>

I. **SNOWDEN CONCEDES HIS LIABILITY ON COUNT I REGARDING PUBLICATION OF *PERMANENT RECORD*.**

Apart from raising various affirmative defenses addressed below, *see* Part III, *infra*, Snowden's opposition does not attempt to dispute his liability as to Count I pertaining to publication of his memoir *Permanent Record*.  Indeed, all material facts establishing Snowden's liability on this claim are undisputed.  First, it is undisputed that Snowden agreed to all terms set forth in his Secrecy Agreements, including that he "submit [intelligence-related] writings or other preparations for prepublication review prior to disclosing or publishing any such writings or other

preparations." Pl.'s MSJ Br. at 4, ¶ 6; *see* Opp'n at 5 (no dispute for this paragraph); Local Civil Rule 56(B) (providing that "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such fact is controverted in the statement of genuine issues filed in opposition to the motion"). Second, Snowden concedes that *Permanent Record* is squarely within the scope of this prepublication review obligation. Pl.'s MSJ Br. at 9, ¶ 30; *see* Opp'n at 6 (no dispute). And, finally, Snowden also concedes that he published his book without first submitting any manuscript to either the CIA or the NSA. Pl.'s MSJ Br. at 9, ¶¶ 31-32; *see* Opp'n at 6 (no dispute).

Where these key facts have been conceded, and for all of the reasons set forth in the United States' opening memorandum, Snowden is liable as to Count I for breaching his contractual obligations under the Secrecy Agreements as well as his fiduciary duties to the United States in connection with his publication of *Permanent Record*. At a minimum, then, this Court should enter partial summary judgment as to liability on Count I.

## II.   SNOWDEN IS ALSO LIABLE ON COUNT II FOR GIVING UNAUTHORIZED SPEECHES PERTAINING TO INTELLIGENCE MATTERS.

Just as with Count I, Snowden has also conceded all of the facts establishing his liability on Count II. Specifically, Snowden does not dispute that "[t]he CIA and NSA prepublication review requirements apply to any covered disclosure, regardless of the form of disclosure (*e.g.*, written or oral)." Pl.'s MSJ Br. at 7, ¶ 20; *see* Opp'n at 6 (no dispute). Additionally, Snowden does not dispute that "[m]any of [his] speeches purport to discuss intelligence-related activities at the CIA and NSA, and purport to contain, refer to, and might be based on information that is classified or in the process of a classification determination." Pl.'s MSJ Br. at 10, ¶ 36; *see* Opp'n at 8 (no dispute). Finally, Snowden does not dispute that "[c]onsistent with the CIA and NSA Secrecy Agreements as well as the agencies' administrative regulations, Snowden was obligated

to submit these speeches—and/or associated materials such as notes, outlines, slides, or other summaries of the speeches—to CIA and NSA for prepublication review," but that he "did not, at any time, submit his speeches and/or associated materials to the CIA and NSA for prepublication review." Pl.'s MSJ Br. at 11-12, ¶¶ 41-42; *see* Opp'n at 9-10 (no dispute).

These concessions by themselves are sufficient to establish Snowden's liability on Count II. Rather than confronting this straightforward conclusion, however, Snowden's opposition responds to a series of straw-man arguments regarding how prepublication review applies to oral speeches. First, Snowden contends that he "had nothing to submit" for prepublication review, Opp'n at 2, because he did not create notes for his speeches in advance. But, as demonstrated below, the factual record does not support that assertion, and instead confirms that during at least four of his speeches Snowden displayed purported government slides that were marked on their face as containing classified information, which plainly brought his speeches—or at least the slides themselves—within his prepublication review obligations.

With respect to those purported government slides, Snowden contends that he is not required to submit publicly available material for prepublication review. But this argument also misses the mark. For one thing, Snowden himself does not dispute that he is the reason why those purported slides are now publicly available. Allowing him to benefit from his own past disclosures would be both inequitable and at odds with the underlying purpose of the Secrecy Agreements themselves. In any event, the prepublication review process exists in part to determine whether information related to intelligence matters is classified. Here, it is unambiguously clear, from both the text of his Secrecy Agreements and the agencies' regulations, that the purported slides were required to be submitted for prepublication review even if they are otherwise publicly available.

Finally, Snowden argues that summary judgment is premature because he is entitled to

discovery on a variety of subjects pertaining to the interpretation of his CIA and NSA Secrecy Agreements.  But Snowden himself concedes that such discovery is irrelevant when the contract terms are unambiguous.  Here, the Secrecy Agreements unambiguously require submission of his speeches and/or associated materials; thus, there is no need for any discovery.  Snowden's arguments are meritless, and the undisputed facts squarely establish his liability on Count II.

### A.    Prepublication Review Requirements Also Apply to Speeches.

Before addressing Snowden's particular arguments, it bears emphasizing at the outset what Snowden does not dispute—namely, he does not dispute the over-arching point that oral disclosures are also subject to his Secrecy Agreements.

As a factual matter, Snowden concedes that "[t]he CIA and NSA prepublication review requirements apply to any covered disclosure, regardless of the form of disclosure (*e.g.*, written or oral)."  Pl.'s MSJ Br. at 7, ¶ 20; *see* Opp'n at 6 (no dispute).  Indeed, the Secrecy Agreements themselves make plain that they apply to oral disclosures.  *See* CIA Secrecy Agreements (ECF No. 15-1) ¶ 5 (requiring prepublication review for "any writing *or other preparation in any form*" (emphasis added); NSA Secrecy Agreements (ECF No. 15-3) ¶ 9 (requiring prepublication review for "all information *or* materials . . . that I have prepared for public disclosure" (emphasis added)).  The agencies' regulations likewise confirm that speeches and other public presentations are subject to prepublication review.  *See* CIA Regulation (ECF No. 15-4) §§ II(A)(1); NSA Regulation (ECF No. 15-6) § 6(b).

As a legal matter, Snowden largely ignores the ample authority upholding and enforcing agency Secrecy Agreements in a broad range of circumstances.  *See* Pl.'s MSJ Br. at 13-16.  At one point, however, Snowden asserts that the Supreme Court's decision in *Snepp* "was about the prepublication review of written manuscripts," not speeches.  Opp'n at 23.  But this is a distinction without a difference, as the form of disclosure is irrelevant.  The Supreme Court's decision cannot

possibly be read to mean that intelligence-related oral disclosures would not be a breach, but written disclosures are. *See Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service. The agreement that Snepp signed is a reasonable means for protecting this vital interest." (citation omitted)). Indeed, the secrecy agreement at issue in *Snepp* did in fact apply to oral disclosures, as did the agreement that the Fourth Circuit upheld in *Marchetti*. *See Snepp*, 595 F.2d at 930 n.2; *United States v. Marchetti*, 466 F.2d 1309, 1312 & nn.1-2 (4th Cir. 1972).

