IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EDWARD SNOWDEN, ) <br> ) <br> Defendant, ) <br> and ) <br> ) <br> MACMILLAN PUBLISHING GROUP, LLC d/b/a ) <br> HENRY HOLT AND COMPANY, et al., ) <br> ) <br> Relief-Defendants. ) | Civil Action No. 1:19-cv-1197 <br> Hon. Liam O'Grady |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the Plaintiff United States of America's Motion for Partial Summary Judgment, as to liability, against Defendant Edward Snowden. Dkt. 21. The motion has been fully briefed, and the Court dispensed with oral argument because it would not aid in the decisional process.

### I. Background

The United States of America ("the Government") has sued Defendant Edward Snowden ("Snowden"), alleging breach of contract and fiduciary duties. Count 1 alleges that by publishing his book *Permanent Record* Snowden breached several contracts with and fiduciary duties to the United States. Count 2 alleges that Snowden breached contracts with and fiduciary duties to the United States when he made certain public speeches or remarks which included visual displays. The Government has also named defendants Macmillan Publishing Group, LLC d/b/a Henry Holt and Company, Verlagsgruppe Georg von Holtzbrinck GmbH a/k/a Holtzbrinck

1

Publishing Group, and HIM Holtzbrinck 37 GmbH as parties necessary to accord relief in this action, but has not asserted independent claims against them.

Snowden was previously employed by, and worked as a contractor for, the Central Intelligence Agency ("CIA"). As a condition of employment with the CIA, Snowden entered into "Secrecy Agreements" with the CIA. He was also a contractor for the National Security Agency ("NSA"), and as a condition of his employment there, entered into "Secrecy Agreements" with the NSA.

Snowden entered into three Secrecy Agreements with the CIA, on November 22, 2005, August 28, 2006, and April 16, 2009, respectively, and each was executed by him within the Eastern District of Virginia. The CIA Secrecy Agreements contain materially identical terms, set forth in relevant part below.

The terms of the CIA Secrecy Agreements required Snowden to acknowledge and accept a special relationship of trust. Am. Compl. Ex. A ¶ 2.[1] They also require Snowden to submit certain materials for prepublication review, and to obtain written disclosure authorization, before publicly disclosing the materials. *Id.* ¶ 5.[2] Specifically, Snowden is required to obtain

---

[1] Paragraph 2 of the CIA Secrecy Agreements provide:
    I accept that by being granted access to such information or material I will be placed in a position of special confidence and trust and will become obligated to protect the information and/or material from unauthorized disclosure.

[2] Paragraph 5 of the CIA Secrecy Agreements provide:
    I hereby agree to submit for review by the Central Intelligence Agency any writing or other preparation in any form, including a work of fiction, which contains any mention of intelligence data or activities, or contains any other information or material that might be based on either of the categories set forth in paragraph 3, that I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment or other service with the Central Intelligence Agency or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to the categories set forth in paragraph 3. I further agree that I will not take any steps towards public disclosure until I have received written permission to do so from the Central Intelligence Agency.

2

prepublication review of any preparation, in any form, containing any mention of intelligence data or activities, or any other information or material which is or might be based on information which is marked classified, known to be classified, or known to be in the classification determination process. *See id.* ¶¶ 3, 5. The terms of the CIA Secrecy Agreements further provide that Snowden forfeits any proceeds from disclosures that breach the Agreements. *Id.* ¶ 12.[3] These terms continue to apply to Snowden. *Id.* ¶ 13.[4]

Snowden also signed three materially identical NSA Secrecy Agreements on July 7, 2005, May 6, 2009, and March 27, 2013, respectively. The NSA Secrecy Agreements, like those of the CIA, required Snowden to acknowledge his position of special trust and confidence. Am. Compl. Ex. C pmbl.[5] The NSA Secrecy Agreements also require Snowden to submit certain

---

Paragraph 3 of the CIA Secrecy Agreements provide:
> In consideration of being employed or otherwise retained to provide services to the Central Intelligence Agency, I hereby agree that I will never disclose in any form or manner, to any person not authorized by the Central Intelligence Agency to receive it, any information or material in either of the following categories:
>> a. information or material received or obtained in the course of my employment or other service with the Central Intelligence Agency that is marked as classified or that I know is classified.
>> b. information or material received or obtained in the course of my employment or other service with the Central Intelligence Agency that I know is in the process of a classification determination.