Snowden also unpersuasively attempts to distinguish the past cases involving speeches. *See* Opp'n at 18 & n.4. The *Agee* court expressly held that "a clear pattern of using oral statements as well as written works" warranted "the broadest permissible injunction," including extending to oral disclosures. *Agee v. CIA*, 500 F. Supp. 506, 510 (D.D.C. 1980). Although the *Agee* court excluded a subset of oral disclosures from prepublication review—*i.e.*, "extemporaneous oral remarks that consist solely of personal views, opinions, or judgments on matters of public concern, and that do not contain, or purport to contain, any direct or indirect reference to classified intelligence data or activities," *id.* at 511—Snowden's speeches here are not akin to such remarks, as discussed further below. *See* Part II.B.2, *infra*. As for *United States v. Bissonnette*, No. 16-cv-1070 (E.D. Va.), Snowden discounts that precedent because it was "a negotiated settlement." Opp'n at 18 n.4. Although the case was resolved through settlement, the Court entered a consent decree, which is more than just a purely private contract. *Cf. Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 519 (1986) ("[C]onsent decrees have attributes both of contracts and of judicial decrees[.]"). Consistent with *Agee* and *Bissonnette*,

therefore, prepublication review requirements apply equally to oral remarks discussing information subject to secrecy agreements.

### B. Snowden's Particular Speeches and/or Associated Materials Were Required to be Submitted for Prepublication Review.

Despite Snowden's concession that speeches generally are subject to prepublication review requirements, he argues that his particular speeches "were extemporaneous and not the result of advance preparation."  Opp'n at 8-10; *see also id.* at 14.  Thus, in his view, he "had nothing to submit" for prepublication review.  *Id.* at 2.  But this argument is contrary to the undisputed factual record, which demonstrates that his speeches were pre-planned events during which he displayed and discussed purported government slides marked on their face as containing classified information.  And with respect to those slides, his Secrecy Agreements are unambiguously clear that he needed to submit such materials for prepublication review.  On this record, there is no genuine issue that he was required to submit his speeches—or at least the purported government slides he displayed during those speeches—for prepublication review.

### 1. Snowden's Speeches Were Prepared in Advance, and At Least the Purported Slides Should Have Been Submitted for Prepublication Review.

Snowden attempts to bring his speeches outside the prepublication review requirements by characterizing them as "extemporaneous and not the result of advance preparation."  Opp'n at 9-10.  Contrary to Snowden's characterization, however, the factual record here confirms that Snowden's speeches, or at least the materials displayed during those speeches, were prepared in advance and should have been submitted for prepublication review.

In support of his characterization of his speeches, the only evidence Snowden cites is his own declaration.  That declaration states:

> On recollection and belief, for the appearances described in the government's complaint and motion for partial summary judgement, I did not prepare remarks,

outlines, or notes that mentioned intelligence data or activities or that contained or purported to contain, referred to, or were based upon information I obtained as a result of my relationship with the CIA or the NSA that is or was classified or in the process of a classification determination.

Snowden Decl. (ECF No. 52-15) ¶ 8; *see also id.* ¶¶ 9-11, 13, 15, 17-18.

As an initial matter, these statements are likely inadmissible, given that it is not clear what Snowden means by "[o]n recollection and belief," and similar qualifying language has consistently been held not to satisfy the "personal knowledge" requirement of Rule 56(c)(4). *See Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831 (1950); *Union Pac. R.R. Co. v. Baltimore & Annapolis R.R. Co.*, 2009 WL 3633349, at *4 (D. Md. Oct. 27, 2009) (collecting cases).

In any event, Snowden's declaration does not establish that his remarks were "extemporaneous and not the result of advance preparation." Opp'n at 9-10. The declaration does not say that Snowden prepared no notes, only that he did not prepare certain types of notes—*i.e.*, notes that "mentioned intelligence data or activities or that contained or purported to contain, referred to, or were based upon information I obtained as a result of my relationship with the CIA or the NSA that is or was classified or in the process of a classification determination." Snowden Decl. ¶ 8. Moreover, as discussed in the Government's opening motion for summary judgment, it is not up to Snowden to decide whether his notes contain intelligence-related or classified information; that judgment is for the agencies to make. *See* Pl.'s MSJ Br. at 13-14; *see also Snepp*, 444 U.S. at 512; CIA Secrecy Agreements ¶ 6; NSA Secrecy Agreements ¶ 9.

Regardless, even assuming the record demonstrated that Snowden prepared no notes for his remarks, that still does not mean that he "had nothing to submit" for prepublication review. Opp'n at 2. Indeed, the record here proves otherwise: Snowden is obviously capable of identifying the topics of his speeches in advance, as proven by the fact that he has prepared a collection of "videos, articles, and slides" that he keeps easily accessible while he is speaking; he uses this

collection to "help illustrate and contextualize the examples I choose to highlight as I speak." Snowden Decl. ¶ 20.  This collection includes purported "government slides," *id.* ¶ 19, which Snowden himself contends are classified.  *See* Opp'n at 14-15 ("He also . . . shows government slides published by news organizations that the government still deems classified."); *see also* Pl.'s MSJ Br. at 10-11, ¶¶ 37-40 (listing four examples of public remarks in which Snowden displayed and discussed purported slides marked, on their face, as containing classified information); Opp'n at 8-9 (no dispute as to displaying purported slides marked as classified).  Regardless of whether any other aspect of his speeches falls within his Secrecy Agreements, at a minimum Snowden's collection of purported government slides needed to be submitted for prepublication review—*i.e.*, because the slides themselves clearly contain "information or material that might be based on" classified information, CIA Secrecy Agreements ¶ 5, and "purport to contain, refer to, or are based upon" classified information, NSA Secrecy Agreements ¶ 9.  *See* Pl.'s MSJ Br. at 24.  The slides, by themselves, are therefore sufficient to demonstrate that Snowden violated his prepublication review obligations in connection with his speeches.[1]

Finally, even if Snowden prepared no notes for his remarks, and even if he did not display or discuss purported government slides marked as classified, that still would not necessarily excuse him from prepublication review.  For example, both the NSA Secrecy Agreements and NSA's implementing regulation apply to oral disclosures, and neither provides an exception for oral disclosures that are unaccompanied by written materials.  *See* NSA Secrecy Agreements ¶ 9; NSA Regulation § 6.b.[2]  Here, Snowden concedes that the topics of his speeches otherwise fall within

---

[1] As the United States noted in its opening brief, for purposes of this lawsuit, the United States does not confirm or deny whether the slides in question—or, for that matter, any of the contents of Snowden's book and/or speeches—are in fact classified.  *See* Pl.'s MSJ Br. at 20-21.