[3] Paragraph 12 of the CIA Secrecy Agreements provide:
> In addition to any other remedy to which the United States Government may become entitled, I hereby assign to the United States Government all rights, title, and interest in any and all royalties, renumerations and emoluments that have resulted or will result or may result from any divulgence, publication or revelation of information or material by me that is carried out in breach of paragraph 5 of this agreement or that involves information or material prohibited from disclosure by the terms of this agreement.

[4] Paragraph 13 of the CIA Secrecy Agreements provide:
> I understand and accept that, unless I am provided a written release from this agreement or any portion of it by the Director, Central Intelligence or the Director's representative, all the conditions and obligations accepted by me in this agreement apply both during my employment or other service with the Central Intelligence Agency, and at all times thereafter.

[5] The preamble of the NSA Secrecy Agreements provide:

3

materials for prepublication security review before publicly disclosing them, and not to disclose that information before receiving written authorization to do so. *Id.* ¶ 9.[6] The NSA Secrecy Agreements specifically require prepublication review of all information or materials, including fictitious works, which contain or purport to contain, or refer to or are based upon classified information or information in the process of a classification determination which was obtained as

---

        I understand that access to Protected Information under a U.S. Government agency contract is subject to statutory requirements and penalties and involves a special trust and confidence regarding the national security. Intending to be legally bound, I hereby accept the obligations set forth in this Agreement in consideration of my being granted such access.

[6] Paragraph 9 of the NSA Secrecy Agreements provide:
        I agree that I will submit for security review in accordance with NSA/CSS Policy 1-30 "Review of NSA/CSS Information for Public Dissemination" all information or materials, including works of fiction, that I have prepared for public disclosure which contain or purport to contain, refer to, or are based upon protected information, as defined in paragraph 1 of this Agreement. I understand that the term "public disclosure" includes any disclosure of protected information to one or more persons not authorized to have access to it. In addition, I agree:
            (a) to submit such information and materials for prepublication review during the course of my access to protected information under a contract with the NSA and thereafter;
            (b) to make any required submissions prior to discussing the information or materials with, or showing them to anyone who is not authorized to have access to them;
            (c) not to disclose such information or materials to any person who is not authorized to have access to them until I have received written authorization from the NSA that such disclosure is permitted; and
            (d) to assign to the United States Government all rights, title and interest and all royalties, remuneration, or emoluments of whatever form that have resulted, will result, or may result from any disclosure, publication, or revelation of protected information not consistent with the terms of this agreement.

Paragraph 1 of the NSA Secrecy Agreements define "Protected Information" as:
        Information obtained as a result of [a] relationship with NSA which is classified or in the process of a classification determination . . . . It includes, but is not limited to, intelligence and intelligence-related information, sensitive compartmented information (information concerning or derived from intelligence sources and methods), and cryptologic information (information concerning communications security and signals intelligence, including information which is also sensitive compartmented information) . . . .

a result of a relationship with the NSA. *Id.* ¶¶ 1, 9. Moreover, like the CIA Secrecy Agreements, the NSA Secrecy Agreements provide that the United States is entitled to all proceeds from publications which breach the contract. *Id.* ¶ 9(d). These NSA Secrecy Agreements continue to apply to Snowden. *Id.* ¶ 9(a) (contractual term applies during the course of "a contract with the NSA and thereafter"), ¶ (6) (contractual term allowing distribution of information is based on necessity but is not limited by time).

While subject to these Secrecy Agreements, Snowden wrote a book entitled *Permanent Record*. The book purports to discuss intelligence-related activities at, of, and relating to both the CIA and NSA. The book further purports to describe classified information. Snowden shared manuscripts of the book, then published it and made it publicly available in September of 2019. He did not submit *Permanent Record* for prepublication review to either the CIA or NSA prior to these disclosures, and it was not approved for disclosure prior to publication.

Additionally, and while subject to the Secrecy Agreements, Snowden has made public remarks at various events including a "TED" conference, an internet security trade fair ("it-sa"), the College of William & Mary, and Dalhousie University. During each of these events, Snowden caused to be displayed and discussed, among other things, at least one slide which was marked classified at the Top Secret level, and other intelligence-related activities of the CIA and NSA. He never submitted any materials or slides to the CIA or NSA for prepublication review, and never received written authority to make his public remarks or publish his slides.