[2] Even if a former employee does not prepare notes or other written materials in advance of a speech, the employee can still contact the prepublication review authority and provide a

his Secrecy Agreements.  *See* Pl.'s MSJ Br. at 10, ¶ 36 ("Many of Snowden's speeches purport to discuss intelligence-related activities at the CIA and NSA, and purport to contain, refer to, and might be based on information that is classified or in the process of a classification determination."); Opp'n at 8 (no dispute).  In these circumstances, Snowden should not be excused from compliance with prepublication review.  In any event, the Court need not resolve the outer boundaries of when speeches or remarks unaccompanied by written notes need to be submitted for prepublication review, because Snowden's speeches here—in which he displays and discusses purported government slides marked on their face as classified—obviously contain material that could have, and should have, been submitted for prepublication review.

## 2. The Purported Government Slides Needed to be Submitted, Regardless of Whether they are Available Publicly

Presumably in recognition of the fact that the purported government slides he displays are encompassed by his Secrecy Agreements, Snowden also argues that he need not comply with prepublication review for those slides because they are publicly available and were not personally prepared by him.  *See, e.g.*, Opp'n at 14.

This argument should be rejected out-of-hand.  Snowden appears to admit that, with respect to the purported government slides he displays, he is the reason why those purported materials are now publicly available.  *See* Opp'n at 15 n.2.  It would make a mockery of the prepublication review system if Snowden could effectively avoid civil liability for his speeches based on his own past disclosures of information that falls within the scope of his Secrecy Agreements.  Under Snowden's approach, an employee could leak sensitive intelligence-related material subject to a

_____

summary of the topics that will likely be discussed—thereby ensuring that the information intended to be disclosed is approved for public release, consistent with the overall purpose of the Secrecy Agreements and the prepublication review scheme.

non-disclosure agreement to the media, and then go on a speaking tour about that same information—all without any fear of losing the profits from that speaking tour. Such an interpretation would be plainly inconsistent with the Secrecy Agreements' overall purpose of preventing the improper disclosure of classified information. *Cf.* Restatement (Second) of Contracts § 202, ¶ 1 (1981) (when interpreting a contract, "if the principal purpose of the parties is ascertainable it is given great weight."); *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232 (1959) (noting the "[d]eeply rooted" maxim "that no man may take advantage of his own wrong").

In any event, Snowden is hardly akin to the "farfetched" hypotheticals that the court in *Agee* held were outside the scope of prepublication review—*i.e.*, a former employee "reading a passage aloud from a book to another person, or telling his wife what a newspaper has reported[.]" 500 F. Supp. at 510; *see* Opp'n at 19-20. Here, Snowden does not simply "read aloud" from a secondhand source; instead, he displays a purported primary source document—a government slide that is marked as classified—and then speaks about its contents.[3] As such, his speeches are well outside the type of remarks that the court in *Agee* held were not subject to prepublication review—*i.e.*, "oral remarks that consist solely of personal views, opinions, or judgments on matters of public concern, and that do not contain, or purport to contain, any direct or indirect reference to classified intelligence data or activities[.]" 500 F. Supp. at 511.

As a contractual matter, moreover, Snowden was plainly required to submit all materials subject to his Secrecy Agreements for prepublication review, such as the purported government

---

[3] Snowden himself admits that he does not simply read aloud from the slides, but instead affirmatively expounds upon them. *See* Snowden Decl. ¶ 20 ("The videos, articles, and slides help illustrate and contextualize the examples I choose to highlight as I speak."); *see also* 2014 Ted Talk Tr. (Exh. J, ECF No. 22-5) at 6-12 (expounding upon information contained in purportedly classified slides); 2015 it-sa Speech Tr. (Exh. K, ECF No. 22-5) at 7-8 (same); 2017 William & Mary Speech Tr. (Exh. L, ECF No. 22-5) at 43-45, 56-58 (same); 2015 Dalhousie Univ. Speech Tr. (Exh. M, ECF No. 22-5) at 24-27 (same).

slides, regardless of whether those materials are publicly available.   Again, the Secrecy

Agreements and implementing regulations make this obligation clear.   Specifically, consideration

of whether information is publicly available is part of the prepublication review process itself.   *See*

CIA Secrecy Agreements ¶ 6 (if an employee challenges denial of permission to publish on the

basis that "the information or material in question derives from public sources," then the employee

"may be called upon to specifically identify such sources"); *see also* CIA Regulation § II.E.4

("When otherwise classified information is also available independently in open sources and can

be cited by the author, the PRB will consider the fact in making its determination on whether that

information may be published with the appropriate citations."); NSA Regulation § 3.b ("Where

information intended for public release is available to the NSA/CSS affiliate from classified

sources and also independently from open sources, the affiliate may be permitted to release the

information if the affiliate can cite an adequate open-source publication where the specific

information is available[.]").[4]

Prepublication review obligations apply, consistent with applicable Secrecy Agreements,

regardless of whether information is publicly available.   The mere fact that information may be in

the public domain—including purportedly leaked classified documents—does not somehow

exempt it from prepublication review obligations.   *See Alfred A. Knopf, Inc. v. Colby*, 509 F.2d

---

[4] Snowden's only discussion of the agency regulations is in a footnote, in which he contends that "the policies postdate Mr. Snowden's government employment" and thus are irrelevant.   Opp'n at 20-21 n.10.   As both the CIA and NSA declarants explained, however, materially similar versions of those regulations were in effect at all times relevant to this litigation. *See* CIA Decl. (ECF No. 22-1, Exh. A) ¶ 17 n.2; NSA Decl. (ECF No. 22-1, Exh. B) ¶ 7 n.3. Snowden also contends that the agency regulations are not expressly referenced in the Secrecy Agreements.   That assertion, even if true, would not make the agency regulations any less binding. In any event, it is also wrong.   The NSA Regulation *is* expressly incorporated into the NSA Secrecy Agreements.   *See* ¶¶ 9, 13.   And upon Snowden's departure from the CIA, he acknowledged that he had been "advised on Headquarters policy regarding nonofficial publication and presentation by employees and former employees."   CIA Security Exit Form (ECF No. 15-2) ¶ 5.