The Government seeks to recover proceeds resulting from unauthorized disclosures made in breach of the Secrecy Agreements. Snowden raises three affirmative defenses. First, he asserts that the United States anticipatorily breached the Secrecy Agreements by indicating it would refuse to review Snowden's materials in good faith and within a reasonable time. Second,

he asserts that this lawsuit is based upon animus towards his viewpoint and that the government is engaged in selectively enforcing the Secrecy Agreements. Third, and finally, he argues that the Secrecy Agreements do not provide a basis for the government's claim.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). When ruling on a motion for summary judgment, the nonmovant's evidence is to be believed and all justifiable inferences should be drawn in the nonmovant's favor. *See id.* (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam)). The function of the Court is not to determine the truth of a matter or weigh credibility, but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *JKC Holding Co. LLC v. Washington Sport Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. Discussion

### A. Snowden Is Not Entitled to Discovery

Where a nonmovant shows that, for specified reasons, he cannot present facts which are essential to his opposition, courts may defer or deny summary judgment and allow discovery. Fed. R. Civ. P. 56(d). "Rule 56(d) mandates that summary judgment be denied when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition.'" *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (footnote omitted) (quoting

*Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)). Yet, "when the

information sought would not by itself create a genuine issue of material fact sufficient for the

nonmovant to survive summary judgment," courts will deny a motion for discovery brought

under Rule 56(d). *Id.*

Snowden requests in his opposition to summary judgment that this Court deny the

Government's motion and instead order discovery for two reasons. First, he argues that if the

Court determines the Secrecy Agreements are ambiguous, then he will require discovery

regarding course of performance, course of dealing, and common trade practice, to ascertain the

meaning of the Secrecy Agreements. Second, he argues that discovery will show the Secrecy

Agreements are unenforceable against him based on his affirmative defenses of selective

enforcement and anticipatory breach.

Snowden's first argument, that he requires discovery into the Secrecy Agreements'

course of performance, dealing, and common trade practices, fails because the contractual

language of the Secrecy Agreements is unambiguous. "The issue whether a contract provision is

ambiguous presents a question of law, not of fact." *Video Zone, Inc. v. KF & F Properties, L.C.*,

267 Va. 621, 625 (2004).[7] Under the "plain meaning" rule, when an agreement "is plain and

unambiguous in its terms, the court is not at liberty to search for its meaning beyond the

instrument itself." *Lerner v. Gudelsky Co.*, 230 Va. 124, 132 (1985). Thus, a "court may not,

---

[7] "In Virginia . . . the validity, interpretation, or construction of a contract is governed by the substantive law of the *lex loci contractus*—the place of contracting. The place of contracting is determined by the place where the final act necessary to make the contract binding occurs." *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000) (internal citations omitted). The CIA Secrecy Agreements identified above were executed in Virginia. Am. Compl. ¶ 18, Answer ¶ 18. Accordingly, the substantive law of Virginia governs the validity, interpretation, or construction of the CIA Secrecy Agreements. The pleadings do not indicate the *lex loci contractus* of the NSA Secrecy Agreements, but the Court does not believe a conflict of laws exists.

where the contractual language is clear, invite or accept the submission of extrinsic evidence, 'find' ambiguity in the contractual text based upon that evidence, and resolve the found ambiguity by resort to that extrinsic evidence." *Schneider v. Cont'l Cas. Co.*, 989 F.2d 728, 731 (4th Cir. 1993).[8]

As Snowden concedes, extrinsic evidence of course of performance, course of dealing, or common trade practice, is irrelevant when a court finds the contract to be unambiguous. *See* Def.'s Br. In Opp'n to Pl.'s Mot. For Part.'l Summ. J. 16. The contracts at issue here are unambiguous and clear. The relevant paragraphs, recounted herein, prohibit contract signatories from disseminating certain information and materials. Snowden attempts to impute ambiguity into the terms "prepared," "information or material," and "disclosure," as they are used in the contract, but to no avail. First, it is Snowden, not the contracts, who suggests that "prepared" materials "must have been planned in advance, and personally prepared by the employee." *Id.* at 17. The contracts do not so limit the term "prepared." Second, contrary to Snowden's contention, the category of "information or material" subject to prepublication review does not explicitly exclude matters learned outside a former employee's job. The contracts are clear that even tangentially related information or material—indeed, even fictional works—are subject to prepublication review. *See* Am. Compl. Ex. A ¶ 5 (the CIA Secrecy Agreements require prepublication review of "any writing or other preparation in any form . . . which contains any mention of intelligence data or activities,"); Am. Compl. Ex. C ¶ 9 (the NSA Secrecy Agreements require prepublication review of "all information or materials" which even "purport

---

[8] Snowden has failed to identify binding authority which supports his argument that federal contract law governs here. In any case, when interpreting contracts subject to the Contract Disputes Act, "extrinsic evidence . . . may not be considered unless an ambiguity is identified in the contract language." *City of Tacoma, Dep't of Pub. Utilities v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994). Thus, no conflict exists.

to contain, refer to, or are based upon" protected information). Finally, Snowden attempts to redefine "disclosure" to mean something akin to "first disclosure." Yet a disclosure can occur after another disclosure has occurred.