1362, 1370 (4th Cir. 1975) (classified information "was not in the public domain unless there had been official disclosure of it"); *see also Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("[W]e have unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations."). Thus, even when purportedly classified information is publicly available, agencies retain significant interests in avoiding official confirmation (or denial) of the information. Indeed, Snowden has now effectively conceded this point. *See* Snowden's Notice of Correction (ECF No. 57) (withdrawing, in light of *Alfred A. Knopf* decision, argument about Secrecy Agreements necessarily allowing re-publication of information that is "in the public domain").

Finally, contrary to Snowden's rhetoric, requiring former employees to submit their speeches and associated materials for prepublication review is not tantamount to unconstitutional censorship. *See* Opp'n at 20-24. As the Supreme Court held in *Snepp*, the Secrecy Agreements "require[] no more than a clearance procedure subject to judicial review," 444 U.S. at 513 n.8, which is a constitutionally reasonable method of protecting intelligence-related information. *Id.* at 509 n.3. That holding is equally controlling for speeches as it is for writings. *See also Marchetti*, 466 F.2d at 1317 ("Marchetti retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain."); *Agee*, 500 F. Supp. at 510 ("Agee's conduct demonstrates a clear pattern of using oral statements . . . to further his intention of undermining the work of the CIA" and thus "this Court would be remiss if it entered an injunction limited in the manner Agee requests.").

In short, when Snowden gives speeches or remarks that contain information or materials

subject to his Secrecy Agreements, even if such information or materials have been published by newspapers, the speeches—or at least the purported government slides he displays—still must be submitted for prepublication review. And because Snowden admits that he never submitted any such speeches or materials for prepublication review, *see* Answer (ECF No. 50) ¶ 107, there is no genuine dispute as to his liability on Count II.

## C. Snowden Is Not Entitled to Any Discovery on This Claim.

Snowden's last-ditch effort to avoid liability on Count II is to assert that he needs discovery to oppose summary judgment. As Snowden agrees, however, his request under Rule 56(d) cannot succeed if he seeks "to discover only non-material evidence." Opp'n at 26; *see also Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 250 (4th Cir. 2018) ("[A] court may deny a Rule 56(d) motion when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment."). For several reasons, Snowden's requested discovery on Count II seeks information that is legally irrelevant.

First, Snowden himself agrees that, when a contract is unambiguous, "extrinsic evidence is irrelevant." Opp'n at 16. Here, the Secrecy Agreements unambiguously require submission of Snowden's speeches and/or associated materials (such as the purported government slides) for prepublication review. *See* Parts II.A-B, *supra*. Thus, extrinsic evidence is irrelevant as a matter of law, as Snowden concedes.

Second, even if the Secrecy Agreements were ambiguous in some respect, that still would not justify Snowden's requested discovery. For all the reasons discussed below with respect to Snowden's affirmative defenses, *see* Part III.A, *infra*, Snowden waived his ability to challenge the Secrecy Agreements as ambiguous. In the Secrecy Agreements, Snowden acknowledged that it was his burden to consult with the agencies to find out whether they believed certain information was classified and/or subject to prepublication review. *See* CIA Secrecy Agreements ¶¶ 4, 6; NSA

Secrecy Agreements ¶¶ 2, 9.  If Snowden believed that his prepublication review obligations were ambiguous, the proper course was to contact the agencies for clarification—not to go forward with his speeches, force the Government to file suit, and then argue that he is entitled to create a record in district court about how best to interpret the Secrecy Agreements.  Allowing Snowden to deploy this tactic would undermine the very policy of prepublication review itself.  *See* Part III.A, *infra*.

Even if considered on the merits, Snowden still has not demonstrated an entitlement to any discovery.  For example, Snowden never explains why he needs discovery to establish the parties' course of performance or course of dealing with respect to the Secrecy Agreements.  *See* Lustberg 56(d) Decl. (ECF No. 53) ¶ 7.  Snowden himself is one of the parties to the Secrecy Agreements, and thus he is equally aware of the parties' course of dealing and performance under those Agreements.  Nothing prohibited Snowden from addressing those topics in his declaration, yet he failed to do so.  *Cf.* Opp'n at 25-26 (the argument for discovery under Rule 56(d) is strongest where "the nonmovant seeks necessary information possessed only by the movant").[5]

Similarly, Snowden does not explain how exploring the Government's past enforcement decisions, *see* Lustberg 56(d) Decl. ¶ 9, could plausibly shed light on the meaning of the Secrecy Agreements' terms.  Government enforcement decisions "often involve[] a complicated balancing of a number of factors," only one of which is "assess[ing] whether a violation has occurred[.]"  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  Thus, examining past enforcement decisions would not meaningfully inform how the Secrecy Agreements ought to be interpreted.  And to the extent

---

[5] The only fact mentioned by Snowden that he arguably does not possess is information regarding whether "the government has been aware that Mr. Snowden has been speaking publicly for years[.]"  Lustberg 56(d) Decl. ¶ 8.  But that fact is legally irrelevant absent a laches defense, which Snowden has not pled here, and which would be meritless in any event.  *See United States v. Summerlin*, 310 U.S. 414, 4 16 (1940) ("It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights.").

Snowden contends that past enforcement decisions are relevant as "trade usage," he ignores that the Government has already provided him with the relevant "trade usage" information—*i.e.*, the agencies' implementing regulations. *See* Restatement (Second) of Contracts § 222 (a usage of trade "may include a system of rules"). Snowden offered no substantive response to the agencies' regulations, and indeed Snowden has conceded that he was required to submit his speeches and/or associated materials for prepublication review and that he did not do so. *See* Pl.'s MSJ Br. at 11, ¶¶ 41-42; Opp'n at 9-10 (no dispute). Based on this record, there is no basis for postponing decision because the information Snowden seeks "would not by itself create a genuine issue of material fact sufficient for [Snowden] to survive summary judgment." *Hodgin*, 885 F.3d at 250. Just as with Count I, then, all of the relevant facts are undisputed, no further discovery is necessary, and the Court should enter summary judgment against Snowden as to liability on Count II.