The plain meaning of the contracts set forth above require prepublication review of a signatory's public disclosures which refer to, mention, or are based upon, classified information or intelligence activities or materials. The contractual language here is clear, and this Court is therefore legally barred from accepting extrinsic evidence of course of performance, course of dealing, and common trade practices. Accordingly, extrinsic evidence cannot generate an issue of material fact.

Where a motion under Rule 56(d) seeks "information [that] would not by itself create a genuine issue of material fact," courts may deny the motion. *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 250 (4th Cir. 2018). Because the discovery sought will not create a genuine issue of material fact, Snowden is not entitled to discovery as to the meaning of the terms in the Secrecy Agreements.

Snowden's second argument for discovery is based on two affirmative defenses, but this argument also fails. Through secrecy agreements like those at issue here, the executive branch seeks "to ensure *in advance*, and by proper procedures, that information detrimental to national interest is not published." *Snepp v. United States*, 444 U.S. 507, 513 n.8 (1980) (emphasis in original). This is because, "[w]hen a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA—with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful." *Id.* at 512. Thus, the contracts specify a procedure with both timing and substance requirements, and the results of the specified procedure are subject to judicial review.

*See United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972); *see also, e.g., United States v. Snepp*, 897 F.2d 138, 143 (4th Cir. 1990) (explaining the prepublication review process: "If the Agency denies approval, [the employee] may not publish the manuscript. If [the employee] wishes to publish a manuscript in spite of the Agency's denial of approval without violating his secrecy agreement, then he must institute an action for judicial review of the Agency decision.").

Snowden signed these contracts and agreed in advance to the judicially-reviewable prepublication review procedure. Yet his failure to participate in the prepublication review process eliminated the judiciary's ability to review any hypothetical denials which may have resulted if he had made any submissions. *See Snepp*, 897 F.2d at 143 (interpreting *Snepp*, 444 U.S. 513 n.8 to require that "[t]he only substitute for CIA [prepublication] clearance would be a judicial declaration that clearance had been improperly withheld."). Under the mechanisms for reviewing denials of prepublication authorization, "the burden of obtaining judicial review," falls upon signatories to secrecy agreements. *Marchetti*, 466 F.2d at 1317. Considering the merits of these defenses here, after Snowden declined to engage in the procedure outlined in the contract and approved by binding precedent, would improperly shift the signatory's burden onto the agencies. Accordingly, Snowden ceded judicial review of hypothetical prepublication decisions by failing to seek prepublication review, and thereby effectively waived the affirmative defenses which he now seeks to assert.

### B. There Is No Genuine Dispute Regarding Defendant's Breach of the Contracts

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004). Snowden does not dispute that the first and third elements are met. A legally

enforceable obligation exists where there has been an offer, an acceptance, and consideration. *See Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346 (1980). Here, the Secrecy Agreements are legally enforceable obligations because Snowden accepted employment and benefits conditioned upon prepublication review obligations, in consideration of access to classified materials. Courts have upheld similar agreements between the United States and employees or contractors given access to classified information which require prepublication review as valid and enforceable. *See Snepp*, 444 U.S. at 511 ("failure to submit to prepublication review was a breach of his trust,"); *see also Marchetti*, 466 F.2d at 1317 (a Secrecy Agreement signatory "may not disclose classified information obtained by him during the course of his employment which is not already in the public domain."). Also, disclosures in breach of Secrecy Agreements pertaining to national security cause injury to the United States. *See Snepp*, 444 U.S. at 512; *Marchetti*, 466 F.2d at 1316-17; *see also Fitzgibbon v. C.I.A.*, 911 F.2d 755, 766 (D.C. Cir. 1990) (noting that courts have "recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations.").