## III.   SNOWDEN'S AFFIRMATIVE DEFENSES ARE WAIVED, ARE FACIALLY MERITLESS, AND DO NOT WARRANT ANY DISCOVERY.

Finally, Snowden attempts to evade his liability as to both Counts I and II by interposing two purported "affirmative defenses"—selective enforcement and anticipatory breach. As set forth below, these defenses are both waived and facially meritless.

### A.   Snowden Waived Any Affirmative Defenses When He Unilaterally Bypassed Prepublication Review.

As a threshold matter, by unilaterally bypassing the requisite prepublication review process, Snowden waived his right to raise any affirmative defenses as to either claim. As the United States explained in its opening memorandum, it was Snowden's burden either to pursue prepublication review or seek judicial review of any restrictions on publication. *See* Pl.'s MSJ Br. at 21-22. By choosing to forego these exclusive remedies, Snowden waived any ability to litigate these issues in this enforcement action after having already published and given his speeches.

The exclusivity of Snowden's options—either to obtain agency approval or pursue a judicial action before making his unauthorized disclosures—is confirmed by an epilogue to *Snepp*. Subsequent to the Supreme Court's decision in that case, Snepp sought to amend the injunction against him by placing the burden on CIA to initiate judicial proceedings if the agency withheld permission to publish. The Fourth Circuit rejected that request, explaining:

> In compliance with his contract, Snepp must submit his manuscript to the Agency for clearance prior to publication. If the Agency denies approval, Snepp may not publish the manuscript. If Snepp wishes to publish a manuscript in spite of the Agency's denial of approval without violating his secrecy agreement, then he must institute an action for judicial review of the Agency decision.

*Snepp*, 897 F.2d at 143; *see also id.* (Snepp had "an obligation to obtain 'clearance' from the CIA prior to publication" and "[t]he only substitute for CIA clearance would be a judicial declaration"); *Marchetti*, 466 F.2d at 1317 (an author may seek judicial review of agency disapproval of publication, but "the burden of obtaining judicial review . . . ought to be on" the author).

Consistent with this controlling authority, this Court has repeatedly refused to consider affirmative defenses raised in materially identical circumstances, *i.e.* where a former employee had made the unilateral decision to publish without obtaining either agency or judicial approval for doing so. In *United States v. Jones*, No. 10-cv-765 (E.D. Va.) (Lee, J.), this Court held that the former employee "had a remedy and that remedy was to come to U.S. District Court and to pursue a claim to determine if the Agency's withholding of permission was unreasonable," but that "[n]ot having exercised that right," the defendant's asserted affirmative defenses were irrelevant as a matter of law. *Jones*, Tr. of Bench Ruling (previously filed as Exh, N, ECF No. 22-2) at 19-20. Similarly, in *United States v. Scherck*, No. 12-cv-754 (E.D. Va.) (Hilton, J.), this Court held that where the former employee "did not seek [prepublication] approval and he admits that," then "the reasons why he did it would not really be relevant to the case." *Scherck*, Tr. of Bench Ruling

(previously filed as Exh. O, ECF No. 22-2) at 24-25.[6]

Thus, as *Snepp* and *Marchetti* (and related caselaw) establish, the burden was on Snowden to obtain permission for his disclosures, either from the relevant agencies or by instituting a judicial action prior to making the disclosures.  If Snowden believed that the agencies could not lawfully withhold permission for his disclosures either because of "selective enforcement" of his Secrecy Agreements or because the agencies had already breached those Agreements, he could have raised those arguments during the prepublication review process itself, or by filing an affirmative judicial action seeking permission to publish based on those arguments.  Snowden chose neither option, and instead decided unilaterally to make his disclosures.  As a result, he cannot now raise those arguments as "affirmative defenses" to this enforcement action.

Judicial consideration of Snowden's asserted defenses would eviscerate the policy behind *Snepp* and *Marchetti*, both of which found that the relevant breach was the author's failure to provide the CIA with the opportunity to determine, in advance of publication, whether a given work contained any classified information.  *Snepp*, 444 U.S. at 511-12; *id.* at 513 n.8 ("The problem is to ensure *in advance*, and by proper procedures, that information detrimental to [the] national interest is not published.") (emphasis in original); *Marchetti*, 466 F.2d at 1317.  Indeed, if persons subject to Secrecy Agreements were permitted to raise affirmative defenses in response to

---

[6] Conversely, authors have consistently obtained judicial consideration of their claims by challenging prepublication decisions prior to making any actual publication—*e.g.*, on the ground that the decision violated the author's First Amendment rights or was otherwise improper.  *See* Pl.'s MSJ Br. at 15-16 (collecting cases); *see also, e.g.*, *Wilson v. CIA*, 586 F.3d 171, 182 (2d Cir. 2009); *Pfeiffer v. CIA*, 60 F.3d 861, 863 (D.C. Cir. 1995); *McGehee v. Casey*, 718 F.2d 1137, 1140 (D.C. Cir. 1983); *Alfred A. Knopf, Inc.*, 509 F.2d at 1365; *Berntsen v. CIA*, 618 F. Supp. 2d 27, 28-29 (D.D.C. 2009); *Stillman v. CIA*, 517 F. Supp. 2d 32, 35, 38-39 (D.D.C. 2007).  These challenges have included arguments that the agency was taking too long to complete prepublication review.  *See, e.g.*, *Berntsen*, 618 F. Supp. 2d at 28 & n.2; *Stillman*, 517 F. Supp. 2d at 36.  Importantly, none of these authors simply published the material and then attempted to challenge the agency's withholding of permission after-the-fact.

an enforcement action, they would have substantially less incentive to challenge agency restrictions on publication upfront—*i.e.*, because they could unilaterally publish, and then simply raise their arguments as affirmative defenses.  Such an approach would be contrary to the Fourth Circuit's holding that the author has the burden to initiate a judicial action challenging agency restrictions on publication.  *See Snepp*, 897 F.2d at 143; *Marchetti*, 466 F.2d at 1317.