Snowden's arguments go to the second element, breach of his obligations. The terms of these Secrecy Agreements are clear, and provide that he is in breach of his contracts and the fiduciary duties identified therein if his public disclosures include the type of information and materials the contracts required to be submitted for prepublication review. Specifically, the CIA Secrecy Agreements require prepublication review of "any writing . . . which contains any mention of intelligence data or activities, or contains any other information or material that might be based on" certain information, which was "received or obtained in the course of [CIA] employment . . . that is marked as classified or [known to be classified or known to be in the

process of classification determination]." Am Compl. Ex. A ¶¶ 3, 5. Similarly, the NSA Secrecy Agreements require prepublication review of "all information or materials . . . prepared for public disclosure which contain or purport to contain, refer to, or are based upon protected information," which is "[i]nformation obtained as a result of [a] relationship with NSA which is classified or in the process of a classification determination," including but "not limited to, intelligence and intelligence-related information." Am. Compl. Ex. C ¶¶ 1, 9. Because there is no genuine dispute of material fact that Snowden publicly disclosed the type of information and materials described above in *Permanent Record* and his speeches, the Government is entitled to summary judgment on both Counts.

*Count 1*

Count 1 pertains to the publication of Snowden's book, *Permanent Record*. It is undisputed that Snowden authored *Permanent Record*, and that *Permanent Record* was published. The Government is entitled to summary judgment as to liability on Count 1 because *Permanent Record* contains information and materials which Snowden was required to submit for prepublication review.

*Permanent Record* contains information which both the CIA and NSA Secrecy Agreements obligated Snowden to submit for prepublication review. As a book, *Permanent Record* is a writing and prepared material containing information. It purports to discuss, describe, and refer to, *inter alia*, secret government programs, clandestine CIA and NSA information, CIA intelligence activities, and classified NSA materials. The references to secret government programs and to CIA activities mention intelligence activities. The descriptions of clandestine intelligence agency information contain, or may be based on, classified information obtained in the course of Snowden's employment with those agencies. References to classified

NSA materials constitute information which may be, or may be based upon, classified information or material obtained in the course of Snowden's employment. Accordingly, Snowden's publication of *Permanent Record* without prior submission for prepublication review breached the CIA and NSA Secrecy agreements and the attendant fiduciary duties set forth in those agreements. Because both the CIA and NSA Secrecy Agreements prohibit unauthorized publication of certain information, and *Permanent Record* discusses those types of information, the Government is entitled to summary judgment as to liability on Count 1.

### *Count 2*

Count 2 pertains to Snowden's statements and visual aids. There is no dispute that Snowden made the speeches and referred to the accompanying visual aids, and there is no dispute that they were made to the public. The Government is entitled to summary judgment as to liability on the breach of contract claim in Count 2 because the comments and displays contain information and materials Snowden was required to submit for prepublication review.

First, Snowden admits to having displayed at least one slide which is marked and purports on its face to be classified at each of the four speeches identified by the government. Answer ¶¶ 101-04. Snowden argues that his display of purportedly classified slides cannot support summary judgment first, when such slides are publicly available, and second, when they were not personally created by him. Both arguments fail. The first argument fails because, as Snowden now concedes, mere public availability does not place information or materials in the public domain—instead, "classified information obtained by the CIA or [NSA] . . . [is] not in the public domain unless there [has] been official disclosure of it." *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975). Thus, his public disclosure can support summary judgment even if the disclosed material is publicly available. Moreover, although Snowden did not create

13

the slide in the first instance, he prepared it for public disclosure—along with the other videos, articles, and slides which he uses to illustrate his speeches—when he identified it, made it available, and ultimately presented it to the public at his speeches.

The slide used in conjunction with each of Snowden's speeches is marked as classified. On its face it purports to contain or refer to, and may be based on, classified information. Furthermore, Snowden admits that the speeches themselves purport to discuss intelligence-related activities of the CIA and NSA and purport to contain or refer to classified information or information which is in the process of a classification determination.[9] Accordingly, Snowden's public comments and displays, which occurred without prepublication review, breached the CIA and NSA Secrecy Agreements and their attendant fiduciary duties. Because both the CIA and NSA Secrecy Agreements prohibit unauthorized publication of certain information, and Snowden's speeches and visual aids disclose those types of information, the Government is entitled to summary judgment as to liability on Count 2.

### IV. Conclusion

For the reasons stated above, the Government's motion is hereby **GRANTED**.

It is **SO ORDERED**.

December 17, 2019
Alexandria, Virginia

Liam O'Grady
United States District Judge

---

[9] *Compare* Am. Compl. ¶ 100 (stating in the first sentence that "Many of Snowden's speeches discuss intelligence-related activities at the CIA and NSA, and/or contain, purport to contain, refer to, or are based on information that is classified or in the process of a classification determination.") *with* Answer ¶ 100 ("Defendant admits the first sentence of paragraph 100 as to his public remarks."); *see also* Answer ¶¶ 101-05 (admitting to discussing slides marked classified and other intelligence-related activities of the CIA and NSA).