Moreover, consideration of Snowden's affirmative defenses would be wholly impractical; it would require the Court to engage in entirely speculative analysis of a counterfactual world, in which Snowden did provide CIA and NSA with opportunities to conduct prepublication reviews of both *Permanent Record* and all applicable speeches subject to his Secrecy Agreements.  The Court would then have to attempt to predict how the agencies would respond to those submissions, and specifically whether the agencies would deny permission to publish for improper reasons (as Snowden asserts).  Avoiding such speculation is precisely why authors should be required to seek permission from the agencies (and, if necessary, file a judicial action) prior to unilaterally disclosing the information covered by their Secrecy Agreements.  *Cf. McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) ("[E]xhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context.").  Having failed to actually engage in the prepublication review process prior to making his disclosures, Snowden should not be permitted to raise his affirmative defenses and thereby litigate a wholly speculative and hypothetical counterfactual, entirely of his own creation.

Notably, despite the United States' prior explanation that it is the author's burden to challenge an agency's denial of permission to publish, *see* Pl.'s MSJ Br. at 21-24, Snowden's only response is in a footnote, asserting that this option was a "mirage" for him, because "[h]ad he filed such a lawsuit, the government would undoubtedly have . . . rel[ied] upon the fugitive

disentitlement doctrine" to prevent him from raising his arguments.  Opp'n at 34 n.16.  To the extent Snowden believes that the fugitive disentitlement doctrine precludes him from raising these arguments in an affirmative judicial action, however, then the doctrine should likewise preclude him from raising these arguments here in the form of affirmative defenses.  Nor would there be any inequity in holding as much, given that application of the doctrine is necessarily a self-inflicted wound—and those who suffer its consequences can, at "any time," secure the judicial process that the doctrine denies them "simply by entering the United States."  *United States v. Batato*, 833 F.3d 413, 427 (4th Cir. 2016).  In any event, it is pure speculation as to how the United States would have responded if Snowden had complied with his prepublication review obligations.[7]

Nothing about the fugitive disentitlement doctrine alters *Snepp*'s binding rule that, absent agency permission to publish, an affirmative civil action is the exclusive remedy.  897 F.2d at 141-43.  Because Snowden unilaterally chose to publish rather than pursue these remedies, he waived his ability to present his arguments as affirmative defenses in this enforcement action.

> **B.  The Affirmative Defenses Are Meritless, and Do Not Warrant Any Discovery.**

Even if the Court were to consider Snowden's affirmative defenses, both are facially meritless, and neither defense warrants any factual development or affects the United States' entitlement to summary judgment on the material and undisputed facts presented.

---

[7]  The United States has not argued in this case that the fugitive disentitlement doctrine precludes Snowden from raising his arguments (either as affirmative defenses or in connection with an affirmative judicial action).  Indeed, the Department of Justice has stated that this lawsuit is separate from criminal charges brought against Snowden.  *See* U.S. Dep't of Justice Press Release, *United States Files Civil Lawsuit against Edward Snowden for Publishing a Book in Violation of CIA and NSA Non-Disclosure Agreements*, available at https://www.justice.gov/opa/pr/united-states-files-civil-lawsuit-against-edward-snowden-publishing-book-violation-cia-and.  The United States reserves the right to invoke the fugitive disentitlement doctrine in this case at a later point as it deems appropriate.

### 1.   Selective Enforcement

Snowden first contends that the Government has engaged in "selective enforcement of the Secrecy Agreements to discriminate based on viewpoint." Opp'n at 29. But this purported defense is barred as a matter of law, as the Fourth Circuit expressly held in its first *Snepp* decision:

> [T]here is a basic legal reason why the defense is unavailable. Defendant has cited, and we have found, no authority suggesting that the defense of selective enforcement, normally applied in criminal cases, should be extended to civil actions. Moreover, defendant voluntarily agreed to be bound by the contractual provision requiring prepublication review and he can have little complaint about its being enforced.

*Snepp*, 595 F.2d at 933. This holding has not been overruled by the Fourth Circuit or the Supreme Court, and thus it remains binding and precludes consideration of Snowden's defense.[8]

Regardless, any selective enforcement defense here would be meritless. "A selective prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive," *i.e.*, the decision about which cases to bring and how to allocate scarce prosecutorial (or enforcement) resources. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Chaney*, 470 U.S. at 832). Prosecutorial decisions thus enjoy a "presumption of regularity . . . in the absence of clear evidence to the contrary." *Id.* at 464-65; *see also Attorney General v. Irish People, Inc.*, 684 F.2d 928, 949 (D.C. Cir. 1982) ("If the Government has a valid ground to bring this action, then presumptively it has every right and duty to do so."). "In order to dispel the presumption" of regularity, a defendant has the burden of demonstrating that the prosecution in question both "had a discriminatory effect and . . . was motivated by a discriminatory purpose."

---

[8] Snowden's reliance on *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016), is misplaced because that case arose in a fundamentally different context—*i.e.*, affirmative claims brought by a civil plaintiff, seeking nominal damages for past violations and injunctive relief against future violations. *See id.* at 630. Allowing those types of claims to be brought by civil plaintiffs does not support allowing a civil *defendant*, in a retrospective enforcement action, to raise a selective enforcement defense as a means of avoiding liability for past conduct.

*United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016).  Further, and of particular relevance here, "the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal[.]"  *United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012), *as amended* (Feb. 15, 2012).  "[R]ather than presenting clear evidence, the defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent."  *Id.* (quoting *Armstrong*, 517 U.S. at 470); *see also Hare*, 820 F.3d at 99.

Here, Snowden does not (and cannot) carry his heightened burden for establishing either element of the selective enforcement defense—*i.e.*, "(1) that similarly situated individuals . . . were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith."  *Hare*, 820 F.3d at 99.  First, Snowden does not even attempt to identify a "similarly situated" individual who has been treated differently.  In the selective enforcement context, "similarly situated" individuals are those whose circumstances have "no distinguishable legitimate enforcement factors that might justify making different enforcement decisions with respect to them."  *Id*.  Snowden makes no attempt to identify any individual who wrote a favorable book, was not prosecuted, but otherwise was similarly situated to him in all material respects.  Snowden's failure to identify any such individual renders his selective enforcement claim a dead letter.  *See Armstrong*, 517 U.S. at 470 (rejecting claim and denying discovery when only attempt to identify similarly situated individuals not prosecuted were based on "hearsay" and "anecdotal evidence"); *Hare*, 820 F.3d at 99-100 (rejecting claim and request for discovery notwithstanding "statistical evidence"); *see also, e.g.*, *Irish People*, 684 F.2d at 946 (a "colorable showing" that an individual has been "singled out" requires the "exist[ence] [of] persons similarly situated who have not been prosecuted"); *United States v. AT & T Inc.*, 290 F. Supp. 3d 1, 3-5 (D.D.C. 2018) (denying a motion for discovery in an antitrust case, holding that where the proposed merger was *sui generis* such that there were no

relevant comparators, a selective enforcement claim failed as a matter of law).

Even apart from Snowden's own circumstances, he also fails to establish that the prepublication review process discriminates based on authors' viewpoints as a general matter. Despite his assertion that "[t]he historical record is replete with evidence" showing viewpoint discrimination, Snowden points to only two examples. First, he cites newspaper articles discussing two books with opposing viewpoints on interrogation techniques, *see* Opp'n at 29-30, but one of those articles demonstrates that both books were submitted for prepublication review and that both were indeed subject to restrictions during the review process. *See* Def.'s Exh. 9 (ECF No. 52-9) at 4 ("Bill Harlow, . . . who co-authored the Rodriguez book, disputed the assertion that he and Rodriguez were given favorable treatment. 'I don't believe we were shown any special favors, and I know that the PRB insisted on removing several large chunks of material from the book[.]'"). Second, Snowden also relies on the *Agee* decision. *See* Opp'n at 31. But the alleged viewpoint discrimination in that case occurred approximately forty years ago, and *prior* to relevant changes in prepublication policies. *See Agee*, 500 F. Supp. at 509 (discussing changes in policies and stating that "[t]he past . . . is no mirror of the future"). Thus, Snowden has entirely failed to support his accusations—either that prepublication review is biased generally, or that he has been singled out for discriminatory enforcement.

Second, Snowden also has not made a credible showing that "the decision to prosecute was invidious or in bad faith." *Hare*, 820 F.3d at 99; *United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) (in order to be credible, the evidence presented must be "something more than mere speculation or 'personal conclusions based on anecdotal evidence'" (quoting *Armstrong*, 517 U.S. at 470)). Snowden fails to offer any evidence, aside from his own subjective belief, that "the government has animus towards Mr. Snowden's viewpoints on privacy and secrecy matters and

has initiated these proceedings against him because of that animus." Opp'n at 11, ¶ 3 (not citing any admissible evidence for this assertion). At most, Snowden points to the pending criminal indictment against him, and avers that "the government considers [him] to be a traitor" based on his past actions. *Id.* at 35. But the United States has made publicly clear that "[t]his lawsuit is separate from the criminal charges brought against Snowden for his alleged disclosures of classified information." U.S. Dep't of Justice Press Release, *supra* note 7; *see also id.* ("This lawsuit is . . . based solely on Snowden's failure to comply with the clear pre-publication review obligations included in his signed non-disclosure agreements.").

Indeed, Snowden does not even attempt to explain how his theory of selective enforcement is consistent with the record of enforcement actions by the United States—most recently, against the defendants in *Jones*, *Scherck*, and *Bissonnette*. *See* Pl.'s MSJ Br. at 15. All of those authors, like Snowden, similarly failed to obtain advance approval for their publications, and thus became defendants in enforcement actions. Snowden provides no reason to believe that those enforcement actions were motivated by discriminatory intent or viewpoint discrimination. *Cf. Venable*, 666 F.3d at 903 ("[D]iscriminatory intent implies that the government selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."). Indeed, the *Bissonnette* action was brought against a decorated Navy SEAL who participated in military action against Osama bin Laden. The shared characteristic in each of these cases is not animus, but rather that each of these authors, like Snowden, plainly violated their Secrecy Agreements by disclosing intelligence-related information without obtaining advance permission. Snowden also wholly fails to address the converse situation—*i.e.*, examples of former officials who have *complied* with prepublication review obligations and been permitted to publish books that are critical of the Government.

In short, Snowden points to no actual evidence demonstrating that it was his "viewpoints on privacy and secrecy" that motivated this enforcement action, as opposed to his brazen, repeated, and highly visible failures to undergo prepublication review for either his book or his numerous public speeches.  *See United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (observing that a person's "public renown may be properly considered among other factors" when deciding to pursue an enforcement action, as such actions can have "increased deterrent effect" as to other would-be violators) (collecting cases).  And again, Snowden retains his First Amendment right "to speak and write about the CIA and its operations, and to criticize it as any other citizen may," provided that he complies with the terms of his Secrecy Agreements which are fully enforceable. *Marchetti*, 466 F.2d at 1317.  The United States is not seeking to prevent Snowden from publishing books or giving speeches that are critical of the Government or governmental policy; rather, the Government is simply seeking to enforce a requirement—one that Snowden willingly and voluntarily assumed—that he comply with prepublication review as required by his Secrecy Agreements.  The breach of those obligations is what motivated this lawsuit, not any purported animus towards his viewpoints.  Snowden's selective enforcement defense therefore fails both legally and factually.

### 2.      Anticipatory Breach

Finally, Snowden also asserts an affirmative defense of anticipatory breach—*i.e.*, that the Government "has made clear through its statements and conduct that it has never intended to review any submissions by Mr. Snowden within a reasonable time and for the sole purpose of determining if they contain classified information."  Opp'n at 11 ¶ 4; *see also id.* at 32-37.

Initially, although Snowden purports to plead "anticipatory breach" as a separate and distinct defense, this theory rests on a premise identical to that underlying his "selective enforcement" defense—namely, that the Government "would not have conducted a good-faith

review" of his memoir and speeches, Opp'n at 32, *because of* "viewpoint discrimination[] and selective enforcement," *id.* at 34. Thus, where the gravamen of both defenses is that the Government has subjected Snowden to "discriminatory treatment," *id.*, many of the arguments set forth above apply equally here, and they likewise indicate this defense's lack of merit.

Further, it is not clear that anticipatory breach—a common law contract doctrine—even applies to the Secrecy Agreements here. *See Snepp*, 444 U.S. at 513 n.9 ("A body of private law intended to preserve competition . . . simply has no bearing on a contract made by the Director of the CIA in conformity with his statutory obligation to protect intelligence sources and methods from unauthorized disclosure."). Given that the Secrecy Agreements here are made in furtherance of statutory obligations to protect intelligence-related information, it would be anomalous to construe statements of various past and/or anonymous government officials as invalidating the Agreements entirely—particularly when the Secrecy Agreements themselves provide that employees' obligations can be discharged only through written release. *See* Pl.'s MSJ Br. at 5-7, ¶¶ 10 & 17; *see* Opp'n at 5-6 (no dispute).

In any event, even if the doctrine of anticipatory breach were available, it still would not help Snowden here. Snowden asserts that the agencies would not have reviewed his submissions in a timely manner, or would have attempted to redact too much information. *See* Opp'n at 33-34. But as the Fourth Circuit previously held, the breach of one paragraph of a Secrecy Agreement does not justify invalidating the whole contract. *See Snepp*, 595 F.2d at 934 ("[E]ven if the CIA could be viewed as having violated Paragraph 6, we deem it an independent clause of the overall agreement, the breach of which would not excuse defendant from his obligation to submit books for prepublication review."). Requirements governing the timing and scope of prepublication review are set forth in different sections of the Secrecy Agreements, apart from the obligation to

actually submit the materials for prepublication review.  *Compare* CIA Secrecy Agreements ¶ 5 (submission for review), *with id.* ¶ 6 (timing and scope of review); and NSA Secrecy Agreements ¶ 9 pmbl. (submission for review), *with id.* ¶ 9 concl. (timing and scope of review).  Thus, even assuming a breach of the timing or scope provisions, that still would not eliminate Snowden's obligation to submit the materials for prepublication review in the first instance.  *See Snepp*, 595 F.2d at 934; *see also* CIA Secrecy Agreements ¶ 17 (each paragraph of contract is severable); NSA Secrecy Agreements ¶ 11 (same).

Finally, even assuming an "anticipatory breach" defense were available and relevant here, Snowden still has not demonstrated such a breach.  Under the anticipatory breach doctrine, where

> one party to a contract declares in advance that he will not perform at the time set for his performance, the other party may bring an immediate action for total breach of the contract . . . . But to constitute an anticipatory breach, . . . it must appear that the party bound under a contract has unequivocally refused to perform . . . [*i.e.*], there must be a *positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.*

*City of Fairfax, Va. v. WMATA*, 582 F.2d 1321, 1325-26 (4th Cir. 1978) (emphasis added); *see also Yorktowne Shopping Ctr., LLC v. Nat'l Sur. Corp.*, No. 1:10-CV-1333, 2011 WL 2414389, at *7 (E.D. Va. June 15, 2011) (O'Grady, J.) ("[I]n order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional.").

Crucially, "[i]n Virginia, the 'objective theory of contract' controls."  *Tattoo Art, Inc. v. Tat Int'l, LLC*, No. 2:10-CV-323, 2011 WL 1304910, at *7 (E.D. Va. Feb. 28, 2011), *aff'd*, 498 F. App'x 341 (4th Cir. 2012).  Under this theory, in assessing issues of contract enforcement, a court looks only to the parties' actual "words and actions, and not [their] unexpressed intentions."  *Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1238 (4th Cir. 1995).  Thus, "[t]he dispositive consideration" in assessing a claim of anticipatory breach is whether the party in question "objectively manifested an unwillingness to perform under the contract—not its

actual, subjective intention." *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 292 (4th Cir. 2010); *accord Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1144 n.15 (Fed. Cir. 2008). Further, "[i]n order to constitute a repudiation . . . [t]he [repudiating] statement must be made [directly] to an obligee under the contract." Restatement (Second) of Contracts § 250 cmt. (b) (1981).

These well-established principles of contract law are fatal to Snowden's anticipatory breach defense, as well as his request for discovery. By definition, the only facts relevant to this theory are those having to do with actual, overt words or actions that the CIA or NSA may have communicated or performed directly to Snowden. Snowden would therefore have direct, personal knowledge of any such communications or actions—yet he does not, and cannot, point to any, on the part of either agency, that even arguably constitutes the requisite "positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." *City of Fairfax*, 582 F.2d at 1326, 1325-26. Instead, Snowden simply speculates that the Government would have breached its obligations under the Secrecy Agreements, and posits that he requires discovery into whether Government had a concededly unexpressed "intent" to renege "its end of the NSA and CIA Secrecy Agreements." Opp'n at 33; *see id.* at 37 (acknowledging that the discovery sought "go[es] directly to questions of intent, motive, and bias," *i.e.*, "matters of mental state"). Simply put, such issues are wholly irrelevant to the sole question this defense presents: whether the Government "objectively manifested an unwillingness to perform under the contract[.]" *Homeland Training Ctr.*, 594 F.3d at 292. Because Snowden does not and cannot contend that either the CIA or the NSA made any such objective manifestations through any words or deeds, the defense must necessarily fail as a matter of law, even were it considered on the merits.

## **CONCLUSION**

Because Snowden's opposition concedes all of the material facts necessary to establishing

his liability both as to Count I and Count II, the Court should grant the United States' motion for

partial summary judgment as to liability on both Counts, and direct the United States to file, within

30 days of granting partial summary judgment, a proposed plan for further remedial proceedings.


Dated:  December 6, 2019                         Respectfully Submitted,

                                                 JOSEPH H. HUNT
                                                 Assistant Attorney General

                                                 G. ZACHARY TERWILLIGER
                                                 United States Attorney

                                                 JAMES M. BURNHAM
                                                 Deputy Assistant Attorney General

                                                 ALEXANDER K. HAAS
                                                 Director, Federal Programs Branch

                                                 ANTHONY J. COPPOLINO
                                                 Deputy Director, Federal Programs Branch


                                                 */s/ R. Trent McCotter*
                                                 R. TRENT MCCOTTER
                                                 Assistant United States Attorney
                                                 Office of the United States Attorney
                                                 2100 Jamieson Avenue
                                                 Alexandria, Virginia 22314
                                                 Tel:      (703) 299-3845
                                                 Fax:      (703) 299-3983
                                                 Email:   trent.mccotter@usdoj.gov


                                                 */s/ Daniel Schwei*
                                                 DANIEL SCHWEI
                                                 Senior Trial Counsel
                                                 ANTONIA KONKOLY
                                                 Trial Attorney
                                                 United States Department of Justice

Civil Division, Federal Programs Branch
1100 L St. NW, Room 12024
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:    (202) 616-8470
Email:  daniel.s.schwei@usdoj.gov

*Counsel for the United States*